UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| TAMMY PASSA, ALIAS,<br>WALTER CASTLE, JR., ALIAS<br>and CHERYL HARRIS-ROSSI, NEXT-OF-KIN of Decedent, JOSEPH E. ROSSI<br><br>VS.<br><br>JEFFREY DERDERIAN et al., | ) | C.A. NO. 03-148-L |

**OBJECTION OF DEFENDANTS GENERAL FOAM CORPORATION, FOAMEX, L.P. AND UNNAMED DEFENDANTS TO MOTIONS TO DISMISS AND/OR REMAND**

**INTRODUCTION**

Defendants General Foam Corporation and Foamex L.P., joined by a number of national manufacturers who manufacture or provide certain products or services and who are not yet, but may be named in litigation arising from the fire at The Station nightclub (the "unnamed defendants"), object to motions to dismiss and/or remand the Station Fire litigation. A memorandum of law in support of jurisdiction and in opposition to motions to dismiss and/or remand is filed herewith.

Defendants
GENERAL FOAM CORPORATION,
FOAMEX, L.P. and
unnamed defendants

HIGGINS, CAVANAGH & COONEY

Gerald C. DeMaria #0637
James A. Ruggieri #2828
123 Dyer Street
Providence, RI 02903
(401) 272-3500 (Tel.)
(401) 273-8780 (Fax)

Of Counsel:
(Pro Hac Vice Motions Pending)

Carl A. Henlein, Esq.
John R. Crockett, III, Esq.
Susan S. Wettle, Esq.
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202-3363
(502) 589-5400 (Tel.)
(502) 581-1087 (Fax)

**CERTIFICATION**

I hereby certify that on the 22nd day of September, 2003, a true copy of the within was hand delivered to:

Thomas C. Angelone, Esq.
HODOSH, SPINELLA & ANGELONE
One Turks Head Place, Suite 1050
Providence, RI 02903

James R. Lee, Esq.
RHODE ISLAND DEPARTMENT
OF THE ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

Anthony F. DeMarco, Esq.
REYNOLDS, DeMARCO & BOLAND, LTD.
170 Westminster Street, Suite 200
Providence, RI 02903

Fred A. Kelly, Esq.
Randall L. Souza, Esq.
NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903

Ronald J. Resmini, Esq.
155 South Main Street
Providence, RI 02903

William P. Robinson, III, Esq.
EDWARDS & ANGELL LLP
2800 Financial Plaza
Providence, RI 02903

Howard A. Merten, Esq.
Eric M. Sommers, Esq.
VETTER & WHITE
20 Washington Place
Providence, RI 02903

James T. Murphy, Esq.
HANSON CURRAN LLP
146 Westminster Street
Providence, RI 02903
Faith A. LaSalle, Esq.
ZIZIK, LaSALLE & POWERS, P.C.
40 Westminster Street, Suite 201
Providence, RI 02903

Joseph V. Cavanagh, Jr., Esq.
Kristin E. Rodgers, Esq.
BLISH & CAVANAGH, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

**and mailed to:**

Marc DeSisto, Esq.
DeSISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906

Christopher C. Fallon, Jr., Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103-3508

Scott J. Tucker, Esq.
TUCKER HEIFETZ & SALTZMAN LLP
Three School Street
Boston, MA 02108

Andrew J. Trevelise, Esq.
REED SMITH LLP
2500 One Liberty Place
Philadelphia, PA 19103-7301

W. Thomas McGough, Jr., Esq.
James J. Restivo, Jr., Esq.
REED SMITH LLP
345 Sixth Avenue
Pittsburgh, PA 15219

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| TAMMY PASSA, ALIAS,<br>WALTER CASTLE, JR., ALIAS<br>and CHERYL HARRIS-ROSSI, NEXT-OF-KIN of Decedent, JOSEPH E. ROSSI | ) | C.A. NO. 03-148-L |
| VS. | ) | |
| JEFFREY DERDERIAN et al., | ) | |

**MEMORANDUM OF DEFENDANTS GENERAL FOAM CORPORATION, FOAMEX, L.P. AND UNNAMED DEFENDANTS IN SUPPORT OF JURISDICTION AND IN OPPOSITION TO MOTIONS TO DISMISS AND/OR REMAND**

## INTRODUCTION

This action arises from the February 20, 2003, fire at The Station nightclub in West Warwick, Rhode Island. The fire resulted in 100 deaths and many more injured persons, with victims from at least eight states. The fire was ignited by pyrotechnics set off by Great White, the rock band headlining the evening's show at the nightclub – all of whose members are non-residents of Rhode Island.

This case and others arising out of the fire were filed in, or removed to, the United States District Court for the District of Rhode Island pursuant to the Multiparty, Multiforum Trial Jurisdiction Act of 2002 ("MMTJA" or "the Act"), Public Law 107-273, § 11020, 116 Stat. 1828 (2002), codified at 28 U.S.C. §§ 1369, 1441(e), 1697, 1785 and 1391(g). The Court has now called on all interested parties in these cases to address the Court's jurisdiction pursuant to the MMTJA in accordance with an established schedule for briefing and oral argument.

Defendants General Foam Corporation ("GFC") and Foamex L.P. ("Foamex") are

a Delaware corporation and a Delaware limited partnership, respectively; neither have a principle place of business in Rhode Island. GFC and Foamex are joined by a number of national manufacturers who manufacture or provide certain products or services and who are not yet, but may be named in litigation arising from the fire (the "unnamed defendants").[1] Together, they respectfully submit this Memorandum of Law in support of this Court's exercise of original and removal jurisdiction and in opposition to the motions to dismiss or remand filed by Defendant American Foam Corporation, Defendants Jeffrey Derderian, Michael Derderian and Derco, and Plaintiffs' Steering Committee. Plaintiffs in this case allege that GFC, a manufacturer of bulk foam, manufactured the packing foam that was applied to the walls and ceilings of the nightclub's stage area. Foamex is alleged to be GFC's successor-in-interest.

This Court must exercise jurisdiction over The Station fire cases now before it because these cases meet the jurisdictional prerequisites of 28 U.S.C. § 1369(a); abstention is not required under 28 U.S.C. § 1369(b); and removal was properly effected under 28 U.S.C. § 1441(e). The exercise of jurisdiction is necessary to protect product defendants, such as the named and unnamed defendants filing this Memorandum, from the prejudice that will otherwise result if this litigation is permitted to follow the historical path of mass disaster cases preceding it – prejudice which the MMTJA was specifically designed to eliminate.

---

[1] By agreement of the parties, and with the approval of Judge Gibney in the Rhode Island Superior Court (Providence), these unnamed but threatened defendants have been represented by counsel, have participated in all court proceedings before Judge Gibney and, pursuant to Judge Gibney's Orders, presently are bearing half the expenses associated with the warehouse where evidence from the fire scene is collected and maintained. Experts retained by the unnamed defendants have participated in the investigation of The Station nightclub fire scene since its inception.

## ARGUMENT

### I. The MMTJA governs these actions: all jurisdictional prerequisites are met; abstention is not required; and removal was properly effected.

The purpose, provisions and the legislative history of the MMTJA is comprehensively and effectively addressed in *Defendant Anheuser-Busch, Inc.'s Memorandum of Law in Support of Removal and In Opposition to Motions to Remand of American Foam Corporation and Derderian Defendants*, previously filed on June 30, 2003, in *Kingsley v. Derderian, et al.*, Civil Action No. 03-208-L.; *Plaintiff Ronald Kingsley's Motion in Opposition to Defendant American Foam Corporation's Motion to Dismiss and Remand Case to State Court*, previously filed on July 2, 2003, in the *Kingsley* action; and *Defendant Triton Realty Limited Partnership's Memorandum in Support of Objection to Motions to Abstain and/or Dismis*s, previously filed on August 26, 2003, in this action.

These Memoranda also fully and competently address the arguments that the MMTJA's jurisdictional prerequisites have been met, that abstention by the Court is not required, and that removal of these actions was properly effected. In recognition of the Court's request that memoranda not be duplicative, GFC, Foamex and the unnamed defendants join in, adopt and incorporate by reference those arguments supporting jurisdiction as if fully set forth herein. Instead, GFC, Foamex and the unnamed defendants direct their Memorandum of Law to the specific arguments that (1) The Station fire is precisely the type of single catastrophic event that the MMTJA was intended to address, and (2) abstention is not required because the "primary defendants" are the currently named defendants and the potentially hundreds of product defendants that will be brought into the litigation over the fire, and there is substantial diversity among those parties.

## II. The Court must exercise jurisdiction vested by the MMTJA to effectively manage The Station fire litigation.

As noted, the Memoranda of Law previously filed have discussed in great detail the MMTJA's legislative history as it relates to the purpose and scope of the Act – namely to provide for consolidation of multidistrict litigation generated by a single catastrophic event in order to protect parties from the extreme costs and prejudice from "litigating the same liability question several times over in separate lawsuits." *See* H.R. Conf. Rep. No. 107-685, 107th Cong., 2d Sess. 200, *reprinted in* 2002 U.S.C.C.A.N 1120, 1152. The Conference Report accompanying the MMTJA acknowledged that:

> It is common after a serious accident to have many lawsuits filed in several states, in both state and federal courts, with many different sets of plaintiffs' lawyers and several different defendants. ... Different expert consultants and witnesses may be retained by the different plaintiffs' lawyers handling each case. The court in each lawsuit can issue its own subpoenas for records and for depositions of witnesses, potentially conflicting with the discovery scheduled in other lawsuits. Critical witnesses may be deposed for one suit and then redeposed by a different set of lawyers in a separate lawsuit. Identical questions of evidence and other points of law can arise in each of the separate suits, meaning that the parties in each case may have to brief and argue – and each court may have to resolve – the same issues that are being briefed, argued, and resolved in other cases, sometimes with results that conflict.

*Id.* The litigation being generated by The Station fire presents the prime example of the problems and prejudice the MMTJA attempts to redress and thus demonstrates why this Court should exercise jurisdiction vested by the Act.

**A. The MMTJA was enacted to address multidistrict litigation arising out of a single mass disaster such as The Station fire.**

There can be no dispute that the fire that swept through The Station nightclub is precisely the type of single mass accident that the MMTJA was intended to encompass. As evidenced by the Memoranda filed by *all* parties on this issue of jurisdiction, the legislative history of the MMTJA repeatedly references airplane accidents and hotel fires as archetypes of mass disasters that spawn the large and disperse litigation to which the Act is directed. Even the House of Representatives' "Minority View" of the MMTJA, as reflected in the 106th Congress' House Report on the earlier version of the Act, clarified that the MMTJA was intended to cover single incident mass disasters, *as opposed to serial torts* involving repeated instances of the same injury.[2] The Station fire is identical in all relevant respects to single mass disasters expressly referenced by the MMTJA's drafters and, in particular, to hotel fires: a large number of people from various states killed or injured in a central location, where components, finishes and furnishings produced by hundreds of different companies are alleged to have substantially contributed to the death and injury toll. For example:

- A devastating fire occurred on December 31, 1986, at the Dupont Plaza Hotel in San Juan, Puerto Rico. The fire, set by three employees, swept through the lobby and casino areas and, as a result, 97 people died in less than 12 minutes. "The sprawling litigation that burst forth from the smoldering embers of the charred hotel encompassed wrongful

---

[2] In H.R. No. 106-276, 106th Cong. 2d. Sess. 21-22 , the "Minority View" section provided:

> It is our understanding that, in effect, [the Act] would only apply to a very narrowly defined category of cases, such as, plane, train, bus, boat accidents and environmental spills, many of which may already be brought in federal court. However, it would not apply to mass tort injuries that involve the same injury over and over again such as asbestos and breast implants.

death, personal injury, property damage, and other claims brought by more than 2,000 plaintiffs against more than 200 defendants." *In re Three Additional Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 93 F.3d 1, 2 (1st Cir. 1996). The litigation culminated in a thirteen-month trial in federal court in San Juan.

- On November 21, 1980, a fire broke out at the 21-story MGM Grand Hotel in Las Vegas, Nevada. The fire at the Strip hotel killed 87 people and injured hundreds of others. It also prompted 1,357 claims against 118 companies, generating four years of litigation in federal court in Las Vegas.
- After a fire in 1977 swept through the Beverly Hills Supper Club in Southgate, Kentucky, killing 165 people and injuring hundreds more, lawsuits named more than 1,100 defendants, including almost every insurance company in Kentucky, and argued that everything from faulty wiring to poor construction to unsafe furnishings led to the disaster.

Indisputably, the Station Fire will generate extensive litigation. To date, only a limited number of plaintiffs have filed suit. Nonetheless, the proceedings before Judge Gibney, as well as the Miscellaneous Petitions filed with respect to the investigation of the fire scene, demonstrate that there are hundreds more plaintiffs waiting in the wings.[3] The Plaintiffs' Steering Committee, formed for purposes of organizing the fire scene investigation for the Rhode Island Superior Court, claims in its Memorandum of Law in opposition to jurisdiction under the MMTJA that it is appearing on behalf of 182 persons who were injured or killed in the fire. A large number of potential plaintiffs, admittedly, are nonresidents of Rhode Island. *See* Memorandum of Law in Support of Defendants, Jeffrey Derderian, Michael Derderian, and DERCO d/b/a The Station's Motion to Remand, filed in the *Kingsley* action, at p. 11. (The Derderian Defendants determined

---

[3] *See, e.g.,* Transcript of Hearing before Judge Gibney on May 9, 2003, at p. 14, where Plaintiffs' Steering Committee attorney Max Wistow states: "We have not filed a suit, a classical suit for damages. Although we have from the beginning named nine representative plaintiffs and we have more – when I say, 'representative plaintiffs,' I mean in cases, and we have more than 50 cases." (Relevant portion attached as Exhibit 1.)

that, of the victims whose residency is known, 148 are/were from Rhode Island and 71 are/were from other states.)

Further, the defendants that have been named to date are only a fraction of those who ultimately will be drawn into the litigation. The preliminary lawsuits have focused on persons and entities most obviously affiliated with the premises and the fire itself – the club's owners, governmental entities and individuals who allegedly failed to identify hazards, the band Great White and its management, businesses that allegedly promoted the concert and facilitated the overcrowding on that fateful evening and, finally, those who are alleged to have had a connection to the packing foam applied by the nightclub's owners to the walls and ceilings of the stage area. GFC and Foamex fall into the last category.

In the absence of the MMTJA, litigation over The Station fire will play out as follows: hundreds of lawsuits will be filed, each naming the same or essentially the same hundreds of defendants, dispersed across assorted courts – state and federal – in Rhode Island and various states across the country. The plaintiffs' attorneys' own statements, and the history of similar litigation involving identical mass fire disasters, establish that this scenario is not mere conjecture, but is based in reality.

The mere fact that the Act is new and untested is not grounds for the Court to reject its significant jurisdictional grant over The Station fire mass disaster litigation. The MMTJA was enacted to redress the waste and severe prejudice to product manufacturers, such as GFC, Foamex and the unnamed product defendants, that follows having to defend numerous lawsuits, filed in various courts in several states, and involving the same liability questions. By providing jurisdiction

over such litigation, the MMTJA permits the disperse litigation arising from a single mass disaster to be efficiently consolidated and coordinated in one federal court. The Station Fire presents the first opportunity to utilize the MMTJA to more effectively handle multidistrict litigation, and the Act grants this Court jurisdiction over all of the actions arising out of the fire.

**B. Product manufacturers with "deep pockets" are "primary defendants" in mass disaster litigation of this type.**

In establishing jurisdiction under the MMTJA, this Court must make a finding as to who qualifies as "primary defendants" in the litigation. In the isolated circumstance where (1) all of the "primary defendants" are from the same state as a substantial majority of plaintiffs, and (2) the claims asserted will be primarily governed by the laws of that state, the Act provides an exception to federal jurisdiction. 28 U.S.C. 1369 (b).

The hundreds of product defendants sued in mass disaster cases are the most harshly prejudiced by dispersed and uncoordinated mass tort litigation, since plaintiffs focus their efforts on those defendants viewed as most likely to satisfy a judgment. These are the defendants who must deal with repeated depositions of their experts and witnesses in the various courts, respond to uncoordinated discovery and motion practice deadlines particular to each court, and contend with inconsistent evidentiary and legal rulings emanating from the various courts.

Despite the restraint shown in the preliminary litigation, since the days immediately after The Station fire, plaintiffs' attorneys have been open and forthright about their intent to sue a large number of product manufacturers with "deep pockets" for injuries related to the fire.[4], [5], [6]

---

[4] *See, e.g.,* The Associated Press State & Local Wire, "*As Fire Victims Grieve, Lawyers Plot Course for Compensation,*" March 1, 2003. Plaintiffs' attorney Mark Decof, involved earlier in the litigation, stated: "The most culpable people seem to be the owners of the bar and the band. But it would appear that there is wholly inadequate [insurance] coverage there. So you have to look elsewhere – starting with the products

> Our purposes are different because in this case the obvious defendants, the ones that we think probably will be the subject of criminal, possible criminal prosecution, really are not going to be able to respond in a practical way to the tremendous, tremendous damages that are going to be available in a civil case.
>
> So the plaintiffs' lawyers' principal responsibility is to try to see that their clients can be made whole as best that can be in this tragic situation. It's our obligation to explore possible defendants who the AG would not have within his sights for possible criminal prosecution.
>
> The experts that we've been with on the site have encouraged us to believe that there is real reason to spend a great deal of time, effort and money in exploring further the potential liability of the many people that have not yet been named as defendants in any of the two cases that are pending.
>
> We're particularly interested in removing and storing parts of the building, including parts of the structure. We're interested in wall coverings, insulation, parts of the floor, adhesives. And I don't mean to give an inclusive list, but that's the kind of thing that we're looking at.

*Statements of Plaintiffs' Steering Committee Chairman, Max Wistow, during March 28, 2003, Hearing before Judge Gibney*, Transcript pp. 1-2, *ll.* 22-25, 1-18. (Relevant portion attached as Exhibit 2.)

> And the entire thrust of what Messrs. Decof, Mandell and I were trying to do in our exercise was to isolate and determine which manufacturers should be sued

---

involved, the people who supplied them, the people who prepared them and maintained them."

[5] *See, e.g.,* The Boston Herald, "*Company That Bought Foam Maker Might Face Slew of Suits*," March 6, 2003. Plaintiffs' attorney Leonard Decof, involved earlier in the litigation, stated: "There'll be a lot of materials that will have to be looked at and inspected.... Some of these things might be manufactured by very large companies. They will have insurance and they will have assets."

[6] Attorney Stan Chesley (who also represented plaintiffs in the Beverly Hills Supper Club Fire Litigation, the MGM Grand Hotel Fire Litigation, and the San Juan Dupont Plaza Fire Litigation) stated that he expects any mass tort lawsuit arising from the Fire to be well in excess of $49 million [the insurance available to those directly associated with The Station nightclub], and that "the real money" would come from more than 1,000 defendants – from insurance companies to the makers of the soundproofing equipment to those who wired the club. The Boston Globe, "*Cincinnati Lawyer Sees Role in R.I. Fire Cases, Some in State Question Plan,*", February 28, 2003.

> because we believe, and I think with good reason, that the manufacturers will be the key to this case.

*Statements of Plaintiffs' Steering Committee Chairman, Max Wistow, during May 1, 2003 Hearing before Judge Gibney*, Transcript p. 37, *ll.* 1-5. (Relevant portion attached as Exhibit 3.)

> He should be applauding, in my humble opinion, the fact that there are lawyers out there trying to get as much information to nab as many defendants as possible.

*Statements of Plaintiffs' Steering Committee Chairman, Max Wistow, during May 9, 2003 Hearing before Judge Gibney*, Transcript pp. 8-9, *ll.* 25, 1-3. (Relevant portion attached as Exhibit 4.)

As mass disaster litigation repeatedly demonstrates, the "deep pocket" national product manufacturer defendants are truly the "primary defendants" referenced in the MMTJA. Without fail, they are the defendants to whom plaintiffs will look to satisfy any judgment.

The Class Action Fairness Act of 2002 (CAFA), discussed in Defendant Anheuser Busch, Inc.'s Memorandum of Law filed in *Kingsley*, is persuasive on this issue. The CAFA has not been enacted by Congress, but it was under consideration at the same time and by the same Congressional committee as the MMTJA, and reflects Congress' common scheme to expand federal jurisdiction where warranted by particular circumstances. The CAFA, like the MMTJA, would vest the federal district courts with original jurisdiction in class actions above a certain value, where minimum diversity exists – namely, where "any member of a class of plaintiffs is a citizen of a State different from any defendant." H.R. Rep. No. 107-370, 107th Cong., 2d Sess. 4. Again, with nearly identical language to that used in the MMTJA, the CAFA excluded from the federal courts' jurisdiction, actions that are local in nature – *i.e.* where:

> (i) the substantial majority of the members of the proposed plaintiff class and the primary defendants are citizens of the State in which the action was originally filed; and

(ii) the claims asserted therein will be governed primarily by the laws of the State in which the action was originally filed.

*Id* at 5. The Report expressly stated that these exceptions were to be construed narrowly and that parties opposing federal jurisdiction would bear the burden of demonstrating applicability of an exception to jurisdiction. Specifically, the Report provides:

> It is the Committee's intention with regard to each of these exceptions that the party opposing Federal jurisdiction shall have the burden of demonstrating the applicability of an exemption.

Id. at 31. The House Report on CAFA further explained:

> For the purposes of the [federal jurisdiction] carve out, the only parties that should be considered 'primary defendants' are *those who are the real 'targets' of the suit; that is, the parties that would be expected to incur most of the loss if liability is found.* For example, an executive of a corporate defendant who, in the interest of completeness, is named as a co-defendant in a class action against his employer normally should not be deemed a 'primary defendant.' In most instances, the executive would not be the real 'target' of the purported class action; his employer company would be.

*Id.* at 30 (emphasis added).[7] The CAFA's definition of "primary defendant," a term used in a context identical to that of the MMTJA, establishes that all of the product manufacturers, named and

[7] Similarly, for purposes of evaluating what is meant by a "substantial majority of plaintiffs," H.R. No. 107-370 provides:

> A purported class action should be deemed a case that falls outside Federal jurisdiction only if *virtually all members* of all proposed classes are residents of a single State of which all `primary defendants' are also citizens. For example, a case in which a proposed class of 1000 persons sues a North Carolina citizen corporation presumably would fit this exception if 997 of those persons were North Carolina citizens.

*Id.* at 30. (Emphasis added.) Based on the numbers represented by the Derderian Defendants in their *Kingsley* memorandum, *infra*, there would not be a "substantial majority" of plaintiffs from Rhode Island under this definition of the language – only 67.6% contrasted with the 99.7% ("virtually all") required by the CAFA.

unnamed, as well as the other defendants named in the cases to date, are "primary defendants" within the meaning of the Act.

Both GFC and Foamex are foreign defendants – GFC is a Delaware corporation and Foamex is a Delaware limited partnership; neither have a principle place of business in Rhode Island. Moreover, Rhode Island is a very small state – it is obviously apparent that most, if not all, of the "deep pocket" national product defendants ultimately named in The Station fire litigation will be from states other than Rhode Island. Thus, neither the "primary defendants" nor the "substantial majority of the plaintiffs" are residents of the same state, and abstention is not required.

## CONCLUSION

The MMTJA is new and untested. That, however, is not a valid reason for the Court to avoid exercising the jurisdiction vested by the Act. Rather, the Court must ensure that litigation over The Station fire is efficiently and fairly handled. The MMTJA was enacted to provide federal district courts with the means to envelop and manage disperse litigation arising from a single catastrophic event such as this fire. It was intended to avoid the wasteful and prejudicial situations previously experienced in litigation over mass accidents.

The MMTJA's jurisdictional prerequisites are met; abstention is not required; and removal was properly effected. For these reasons, set forth in this Memorandum and other memoranda filed by parties supporting the exercise of jurisdiction under the MMTJA, the Court should deny the motions to dismiss and remand and exercise its subject matter jurisdiction over what undoubtedly will evolve into vast litigation over The Station fire.

Defendants
GENERAL FOAM CORPORATION,
FOAMEX, L.P. and
unnamed defendants

HIGGINS, CAVANAGH & COONEY

Gerald C. DeMaria #0637
James A. Ruggieri #2828
123 Dyer Street
Providence, RI 02903
(401) 272-3500 (Tel.)
(401) 273-8780 (Fax)

Of Counsel:
(Pro Hac Vice Motions Pending)

Carl A. Henlein, Esq.
John R. Crockett, III, Esq.
Susan S. Wettle, Esq.
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202-3363
(502) 589-5400 (Tel.)
(502) 581-1087 (Fax)

**CERTIFICATION**

I hereby certify that on the 22nd day of September, 2003, a true copy of the within was hand delivered to:

Thomas C. Angelone, Esq.
HODOSH, SPINELLA & ANGELONE
One Turks Head Place, Suite 1050
Providence, RI 02903

James R. Lee, Esq.
RHODE ISLAND DEPARTMENT
OF THE ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

Anthony F. DeMarco, Esq.
REYNOLDS, DeMARCO & BOLAND, LTD.
170 Westminster Street, Suite 200
Providence, RI 02903

Fred A. Kelly, Esq.
Randall L. Souza, Esq.
NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903

Ronald J. Resmini, Esq.
155 South Main Street
Providence, RI 02903

William P. Robinson, III, Esq.
EDWARDS & ANGELL LLP
2800 Financial Plaza
Providence, RI 02903

Howard A. Merten, Esq.
Eric M. Sommers, Esq.
VETTER & WHITE
20 Washington Place
Providence, RI 02903

James T. Murphy, Esq.
HANSON CURRAN LLP
146 Westminster Street
Providence, RI 02903

Faith A. LaSalle, Esq.
ZIZIK, LaSALLE & POWERS, P.C.
40 Westminster Street, Suite 201
Providence, RI 02903

Joseph V. Cavanagh, Jr., Esq.
Kristin E. Rodgers, Esq.
BLISH & CAVANAGH, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

**and mailed to:**

Marc DeSisto, Esq.
DeSISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906

Christopher C. Fallon, Jr., Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103-3508

Scott J. Tucker, Esq.
TUCKER HEIFETZ & SALTZMAN LLP
Three School Street
Boston, MA 02108

Andrew J. Trevelise, Esq.
REED SMITH LLP
2500 One Liberty Place
Philadelphia, PA 19103-7301

W. Thomas McGough, Jr., Esq.
James J. Restivo, Jr., Esq.
REED SMITH LLP
345 Sixth Avenue
Pittsburgh, PA 15219

Jan Audino

can't go forward because we have not filed a suit. That is the entirety of his argument.

We have not filed a suit, a classical suit for damages. Although, we have from the beginning named nine representative plaintiffs and we have more -- when I say, "representative plaintiffs," I mean in cases, and we have more than 50 cases.

We have not done that because we think it would be a rebuke to Rule 11 requiring good-faith pleading. We think it would be a rebuke to the statements, the public statements of the Bar Association and the Rhode Island Trial Lawyers' Association urging people to go slowly. We think it would be a rebuke to all those other lawyers who have cases and who've waited patiently for developments. And most importantly of all, Your Honor, we think it would be in derogation of our obligation to our clients.

Mr. Cunha is absolutely right when he says in his memorandum that these kind of cases are "a breed apart." He's absolutely right when he says that the courts have an obligation to devise mechanisms to handle these cases sometimes, as he says, out of, to use his expression, whole cloth.

You needn't do anything out of whole cloth. What we're asking you to do is well-established precedent.

FRIDAY, MARCH 28, 2003

MORNING SESSION

THE COURT: Good morning.

AUDIENCE: Good morning, Your Honor.

THE COURT: Mr. Decof. Mr. Wistow.

MR. WISTOW: Good morning.

THE COURT: Good morning.

MR. WISTOW: I'd like to report to you what progress we've achieved so far.

As Your Honor knows, having been there this past Wednesday, the day before yesterday, many of the plaintiffs' lawyers, defense lawyers and experts were at the site.

And I can tell you that as a result of the review with our experts of what's there, we're frankly surprised at the wealth of material that remains at the site that needs to be preserved and explored further.

I should say, Your Honor, that no inference should be drawn that the Attorney General hasn't taken everything from the site that he may need for his criminal purposes.

Our purposes are different because in this case the obvious defendants, the ones that we think probably will be the subject of criminal, possible criminal prosecution, really are not going to be able to respond



in a practical way to the tremendous, tremendous damages

that are going to be available in a civil case.

So the plaintiffs' lawyers' principal responsibility is to try to see that their clients can be made whole as best that can be in this tragic situation. It's our obligation to explore possible defendants who the AG would not have within his sights for possible criminal prosecution.

The experts that we've been with on the site have encouraged us to believe that there is real reason to spend a great deal of time, effort and money in exploring further the potential liability of the many people that have not yet been named as defendants in any of the two cases that are pending.

We're particularly interested in removing and storing parts of the building, including parts of the structure. We're interested in wall coverings, insulation, parts of the floor, adhesives. And I don't mean to give an inclusive list, but that's the kind of thing that we're looking at.

All we're talking about today, Your Honor, is setting up a system that will preserve and shelter the material. We're not going to propose any kind of testing whatever this morning, destructive or otherwise. All we're talking about is getting the materials off of



the site and sheltered away from the weather and further degradation and deterioration.

Unfortunately, it's been more than a month since the incident, and the site has been exposed to the weather. There was really no choice because until very recently, just before we moved to go on the site, this was a crime scene, and the Attorney General had priority

And the entire thrust of what Messrs. Decof, Mandell and I were trying to do in our exercise was to isolate and determine which manufacturers should be sued because we believe, and I think with good reason, that the manufacturers will be the key to this case. And let me explain why that is, Your Honor.

There are certain defendants who just jump out at one, I mean, it's -- the Derderians are so obvious that they needn't be mentioned. The Derderians have one million dollars worth of insurance.

The distributor of the foam, not the manufacturer, the distributor of the foam, American Foam, has five million dollars of insurance.

The band, to the best of our knowledge, at this point is substantially judgment-proof.

Triton Real Estate, the owner of the premises, has no insurance and, in fact, has recently instituted lawsuits against insurance companies claiming that it has insurance and alleging that the insurance companies have said there is no insurance.

The town, West Warwick, has four million dollars worth of insurance. And, indeed, even to get to that four million dollars worth of insurance, if the Public Duty Doctrine is -- I shouldn't say if it's invoked, it will be invoked -- if it's upheld to apply, then the

applauding, in my humble opinion, the fact that there are lawyers out there trying to get as much information to nab as many defendants as possible.

Instead, he wants to say limit the discovery, go to suit right away. He forgets his clients when he does that, Your Honor. And his own brief shows that he forgets his clients because he refers to the petition filed by Mr. Mandell, myself and Mr. Decof.

We didn't file any petitions. Nine identified representative clients of ours filed petitions. We're here speaking for them, not for ourselves, Your Honor.

I would like to quote further. And, forgive me, I know how boring it is normally to hear quotes from briefs, but I want to quote something from Mr. Cunha's brief that says far more eloquently why this Court should grant the petition than anything I can say. This appears on page 8 of his brief. And it is absolutely on point and it is absolutely determinative.

And what he says is, and I quote from page 8, "From the outset the plaintiff certainly recognizes that in many respects this is a groundbreaking mass-tort. The Superior Court is confronted not only with the daunting task of devising (sometimes from 'whole cloth') mechanisms for streamlining case administration, which will permit adequate ongoing judicial oversight. As the