IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * *

PASSA, et al.

VS.

DERDERIAN, et al.

* * * * * * * * * * * * * * * *

OCTOBER 15, 2003

03-70L; 03-71L; 03-72L; 03-148L; 03-208L; 03-335L

10:00 A.M.

PROVIDENCE, RI

BEFORE THE HONORABLE RONALD R. LAGUEUX

SENIOR DISTRICT JUDGE

**(MOTIONS TO DISMISS, ABSTAIN, REMAND)**

APPEARANCES:

FOR THE PLAINTIFFS' STEERING COMMITTEE:

MAX WISTOW, ESQUIRE
Wistow & Barylick, Incorporated
61 Weybosset Street
Providence, RI 02903

MARK S. MANDELL, ESQUIRE
Mandell, Schwartz & Boisclair
One Park Row
Providence, RI 02903

FILED
2004 JAN -8 P 12:39
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

ORIGINAL

113

FOR THE PLAINTIFFS' PASSA, CASTLE, ROSSI:

RONALD J. RESMINI, ESQUIRE
Law Offices of Ronald J. Resmini
155 South Main Street
Providence, RI 02903

FOR CONNECTICUT PLAINTIFFS:

ROBERT I. REARDON, JR., ESQUIRE
Reardon Law Offices
160 Hempstead Street
P.O. Drawer 1430
New London, CT 06320

FOR THE DEFENDANT ANHEUSER-BUSCH:

EDWARD M. CRANE, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive - Suite 2100
Chicago, IL 60606

Court Reporter: Angela M. Gallogly, RPR
One Exchange Terrace
Providence, RI 02903

(14 OCTOBER 2003)

THE COURT: Good morning everyone. The matter before the Court is the numerous Station cases, some originally filed here, some removed from the Superior Court. Now, the File Numbers that I have are Miscellaneous Petition 03-70L, Miscellaneous Petition 03-71L, Miscellaneous Petition 03-72L, Civil Action, 03-148L, Civil Action 03-208L, and Civil Action 03-335L. Also, there has been a transfer of the case file from Connecticut to this Court that hasn't arrived yet, so we don't have a number for it. So as of this moment, all these cases are here in this Court and we are about to determine whether or not this Court has jurisdiction over the matter.

There are a lot of lawyers here, and I certainly want to know who is here and who is going to argue, so I would like all the attorneys to identify themselves, who they represent, and whether or not they will argue orally this morning. I'll start at that end of the table.

MR. CAVANAGH: Joseph Cavanagh for Anheuser-Busch, I will not be arguing.

MR. CRANE: Good morning, your Honor, my name is Ed Crane, and with the permission of this Court, I will argue today on behalf of Anheuser-Busch; I'm co-counsel

with Mr. Cavanagh and Ms. Rodgers.

MR. REARDON: My name is Robert Reardon, I'm representing the Connecticut Plaintiffs, and with the permission of this Court, I would like to argue.

MR. RESMINI: Ronald Resmini, I will be arguing on behalf of Passa, Castle, and also Rossi.

MR. FALLON: Good morning, your Honor, Christopher Fallon on behalf of the Derderians, and I'm going to defer argument to the Plaintiffs' Steering Committee.

MR. WISTOW: Max Wistow for the Plaintiffs' Steering Committee, which represents the Petitioners from the Superior Court. I will be arguing.

MR. MANDELL: Mark Mandell, your Honor, for the Plaintiffs' Steering Committee, along with Mr. Wistow, I'll be arguing, thank you.

MR. BREGGIA: Steve Breggia, your Honor, Plaintiffs' Steering Committee. I will not be arguing today.

MR. MINICUCCI: Steven Minicucci, Plaintiffs' Steering Committee, I will not be arguing today.

MR. CREAMER: Ronald Creamer, co-counsel on Passa, I will not be arguing.

MS. SIMPSON: Kimberly Simpson on behalf of McLaughlin & Moran, and I will not argue.

MR. RUGGIERI: James Ruggieri, Foamex, and General Foam, local counsel.

MR. HENLEIN: Carl Henlein. May I have a word with the Court.

MR. MERTEN: Howard Merten, McLaughlin & Moran, and I will not be arguing.

MS. SOLMOR: Good morning, your Honor, Deborah Solmor, I represent Anheuser-Busch, I will not be arguing.

MS. RODGERS: Kristin Rodgers, also on behalf of Anheuser-Busch, I will not be arguing.

MS. LA SALLE: Faith LaSalle on behalf of Shell Oil and Motiva, and I will not be arguing.

MR. TREVELISE: Good morning, your Honor, Andrew Trevelise on behalf of Clear Channel Broadcasting, I will not be arguing.

MR. RESTIVO: Good morning, your Honor, Jim Restivo on behalf of Clear Channel, I will not be arguing.

MS. FIDEN: Laura Fiden on behalf of Clear Channel. I will not be arguing.

MR. ROBINSON: William Robinson on behalf of Clear Channel. I will not be arguing.

MR. MORRISON: Richard Morrison. I will not be arguing.

MR. SCANLON: James Scanlon on behalf of Luna Tech, Incorporated, I will not be arguing.

MR. JONES: Patrick Jones, Plaintiffs' Steering Committee, I will not be arguing.

MR. ANGELONE: Tom Angelone, Foam Corporation. I will not be arguing.

MR. NUGENT: Mark Nugent. Defendant. I will not be arguing.

MR. REMMER: Good morning, your Honor, Robert Remmer for the Connecticut plaintiffs. I will not be arguing.

MS. RUSSO: Denine Russo for unnamed defendant. I will not be arguing.

MR. BENDER: Thomas Bender for Triton Realty Partnership. I will not be arguing.

MR. BURNES: Joseph Burnes for unnamed defendants. I will not be arguing.

MR. CROCKETT: John Crockett, your Honor, for Foamex. I will not be arguing.

MR. McPHERSON: Edwin McPherson for unnamed defendant. I will not be arguing.

MR. SMITH: Philip Smith with Foamex. I will not be arguing.

MR. DeMARCO: Anthony DeMarco for the Derderians. I will not be arguing.

MR. DeSISTO: Marc DeSisto for the Town of West Warwick and Dennis Larocque, and I may be arguing, your Honor.

MR. LEE: Jim Lee, State of Rhode Island. I will not be arguing.

MS. ALEGRIA: Karen Alegria for Attorney Resmini.

MR. REDIHAN: Charles Redihan, Plaintiffs' Steering Committee, no argument.

MR. ST. PIERRE: Mike St. Pierre, Plaintiffs' Steering Committee. I will not be arguing.

MR. MARONEY: Donald Maroney for Daniel Bichele.

MR. HOWE: James Howe for unnamed plaintiffs. I will not be arguing.

MR. SOUSA: Randall Sousa for Jack Russell, your Honor. I will not be arguing.

MS. CLARK: Kim Clark for Jack Russell. I will not be arguing.

MR. KELLY: Fred Kelly for Jack Russell. I will not be arguing.

THE COURT: Is that it, anybody else? All right. As I indicated previously, I want to hear from those who are opposed to Federal Jurisdiction first, those who have filed Motions to Dismiss, filed Motions to Remand, filed Motions for the Court to Extend, and

then I'll hear from those who are pro Federal Jurisdiction, and I'll give the other side some rebuttal time, if necessary. We have set the whole morning aside for this, and I'm a good listener, and I'm ready to listen.

Who will argue first on behalf of those who want the case dismissed?

MR. WISTOW: I have that privilege, your Honor.

THE COURT: You are in favor of remanding in the cases you are involved in?

MR. WISTOW: Indeed, your Honor. Max Wistow, appearing on behalf of the Plaintiffs' Steering Committee, which at this moment in time, your Honor, has inherited the transfer from Judge Gibney, along with the warehouse, and I guess what we're here to decide today is whether your Honor is going to send us back to the State Court along with the warehouse, or whether we stay here, whether at some time in the future you adopt us or disown us, but for the moment, we are the Plaintiffs' Steering Committee left over from the transfer from the Superior Court.

As such, we are eight lawyers who, in the aggregate, represent some 185 separate cases. What I mean by that is we are talking about either deceased, or people who were physically injured, so that the

derivative claims in the next of kin, the total number of plaintiffs we represent is approximately about 460 people.

So far, the Plaintiffs' Steering Committee has, as your Honor knows, only been involved in prefiling activity in the Superior Court, we have not brought any actual lawsuits, but merely equity petitions in the Superior Court to obtain evidence. We ask that this Court reject the case and declare that it has no jurisdiction for, really, a very simple reason, that we think a decent regard for the public and this Court requires us to explain in detail what that reason is. Principally what we're concerned about is a repetition of a result similar to what happened in the *Lexecon vs. Milberg Weiss* case, which, ironically, has a great deal to do procedurally with this case. As your Honor knows, in that case, there was a multidistrict panel, the *Milberg Weiss* case was sent from Illinois to Arizona in 1992, was tried on the merits in Arizona. Following the pretrial proceedings, there was a decision in favor of Milberg Weiss, it was affirmed by the Circuit Court of Appeals following 30 years of precedent, where transfers were made to transferee courts under multidistrict litigation and then kept there. In 1998, the U.S. Supreme Court said that that

was an error, vacated everything, and made everybody start from scratch, so that there were six years in that case of absolutely wasted activity.

What we're concerned about in this situation, your Honor, is not that we are not going to get a fair trial in this Court, not that we're not going to have our day, but that this statute under which we are here is so flawed and so rank with problems, we are concerned we will spend years, if your Honor says there is jurisdiction in this Court, only probably to be in a situation where, years from now, either a Circuit or the United States Supreme Court holds that there was error. Alternatively, we know to an absolute certainty that the Superior Court does have jurisdiction.

The reason we are in this Court is that Congress recently passed the statute that we are here on, and I would like to read to you from Anheuser-Busch's memorandum categorizing the statute. "Congress" -- this is on Page 5 of their brief -- "Congress passed the MMTJA to remove all impediments to full consolidation of cases arising out of qualifying accidents, and thereby advance the critical public interest of conserving judicial resources, decreasing litigation costs, and diminishing the risk of inconsistent adjudications, concluding that Federal

Court is the only forum where full and effective consolidation is achievable. Congress provided provisions for nationwide service of process, nationwide service of subpoenas and expanded venues so that all parties could be joined and all evidence could be obtained in a single Federal forum." Now, unfortunately, something went very severely amiss with the statutory formula. We have already pointed out in our memos, your Honor, that Section 1441, the removal statute, in subsection (e)(2), specifically refers to cases transferred from one Court -- one Federal Court to another pursuant to Section 1407(j). The problem is no such statute exists. There is simply no such 1407(j). One of the purposes of this statute was to amend and overrule, in effect, the U.S. Supreme Court holding in *Lexecon*, which prohibited the transferee Court from retaining jurisdiction. One of the purposes of this statute was to enable all the cases to be ultimately consolidated for trial in one Federal Court.

In fact, the 1407 that was not passed, which does not appear in the statute is -- I can tell you exactly what it was supposed to say because it is cited in H.R. Report 106276, and it's 1407(j)(1), I won't read you the whole thing, but just to give you the flavor -- "Inactions transferred under this section,

when jurisdiction is or could have been based in whole or in part on Section 1369," which is, of course, the jurisdictional statute we're talking about, "the transferee district may, notwithstanding any other provision of this section, retain actions so transferred for the determination of liability and punitive damages." And it goes on to explain that "After that determination, the Court may, if it wishes, remand the cases for trial on compensatory damages to the Federal courts from which they came." That didn't happen. That statute was not passed, so we're exactly in the same problem we had with the *Lexecon* case, except the situation is actually exacerbated now rather than improved. The reason I say that is as part of what was passed, there's a new venue statute, 28 USC 1391(g), which expressly refers to venue under 1369, which is the jurisdictional statute we are talking about. Now, under the old venue statute, before the current statute was passed, under the old venue statute, the action could only be maintained in a district where any defendant resided if "all were in the same state" or, two, "where the events took place," or, 3, "where any defendant resides if no district was otherwise applicable." What that meant is that under the old venue statute in a case like this, where we

didn't have all of the defendants residing in the same state, the only possible venue would have been Rhode Island. What we have now is something quite different, because 1391(g) now says that the case may be brought in any district in which any defendant resides or in which a substantial part of the accident took place.

Now, the problem with that, Judge, is that under 1391(c), which is also a new part of the venue statute for venue purposes, any corporate defendant whatever is deemed to reside in any jurisdiction in which it is subject to personal jurisdiction. So if we took a company like Foamex, for example, which presumably does business in many American states, the venue for any case under 1369 involving Foamex, the venue for any case would be anywhere in the United States. Furthermore, the matter is aggravated by the fact that there is now a new provision, a completely new provision passed as part of the statute, 28 USC, 1697, which gives the Federal District Courts nationwide service of process powers. So even if a Court -- even if a defendant corporation was not otherwise subject to the jurisdiction of a Federal District Court because of minimum contacts or the like, the new statute says that each Federal Court has nationwide service of process powers. So venues are, in fact, good anywhere in the

United States, and there is no mechanism whatever for trial in one Federal Court with the exceptions of the statutory formulation for forum nonconvenience, which I will address in a moment. Right now we know, your Honor, that there are either injured or dead people from Pennsylvania, in the 3rd Circuit, Texas, in the 5th Circuit, Florida in the 11th Circuit, Illinois in the 7th Circuit, Ohio in the 6th Circuit, New Jersey in the 3rd Circuit, Maine, Rhode Island, Connecticut, Massachusetts in the 1st Circuit, and California in the 9th Circuit. The one Connecticut matter we knew about, which was the 2nd Circuit, has been transferred here. All we're missing in terms of Circuits, your Honor, is the 4th, 8th, 10th, and Federal Circuits. Eight out of the twelve Circuits are represented here.

So far Judge Squatrito has decided in the one case that a decision has come down, to transfer this case pursuant to 1404, which is a transfer for all purposes. And the problem arises if some other Federal Courts in other Circuits, perhaps, refuse to do a transfer -- I'm not in a position to predict one way or another whether that can happen -- but if it does, the law is very, very clear that a decision to transfer or not under 1404 is not reversible except for an egregious abuse of discretion.

Now, the other problem with the statute is whether or not the statute itself purports to give jurisdiction to the cases that we're talking about now. And the problem -- the essence of the problem, your Honor, is that 1369(b), which is what all of the parties have spent so much time talking about, provides expressly, and the heading of it is, "Limitation of Jurisdiction of District Courts: The District Court shall abstain from hearing any civil action described in subsection (a), which is the general ground, in which, (1) The substantial majority of all Plaintiffs are citizens of the single state of which the primary defendants are also citizens; and, (2) The claims asserted will be governed primarily by the laws of that state."

Now, there is an enormous argument between the different sides here as to whether or not (b), subsection (b) is, in fact, a limitation on this Court's jurisdiction or whether or not it's some kind of admonition to the Court to refrain from exercising jurisdiction which it otherwise has. And there's an enormous difference between those two, we believe, your Honor. And we think the difference is based on the concept of -- that I need not explain to this Court -- about Federalism, and the relationship of the Federal

Courts to the State Courts, and no principle in our jurisprudence is more well-settled than that the Federal Court's jurisdiction only exists, only exists, on the basis of some constitutional grant or some express grant by Congress, and that there is, in fact, according to our Supreme Court in the *Kokkonen* case at 511 U.S, a presumption against jurisdiction of the Federal Courts, a form of deference to the State Courts. Here we have a situation, your Honor, where tort cases for more than 200 years have been in Federal Court only on the basis of complete diversity of citizenship. I'm not suggesting that Congress cannot change that, but we've had 200 years of precedence on this. In fact, it goes as far back as Chief Justice Marshall's decision in *Strawbridge v. Curtis* in 1806, where he discusses the requirement under the statute at that time for complete diversity in tort cases.

Now, the statute that we're talking about, Section (b), expressly says, "the District Court shall abstain from hearing," it doesn't talk about "may," it is a mandatory -- what I suggest is a mandatory admonition to the Court. Now, I will agree that normally when you talk about a Court abstaining from a case, there is an implication that there is some voluntary act by the Court, that the Court has decided

to abstain. That, however, is not consistent with the language here, which says, "shall abstain." Indeed, if you look at the title, the very title of 1369, generally, it's called, "Multiparty Multiforum Jurisdiction." The general grant of jurisdiction in paragraph (a) says, "in general." And paragraph (b), which we're relying on here is called, "Limitation of Jurisdiction of District Courts." If we go back to the *Lexecon* case, which has some central significance in all of this, Judge Souter said, at Page 962 of that decision, in another context, obviously, that the "mandatory," quote, "shall" end quote, "normally creates an obligation impervious to a judicial discretion." And we suggest that that's the case here, and there are reasons for that, which include the fact that the title of subsection (b), "Limitation of Jurisdiction of District Courts," is some aid, not binding, we agree titles are not binding in the construction, but is some aid in the construction of that case. Indicating that, indeed, there is a limit to the jurisdiction. In the *Pennsylvania Department of Corrections versus Yeskey* case, at 524 U.S., expressly authorizes and suggests to the Court that where there is a question of construction that the titles are sufficient.

Now, the only cases that anybody has been able to find so far dealing with the expression, "shall abstain," and what does that mean in the jurisdictional sense, have been in the bankruptcy context -- dealing with the Bankruptcy Court's jurisdiction, which is under the same Chapter, Chapter 85, granting the District Court's jurisdiction. In the Bankruptcy context, 28 USC 1334, which deals with core versus noncore adjudications in the Court's jurisdiction, also uses the term, "shall abstain" for certain situations. The critical, overwhelmingly important difference in our mind, your Honor, is that that statute starts off by saying, quote, "Upon timely motion of a party in a proceeding the Court shall abstain," and the Circuits and District Courts which have addressed this statute have said that because an action of a party is required, a timely motion is required, and, consequently, if it's not done, there's is a waiver, by definition, it's not jurisdictional, because, of course, subject matter jurisdiction can never be waived.

In our case, the case before your Honor, the statute requires us to do nothing whatever. The statute directs the Court to abstain, whether we make a timely motion, a belated motion, or never a motion. In

fact, to underline that point, 1447(c), which is the procedure to be followed -- 28 USC 1447(c) -- which is the procedure to be followed after removal, expressly talks about a timetable that must be followed by people who object to the removal based on defects, which is 30 days, and has no timetable whatever for an objection to removal based on subject matter jurisdiction. Apropos of that, your Honor, there is also a contention between the parties here as to whether or not a decision by your Honor that there's no subject matter jurisdiction and a remand pursuant to 1447(c), is, in fact, appealable. Those advocating jurisdiction in this Court have taken the position that it is, in fact, appealable that 1447(d) must be read in parlay material with 1447(c). A close reading of the recent U.S. Supreme Court case, the *Quackenbush* case, makes it very clear, that's *Quackenbush vs. Allstate*, makes it very, very clear that if the reason for a remand of the case is a lack of subject matter jurisdiction, which is one of the reasons stated in 1447(c), then it is not, in fact, appealable. That's as opposed to situations where, for example, if your Honor abstained based on, for example, Burford considerations of not interfering with state regulatory systems, which would be, in fact, appealable under the *Quackenbush* decision.

Your Honor has to determine what is the significance of Section (b). Is that a limitation of your jurisdiction, or, what. And the only legislative history, the only legislative history that anyone has been able to find on either side at this point was in the House Conference Report 107685 of September 25, 2002, and, indeed, I quote this from the Triton Brief, and they say that Section (b) was added to create an exception to the minimum diversity rule. I'm quoting both the Triton brief, and the Triton brief, in turn, quotes the House Legislative History. "In brief, a U.S. District Court may not hear any case in which a substantial majority of plaintiffs and the primary defendants are all citizens of the same state and in which the claims asserted are governed primarily by the laws of that same state." In other words, according to the legislative history, only State Courts may hear such cases.

Now, General Foam, Foamex, in their Brief correctly, on Page 8, categorizes that statute, Section 1369(b), as, quote, "An exception to Federal Jurisdiction."

Now, there is a way to see how Congress would have set this up if it was intended to be some discretionary function that your Honor performs to

decide whether or not (b) applies or not, and all of the parties who have submitted briefs in support of this Court's jurisdiction, have referred repeatedly to the Class Action Fairness Act, which, by the way, has never passed Congress, it is not the law. The reason I would refer to it now is to show how in that bill, Congress specifically attempted or at least the committee specifically attempted, to show the difference between an exception to jurisdiction and a situation where the Court could voluntarily decline jurisdiction. And in the Class Action Fairness Act, the purported change was to take any class action where the damages would be in excess of $5 million and there was minimal diversity, as we're talking about here, same kind of minimal diversity and give the Court jurisdiction. In the next paragraph following that grant, both the House and Senate versions said, as follows: "A District Court may in the interest of justice, decline to exercise jurisdiction under Paragraph 2 above," the initial grant, "over a class action in which greater than one-third, but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the state in which the action was originally filed based on consideration of the

following factors." I point that out only to show how simple it would be, how simple it is to say to this Court, you may if you wish take this case or not. The statute we're addressing is completely mandatory and states categorically that the Court "shall" abstain, there is no "may," there is no "if," there are no "buts."

THE COURT: But even if that's so, I have to make the determination that a substantial majority of the plaintiffs are from the same state as the primary defendants; I have to make those determinations as to what those terms mean, and I agree with you that if I find that the substantial majority are from the same states as the primary defendants, then I must abstain, I agree with that. It's a mandatory abstention by statute. And maybe it didn't matter whether it is a jurisdictional statute or a mandatory abstention statute.

MR. WISTOW: I think it does, with all due respect, matter, for this reason, your Honor. If I'm right, and this is a jurisdictional statute, then the burden is on the side asserting the jurisdiction to prove it; not on us to prove the negative. I think that's an important, a very important and critical procedural difference. And for reasons I'm about to

get in to, I think it's going to be impossible for the defendants to satisfy -- I shouldn't say the defendants -- the opposition, my opposition to satisfy that burden. If we look at 1369(b) which talks about a substantial majority of plaintiffs, first of all, the opposition briefs consistently, in my view, confuse the statutory language of plaintiff, and read it to mean potential plaintiffs. I think they confuse consistently the term that's in the statute, primary defendants, with the concept of potential primary defendants. For example, there's all sorts of discussion in the briefs anticipating that we will bring suits against hundreds of defendants. At this point in time, your Honor, that's completely speculative, number 1, and, number 2, if one reads the statute, it's clear we are not talking about what might be, it is the civil action that's before your Honor. It says "The District Court shall abstain from hearing any civil action in which," and then it goes on "the substantial majority," etc., etc. It does not say, it does not say that the Court shall abstain from any action arising out of an accident in which a substantial majority of the persons killed or injured, etc., etc. So your Honor has to look -- and by the way, how could it be anything other than that? How

could how you Honor, today, evaluate, sitting where we are, how many plaintiffs there will be, we don't know. Some people may not bring suit for whatever reasons. If they do, we don't know how many of those cases arising from injured people will result in derivative claims, husbands, children, the like. Those are plaintiffs, your Honor. Similarly, even in the death cases, we don't even know in a death case how many plaintiffs there will be, because there's an option to bring an action for the estate, there's options that the next of kin may bring suits, there may be suits for loss of consortium. So it is patent to me, at least, that when the statute talks about plaintiffs, it's not talking about what might be, because the express terms say in any civil action, not in any accident or any civil action arising out of an accident.

The most difficult question we have is what are primary defendants. I believe, your Honor, that the burden is on those, same as jurisdiction in this Court, to satisfy this Court as to who the primary defendants are. Now, what's interesting --

THE COURT: How about anybody who could be held liable directly to the plaintiffs?

MR. WISTOW: That sounds to me, your Honor, with all due respect, like a defendant.

THE COURT: That's right.

MR. WISTOW: But I think there is a difference between a defendant and a primary defendant for this reason.

THE COURT: The only distinction that's known in the law is a defendant who is potentially liable to a plaintiff is a primary defendant, and a secondary defendant is a defendant who can be held to indemnify a primary defendant who is held liable. That's the only definition I know of in the law.

MR. WISTOW: With all due respect, I hear what your Honor says, it makes a good deal of sense. One of the things that we all know in lawsuits is that sometimes appeals courts disagree with trial courts, I'm not suggesting that your Honor is wrong, but I respectfully feel that there is a very substantial issue, and I would like to address that distinction that your Honor has just made. First of all, section A, which is the general grant of jurisdiction to this Court, expressly refers to defendants -- not primary defendants -- defendants. Section B immediately below it refers to primary defendants, indicating to me, at least, that there is some distinction Congress intended between a defendant and a primary defendant. The people --

THE COURT: Just bad draftsmanship.

MR. WISTOW: If your Honor says this statute was badly drafted, your Honor will find somebody completely agreeing standing at this side of the podium; terrible draftsmanship.

THE COURT: The legislative history indicates that that mandatory abstention provision was thrown in at the last minute in the House to get the Senate to agree to it, to prevent very local disasters from being in Federal Court, that's the history.

MR. WISTOW: I don't disagree with that.

THE COURT: What they meant by primary defendants and substantial majority of plaintiffs is up in the air and has to be construed, and I'm the first line, I'm going to construe it, and, if necessary, we'll get it to the First Circuit Court of Appeals and they can decide whether I'm right or wrong. But that has to be done. Judges do that all the time. We have to construe legislation from Congress. We look at legislative history when it's ambiguous and that's what I plan to do.

MR. WISTOW: May I say, your Honor, on the question of the last minute insertion of this, I agree, that's exactly what happened. The point of the last minute insertion was to get sufficient votes from

people who otherwise oppose the bill. So the fact that it was a last minute insertion, your Honor, with all due respect, really doesn't change anything. If anything, I think it heightens the significance, it was necessary to get the bill passed. And I do agree with your Honor, it is very badly drafted, but I think there are certain obvious errors in the bill, obvious. For example, the definition of injury in the statute where the term is never, ever used, which shows that Congress was passing a statute which had originally a definition and a need for a definition of injury, one of the early forms of the statute, as your Honor knows, is where there were 25 or more people who were killed or injured and there was a definition. So this really is a garbled mess, and I agree that it is very badly drafted. But I think it is important and I could very well be wrong, and I often have been, I think it is very important for your Honor to initially determine who has the burden on the issue of the jurisdiction. Is it the opponents or is it -- may I say your Honor --

THE COURT: Sometimes it doesn't matter. The doctrine of burden of proof is spouted by attorneys all the time, but in most cases, in all the years I have been on the bench, it doesn't matter, the truth is the truth, whatever it is. In this case, the truth that I

have to find is what Congress intended.

MR. WISTOW: Indeed you do, your Honor. By the same token, I would suggest that this is not an ordinary situation of an evidentiary thing. What we are talking about is an inherent concept of Federalism. The interplay between the Federal Courts and the State Courts, and I believe in that context, the U.S. Supreme Court has recognized that this burden of proof is, indeed, important and not merely a legal game of evidence.

THE COURT: If I follow your approach, the potentiality here is that there would be cases in virtually every state in the union, wouldn't be all in Superior Court in Rhode Island, there would be cases filed in all sorts of courts, all across the country, and if we look at this statute, just read it through very quickly, you'll see what Congress intended here. Congress intended to have these mass disaster tort cases in one Court, so that everything could be resolved in one Court, and not spend time all over the country, defense lawyers and plaintiffs' lawyers duplicating their work, having all sorts of discovery problems, and that's what this Congress was trying to accomplish, and that's what I have to keep in mind when I'm construing this action.

MR. WISTOW: I don't quarrel with the fact that there was a general intent to do something by way of consolidation. My very point is, your Honor, that Congress did not conclusively, did not achieve the result your Honor is referring to. These cases cannot be consolidated, cannot be consolidated in one Federal Court, except by 1404, the statutory formulation of forum nonconvenience. The important thing that's missing is the multidistrict panel's ability to transfer all the cases to one Court, and what is so obvious about that, your Honor, is 1441 expressly, expressly, as passed, refers to a nonexistent statute. And what I'm suggesting to your Honor, ultimately, and I'm anticipating where I'm ending up, and I thank your Honor for your patience, what I'm suggesting is this should be sent back to Congress because it is terribly flawed.

Your Honor made a very interesting point about the derivative liability, direct liability as it relates to primary defendants. First of all, that determination will vary from jurisdiction to jurisdiction since this all depends upon state law. If that is the criteria, whether it is derivative, and now we have another very interesting and complex problem here. For example, one of the defendants that

everybody talks about is American Foam, which was the distributor of the foam in question. We know -- it is not before the Court in any evidentiary way -- but by way of argument, we know at this point in time it appears that the way that foam got into the place was a salesman named Warner recommended the thing. The corporation did not do anything itself, it acted through its agents. It, in turn, has, as you may say on some level, derivative liability. It is entitled to indemnity from Warner, clearly, if that's what happened.

Does that satisfy your Honor's definition or anybody's definition of derivative liability or direct liability. I might say that Triton is the one opponent that adopts the position that your Honor has just tentatively embraced. The other defendants have come up with different definitions of primary. For example, Anheuser-Busch, in an attempt to find a definition for primary, went back -- there's only, apparently, one case in the United States where the term primary defendants is even used, at least that I have been able to find and that the opposition has put up, and that's a 1911 United States Supreme Court case involving the U.S. attempt to break up the tobacco cartel, _United States vs. American Tobacco_, and in that case, the

Court said that the American Tobacco was, quote, "a primary defendant" because of their dominant relationship to the matters. They controlled, either through direct ownership or indirect ownership, hundreds of corporations. But the paucity, the absolute paucity of authority for what that term means is such an important situation, your Honor. When I say important, what I mean by that, we are talking about 200 years or more of precedent of having these cases in the State Court. I'm not suggesting they couldn't be put in the Federal Court by a proper statute. What I'm saying is such an important deviation affecting not only 200 years of precedent, but the rights of hundreds and hundreds of injured people, that it be on the statute that's not flawed.

And, again, I go back to why I'm concerned about a flawed Statute, your Honor. It is that your Honor makes an intelligent, well-reasoned decision either agreed to or not agreed to by the First Circuit, or, perhaps, and, perhaps, agreed to or not agreed to by the Supreme Court. In _Lexecon_, 30 years of Circuit appeals, 30 years were overruled like that by the United States Supreme Court with the defendants in that case having wasted six years. So my argument here is the uncertainty of this.

But another definition that was offered, this time by Foamex, was that the primary defendants were the ones with, in effect, the deep pockets, and they cite to the Class Action Fairness Act, again, a statute not passed in support of that. Now, they also quote me in my appearances in the Superior Court about the defendants we were looking for, to see if we could compensate the plaintiffs in this case, and my point on that, your Honor, is it's one thing, I hope your Honor is not entertaining the idea that the primary defendants should be considered to be the deep pocket, I mean it's quite one thing for plaintiffs' lawyers to do that, that's their obligation is to seek deep pockets, if we have an automobile accident and somebody has $10,000 of insurance and General Motors is there, if we don't look for General Motors, there's something's wrong with us.

THE COURT: The other possibility which occurs is that the primary defendants are the people who caused this disaster.

MR. WISTOW: Indeed, your Honor. That's another possibility. That's a very interesting philosophical and almost metaphysical problem as to who caused this disaster, and involves an inquiry into the merits of the case that's very implausible to make at this stage,

I believe, and I might say this, your Honor, along with my position that each case must be looked at separately, because the statute says in any civil action, let's take the band, for example, which, according to the lore that's grown up around this case and also the videotapes more than the lore, ignited the foam with the pyrotechnics, I'm not suggesting that this is going to happen, but it's quite possible that some plaintiffs may not choose to sue the band, not because they're rock music fans, but they may feel that the amount that's recoverable against the band is so de minimis -- by the way, a lot of the defendants here have self-liquidating policies, where medical payments subtract from liability -- they may decide not to sue the band in certain cases.

I would analogize, your Honor, if there was a lawsuit based on what happened in Worcester some years ago where the six firemen were burned to death, that terrible tragedy -- it's sad to think how tragedies get bigger and bigger -- in any event, it might well be that a plaintiff who wanted to bring a suit, say, there was storage, illegal storage in that warehouse with all kinds of material, plaintiff might well say and probably would be well-advised to say I'm not going to sue the homeless people who, quote, "caused the fire."

What I'm doing that for? What am I accomplishing for my clients? And I may be injuring them strategically. So there are some very complex issues that have to be decided.

I was going to talk briefly about this issue of inquiring into the deep pockets, to say that I believe it to be unbelievably unseemly for a Court to inquire into the wealth or the lack thereof of a particular defendant to the point where I think it goes beyond unseemly, I think it would be denial of equal protection of the laws, and I suggest that that definition cannot possibly be applicable.

THE COURT: Well, I don't think that that's so. The main thrust of that argument, as I understand it is that these sponsors may be regarded as primary defendants because they're being sued, they are being asked to respond in damages, and that includes Shell, and Anheuser-Busch, and McLaughlin & Moran, and Clear Television -- Clear Channel.

MR. WISTOW: Your Honor, whose jurisprudence I respect --

THE COURT: That's another possibility of the definition. I don't think the definition is going to be based on who has deep pockets and who doesn't.

MR. WISTOW: I hope not, your Honor. That was

suggested by one of the opposition.

Your Honor has taken the position, and it may prove to be ultimately correct, it's certainly going to be correct unless somebody says otherwise, your Honor has taken the position there is no difference between a defendant and a primary defendant, in effect, that anybody who is sued, is, in effect, the primary defendant, and if that's so, and maybe it is, then this is really one of the worst drawn statutes imaginable, to go from giving general jurisdiction in situations where there is a defendant, and in the next sentence talking about a primary defendant is -- all I can say is shame on our Congress if that's how they draft a statute.

THE COURT: Well, you will have to get down to a lawyer or lawyers somewhere in a committee of Congress, in the House. Do you want to do some digging? Maybe you can sustain your burden of proof and the other side can sustain their burden of proof by finding the culprit.

MR. WISTOW: Will your Honor allow us to do some prefiling discovery in Congress.

THE COURT: That, in actual real life, that's what happens.

MR. WISTOW: Undoubtedly.

THE COURT: And what Congressman and what Senator really reads that language and really thinks about it and says, oh, this is contrary to what the Supreme Court said 15 years ago, or the concept of primary defendant, I've never heard of that in the law.

MR. WISTOW: Your Honor is indubitably correct.

THE COURT: That's the draftsperson, whoever drafted it, probably in a late night committee session when they all wanted to go home. This is what happens.

MR. WISTOW: This statute does smell of the midnight oil, I agree with you, among other things.

THE COURT: Good comment.

MR. WISTOW: However, however, we cannot, we cannot deviate from the proposition in this Country that statutes are passed by Congress, not by draftsman, and Congress is responsible for this. Your Honor is right, it was somebody sitting in a little room somewhere who messed this up. But Congress has to be presumed to have read it. I think it was Bismark who said, "Those who love sausages and statutes should not inquire into the making of either." And I think that applies perfectly to this situation, your Honor.

THE COURT: I have plenty of experience in drafting statutes at the state level, so I know what that process entails. The fact of the matter is that

sometimes legislative history, in this context, is efficient, because Congress never really intended anything. They intended to pass an act that they didn't know what it means. They were trying to accomplish some objective and they left it to somebody else to put it in language that would be understandable and that's where we are.

MR. WISTOW: That is where we are, and I would like to conclude my remarks on the issue about, in effect, I'm taking the position that you must abstain. I feel like Cannute asking the waves not to come in, but, nevertheless, I do ask that. And then I say if your Honor feels there is a voluntary abstention aspect of it, I would ask briefly that you entertain my argument on that. In other words, when you say I do have jurisdiction, but I'm asking you to voluntarily abstain. The point --

THE COURT: Well, none of the Federal Abstention Doctrine, Burford, Younger, Coleman, Colorado River, none of those apply in this case.

MR. WISTOW: In a perverse sort of way, I think Burford does, in this respect, your Honor, I hope this does not strain credulity. There's a very interesting issue in this case that depends and relates to the relationship of the State of Rhode Island to its

municipalities. I know to a certainty that the State is, from my discussions with counsel, the State will be taking the position that the inspection by the fire inspector was done by the municipality and they're responsible for it. The municipality will be arguing the contrary, that it is the State's responsibility. The plaintiffs will be arguing that it's both of their responsibilities, obviously.

Now, for this Court -- this Court will now be asked, if it hears the case, to enter into a decision process that will be determining the relationship of the states to its municipalities. Now, I grant you, this is not to say --

THE COURT: I have that all the time, I have those cases all the time.

MR. WISTOW: Where there's a conflict as to the laws between the state and municipality?

THE COURT: Sure. Those are the questions that have to be decided. And if it is a diversity case, I apply state law. If it is a Federal question case, I apply Federal law. This is what we do.

MR. WISTOW: There is another issue here under Burford -- I think it's Burford -- it's the 11th Amendment issue, and I'd like to state briefly where we are today on the 11th Amendment, the sovereign immunity

of the United States. I'd also like to comment on what standing I have, as your Honor undoubtedly may ask me, why am I raising the sovereign immunity of the State. The first thing is, as your Honor knows, the First Circuit case, *Della Grotta vs. Rhode Island* which is a 1986 case, held that the Rhode Island statute waiving tort immunity did not, did not meet the strict standards of express waiver required by the United States Supreme Court in *Edelman vs. Jordan*, but they did go on to say that the Rhode Island Supreme Court, in the *Laird* case in interpreting the Rhode Island legislative waiver said that, yes, Rhode Island intended to waive its sovereign immunity and be sued in Federal Court.

Now, that decision, your Honor, antedated by many, many years, the statute we are talking about now, 1369. That decision by the Rhode Island Supreme Court was at a time when the State of Rhode Island could be sued only within constitutional limitations of service of process. Each Federal District Court looked to the law of the individual states for its service of process and diversity cases, and, consequently, Rhode Island could say we're not going to be sued in Idaho unless we did something in Idaho. Under this new statute, your Honor, service of process runs anywhere throughout the

United States. So if this statute validly is to be applied to the State of Rhode Island -- your Honor looks at me rather quizzically --

THE COURT: Yes, you're right, I don't know what point you are getting at.

MR. WISTOW: What I'm trying to say is that I don't believe there has been any kind of express waiver by the State of Rhode Island to be sued under this statute. I think there is an 11th Amendment problem.

Now, granted, I am not the Attorney General and one may well question my right to raise this issue. The point I would make, though, as the *Della Grotta* case expressly holds, the sovereign immunity in the State of Rhode Island is purely a legislative function. The Attorney General, through inaction or action, is not authorized to waive that immunity, so I envision yet another problem down the line, because, certainly, the cases that the Plaintiffs' Steering Committee intends to bring will included the State of Rhode Island. Do we want to be in a situation where there is yet further uncertainty?

To conclude my remarks, your Honor, I recently discovered that Judge Smith of this Court and Judge Silverstein of the Superior Court, have been working together on the Blue Cross cases, and they have had

joint orders, and I would respectfully suggest that some consideration be given if your Honor doesn't buy, wholeheartedly, my arguments, which so far it doesn't seem to be the case, that your Honor give some consideration to conferring with and possibly working with Judge Gibney, at least so far as the warehouse is concerned and the testimony. Judge Gibney has devoted a great deal of time and effort and is knowledgeable, she has been to the warehouse on various occasions. I would ask that your Honor at least consider some kind of joint activity with Judge Gibney. If it does nothing else, if your Honor retains this case, it would relieve you of the obligation of taking care of that warehouse, I don't know if your Honor wants to be a landlord or not.

THE COURT: We have a couple of very capable Magistrate Judges who will be delegated that responsibility.

MR. WISTOW: Your Honor has an answer for anything I come up with.

THE COURT: I have great respect for Judge Gibney, I served with her on Superior Court, and I certainly will confer with her. I've already talked with her, as a matter of fact.

MR. WISTOW: The *Laird* case, by the way, which I

referred to earlier, should ring a bell, because that case cites the whole history of immunity of the municipalities and the states, which really began with your Honor's decision in *Becker vs. Beaudoin*, and I know your Honor is going to be very sensitive, I hope -- I shouldn't say I know -- I hope your Honor will be very sensitive about that delicate issue, again, of the relationship between the state and its municipality and the relative, I think, awkwardness of the Federal Court deciding those issues including immunity. Now, again, I know the Attorney General's here, but I respectfully say he has no authority to be waiving anything on behalf of the State when the First Circuit has expressly said that that waiver is a legislative function.

Finally, your Honor, I would like to quote from Judge Squatrito's decision where he transferred the case to you under 1404, and one of the things he was very sensitive to, and I would ask your Honor to take this into account, and I quote, he says, "Although the Connecticut communities where the plaintiff in this action reside have been affected, the epicenter of this tragedy lies in Rhode Island. The wounds inflicted upon the community around the Station run deep. This is so not only because of grief over the loss of life,

but also the sense of angst regarding responsibility for the fire." The key thing I would point to is this comment that the epicenter of this tragedy lies in Rhode Island.

When Mr. Mandell will speak to you on the legislative history -- and I apologize for taking so much time -- one of the things that he will argue is the intent of Congress as to keeping local tragedies within the state courts where applicable. Having said all of that, I thank your Honor for your patience.

THE COURT: All right. Mr. Mandell?

MR. MANDELL: Your Honor, first, thank you for the opportunity to address the Court on these issues. As Mr. Wistow was talking, I feverishly was going through my notes, because almost all the arguments I was going to make were made in his argument. There were a few points, I think, that would be important to add, however. In one of the colloquies your Honor said to Mr. Wistow, the main purpose of the statute or a purpose of the Statute was to consolidate all the potential cases in one Court, so you don't have varying adjudications all over the country, and I certainly believe that's one of the purposes as to those cases to which this statute applies. The only point I would want to make to your Honor is it is only as to those

cases that the statute was meant to apply to, and I sense what Congress intended to do, drafted well or poorly, was to say that cases national in nature are the cases where expanding Federal Court jurisdiction by allowing minimal diversity of jurisdiction. Cases, essentially, local in nature, there is no jurisdiction in Federal Court, and the old rules of complete diversity of jurisdiction would apply. We are not going to make Federal Court available for, essentially, local cases. So where I absolutely agree with your Honor that the purpose of the statute or a purpose of the statute is as to those cases as to which it applies, yes, Congress wanted a consolidation, even though it never did pass the provision that overruled *Lexecon*. As Mr. Wistow said, subparagraph (j) is missing. Somehow in the Conference Committee Report that was left out and did not become law. So I think that's a very important point, though, because, to me, the frame of reference by which this bill was passed, was it was to be a very narrow category of cases, and the legislative history is replete with references to that by the author of the bill, Congressman Sensenbrenner, who at the time was the Chair of the House Judiciary Committee, by Representative Conyers, who is the Chief Democrat speaking about the bill in

the legislative history, Congressman Berman, throughout the legislative history over the many years that initially the repeal of *Lexecon* was put forward, and, as your Honor says, in the 11th hour, or at the 11th hour in the Year 2000, subsection (b) was added, it was only to have a very narrow -- narrowly-identified category of cases. So narrow, in fact, that in the legislative history in 1999, 1998, and before, your Honor, it was identified as those cases -- and this is what I think Congress was trying to do -- identify those cases, plane crashes, international hotel fires, train crashes, where the likelihood is you would have plaintiffs from many states, and, perhaps, defendants from many states, not the possibility that that would happen, but it would be likely that that would happen. So much so that Congressman Sensenbrenner, Congressman Conyers said these cases that we have been talking about are already able to be filed in Federal Court, many of them have been filed in Federal Court, and I can give your Honor citations to that in the legislative history. So that to the extent that they were saying this narrow category of cases, many of which already could have been filed in Federal Court would not apply to our case. And what I'm saying is, I believe what Congress was trying to do was say, look,

there is a category of cases, initially it was in subparagraph (a), (1), (2), and (3). A defendant is a resident of a state, a substantial part of the accident occurred in another state, even if that resident also resided in that state, or you have a resident, a defendant who is a resident in one state and a defendant who is a resident in another state, even if they also reside in the same state in addition, and the third subparagraph was if you have substantial parts of the accident that occur in different states. Frankly, I'm not sure I understand the third part, since it was supposed to be one site/one accident, but it is in the legislation, and that's initially how they define what they thought would be a national -- enough national so that your Honor's principle of consolidation would apply. But that wasn't enough, because it never passed. And it was in the year 2000 at the 11th hour that it was first proposed and didn't pass then, was re-proposed again in the Year 2001, passed initially in the House and then the Senate, and then the Conference wasn't until September of 2002, and it eventually did pass and apply to our case. But the section (b), subsection (b), which is really the crux of, I believe, this argument, passed, and it added some additional qualifications, and what it said was, in addition, as

your Honor knows, in addition to 1, 2, and 3, which you have to satisfy if you're a proponent of Federal Jurisdiction, you also have to prove that (b) doesn't apply, in that if the substantial majority of the plaintiffs are citizens of the same state of which the primary defendants are, and the claims would be governed by the law of that same state. So those were two additional attempts to define what would be a local, as opposed to a national tort or mass tort.

So I think the frame of reference is critical, because as your Honor said, Federal Courts do it all the time, your job is to attempt to define what isn't defined, either in the statute or the legislative history, so much so that Triton says it isn't even hinted at and not clear, but I think the frame of reference with which your Honor approaches that, it may be that any defendant is a primary defendant, or it may also be, recognizing that this is meant to apply to a very narrow category of cases, national in nature, so national in nature that the likelihood is, the likelihood, not the possibility, Mr. Wistow said that there were eight Judicial Circuits -- Federal Judicial Circuits from which there are plaintiffs, at a local roadhouse, a local community bar, regulated locally by the city and the state, of which of the clientele,

generally, is almost entirely from Rhode Island, so that in that situation, I don't think it could be said -- it could be, but I don't think it would be reasonable to say that the likelihood that a fire there would be national in nature, and, therefore, I don't think that the consolidation which would apply to the cases that the MMTJA applies to, would apply here, because this is, essentially, a local tort, however, the people, by chance, happen to be from California, say, or some of the other circuits that Mr. Wistow here referred to. And I think that's what Congress was trying to do. And I think that frame of reference is critical, because taking that frame of reference into defining substantial majority, into defining what a primary defendant is, may be a different definition than anybody who is sued, who is expected to pay. I know that the defendants -- and I say this most respectfully, because arguments evolve over time -- but some said solvency was the issue, some said equitable indemnity, some said we can't tell before the issue of burden of proof really came up, and that was Triton's first brief. Their definitions basically struck me, and I say this most respectfully, as intuition, an intuitive response to what you would think primary defendants means. And I would submit that maybe

shouldn't be the standard, the intuitive standard of what one would think. It's the framework of the statute, what was intended here, and it is true that often it's hard to tell the intention, but here the legislative history clearly says that there was a fight going on in Congress about this bill, so much so that the first -- the progenesis of this bill, the very beginning of this bill was in the '80s, and, in fact, even earlier than that to abolish complete diversity. All the parties that eventually agreed to this bill, agreed to it because it was narrowly applied. The Department of Justice traditionally doesn't like to expand jurisdiction because it doesn't want the Federal Court overloaded. It considers the Federal judiciary already overburdened with new cases, never mind a case with so many hundreds of plaintiffs as will exist here. The Congressional Budget Office determined that there was no cost savings by the statute, because whatever would be saved by the consolidation would be lost, perhaps, by cases coming just as our cases, the miscellaneous petitions, came from State Court.

So that the frame of reference, I think, is critical in here, and by the way, those statements were made even before subsection (b) was grafted on in the year 2000. So I just wanted to make that point that

this case, I think, is different, in that, yes, the need to consolidate may be there for proper and efficient administration of justice, but only those cases that are so national that legislative history calls them, essentially, national, national in nature. Those that would apply to, those cases that aren't -- that however wise it might be to consolidate the statute, just doesn't give the Court jurisdiction over those local cases unless complete diversity of jurisdiction exists.

The only other point I would make, your Honor, is if your Honor has a question about whether or not subsection (b) is jurisdictional, because I firmly believe it is, I would ask now to be able to at least address that. If there's an understanding that, indeed, it is part of a jurisdictional scheme, that (a) and (b) both are matters of the subject matter jurisdiction as opposed to simply abstention, I mean, the defense has addressed, in large part, the abstention issues in subsection (b) as if it was discretionary abstention, or waivable, mandatory abstention, and I firmly believe that subsection (b) is as much a part of the determination of this Court's subject matter jurisdiction , whether it has it or not, as subsection (a).

Very briefly, subsection (b) is an exception to the minimal diversity referred to in (a), and I think the critical part about (a) that is critical is that (a) was meant to be a very narrow expansion of Federal Court jurisdiction by allowing minimal diversity to be used. An exception to that expansion means that the old rules apply; that there will be no expansion if Section (b) applies, and, therefore, minimal diversity can't be used, complete diversity has to be used. Simply stated, if there is no expansion, there has to be a showing of complete diversity. And that's why I think it being an exception, and there are many references in the legislative history, and I can give them to your Honor now by which those members of Congress I talked about, and the House Judiciary Committee Report in the year 2001, and other reports all have said that this is an exception, to the point where -- and one of the comments in the House Judiciary Report, there's a reference to the three amendments that were made at the 11th hour in the year 2000, one was to increase the jurisdictional limit, one was to put in subsection (b) as a further -- as an exception to the expansion of Federal Court jurisdiction, and the third dealt with the conflicts of laws. And in the legislative history, the first two, the jurisdictional

limit and subsection (b), are lumped together and described as making it more difficult to file in Federal Court, more difficult to remove. Not as abstention, but, clearly, as a matter of more difficult to file, because there is a jurisdictional impediment, an additional jurisdictional impediment, and the same with the jurisdictional limit itself. So I think it's -- the issue, as I perceive it, your Honor, is not whether subsection (b) is part of this jurisdictional scheme, I think it clearly is, because it ends the expansion, but whether the defense can sustain their burden of proof that it doesn't apply. And as to that, your Honor -- and you did mention that sometimes burden of proof doesn't matter, either it is or it isn't, the only important point that I would graft on to that is the frame of reference in interpreting those as to how narrowly this was meant to be, I think, can have a vary critical impact on, (1), how the words are defined, and also the importance that they have to prove it; we don't have to disprove.

Mr. Wistow referred to the Class Action Bill, and the only reason I mention that is because I think that's further proof that subsection (b) is a jurisdictional prerequisite. If it applies, there is no Federal Court jurisdiction. It's not just the Court

has to abstain, there is a lack of subject matter jurisdiction, which applies to is it appealable under 1447, because as Mr. Wistow said, if it is subject matter jurisdiction, there is no review by appeal or otherwise. But the Class Action Bill initially started out with the provision, sort of like subsection (a) here saying minimal diversity can apply in a class action. Now, I realize that bill still has not passed, so it's not law, but the legislative history is instructive, and there was something akin to our subsection (b), and that said in that bill, subsection (a), the expansion, doesn't apply, shall not apply. It was there is no jurisdiction in two instances; one is it's a substantial majority, it used the same language of plaintiffs or citizens of the same state as the primary defendants; the second said shall not apply, dealt with stockbrokers, and it was a very definite isolated illustration. That then was changed, and so now there were two subparagraphs; one, as Mr. Wistow said, there was a recognition if between one-third and two-thirds of the plaintiffs were from the same state, the Court had jurisdiction but may decline to exercise it, but the other one, which is critical, because it may deal with the definition of substantial majority, the Court said if there were two-thirds of the people

from the same state, the Court didn't have jurisdiction, it shall not apply.

The defendants have argued that the language "substantial majority" means virtually all, 99.7 Anheuser-Busch said in its brief. And the only thing I would comment about that, your Honor, is that that was before this amendment was made, that was in a House Judiciary Committee Report that was changed, so that the language now is less than one-third, one-third to two-thirds, two-thirds or more. And two-thirds, 66 and two-third's percent, which means more than that, there is no jurisdiction is certainly not 99.7 or virtually all.

Your Honor addressed the issue of the warehouse. There is the argument, and I'll brief, about discretionary abstention based on comity and federalism and those wise principles of judicial administration that your Honor referred to in the Buy-Rite case that you decided in, I think it was '98, and, no, you didn't discretionarily abstain in that case, but you recognized that principle, and I think so much of it stems from what has happened in Superior Court so far. The immediate comprehensive response, not just in preserving the site so it wasn't bulldozed, and not just in having us go out there and protect the evidence

from the site which took place over months, and not just in getting the warehouse and making sure everything is done correctly there, which it is, and also not just in the testing protocols that the Court approved, which we have not yet begun because of the Court's Stay here, but also that Justice Gibney entered a pretty comprehensive pretrial discovery plan, by the way, which is what led to our petition getting removed to your Honor, so I deeply appreciate the opportunity to make these points, and with that I would sit down, your Honor.

THE COURT: Thank you. I have an attention span about an hour and a half, so it is time for me to take a break. Are there anymore people who are going to argue opposed to Federal Jurisdiction at this point?

(NO RESPONSE.)

THE COURT: All the arguments now are going to be in favor of Federal jurisdiction? All right, I'll hear those after the break.

(BRIEF RECESS 11:30 - 11:45 A.M.)

THE COURT: Who will be the lead off hitter for the pro-Federal jurisdiction?

MR. RESMINI: Myself, your Honor, Ronald Resmini. Thank you, your Honor.

Your Honor, we heard arguments of federalism,

comity and jurisdiction before you today so eloquently detailed and expressed. I believe that the old saying is proof of the pudding is in the profits. Today, before in this Court, we have every interested counsel for almost all interested plaintiffs. If you were to take the alternative, which I will get into in somewhat detail, you will bifurcate, and yet you will combine everyone here in many different courts. Already in a relatively short period of time, actions have been filed in this Court by myself, actions were filed in the State Court, actions were filed in the Connecticut Court, actions were filed in the Massachusetts Court. Mr. Wistow indicated that under the venue argument almost any state in any Court could accept a case such as this under the circumstances in which he defines. I do not necessarily agree that the statute is so poorly drafted by the Congress.

What it is, it's very simply put, and, perhaps, not necessarily simply applied. And that's why we are here, to get uniformity, to avoid confusion, and, obviously, hopefully, a significant expenditure by all parties, including the defense. There isn't, perhaps, eight circuits, there are nine circuits which touch this case, because Connecticut happens to be in the Second Circuit and not the First Circuit, but that's

irrelevant. When we look at what one should do in these circumstances, we always have to balance what the alternative is, what happens if you say I'm going to send these cases back where they came from? We talk about the confusion in *Lexecon* after so many years. I believe your Honor has somewhat prepared by that by indicating that you intend to certify the question of accepting jurisdiction, assuming if, in fact, you do, to an Appellate Court to get some resolution. The only caveat I have and others share with me is the fact that discovery will not be continued during this process regardless of how long it takes. I would only ask the Court to reconsider, assuming you accept jurisdiction, to allow discovery to go forward, because of, obviously, the freshness of the evidence, people moving, and the staleness of certain factual situations that may occur a year and a half from now that do not necessarily exist at the moment.

THE COURT: I'll come to that bridge and cross it or not cross it at the appropriate time.

MR. RESMINI: When we talk about jurisdiction, I don't believe that -- and I read all the briefs before I came here today, yesterday and last evening -- I don't believe there was anyone in this courtroom and who was not in this courtroom, who didn't agree that

1369(a) did not given this Court jurisdiction. The question is what happens when we get to (b). Some of us say it's clear, it's not part of jurisdiction. Believe me, this statute, to me, is not as confusing as one would want it to be. You look at what it says, "Limitation of Jurisdiction of District Court," and then they get into those caveats where they use the word "shall." When they say "limitation of jurisdiction," it presupposes that the above has been satisfied in (a), that there is jurisdiction or you don't even get to (b). That's not all that confusing to make that interpretation.

When you look at whether or not you are bound to exercise under the word "shall," I personally believe that you are, regardless of how you balance (a) and (b). That I believe that regardless of whose burden it is, I think it's significantly important for you to feel comfortable that the substantial majority issue in the primary defendant issue has been satisfied, regardless of who put it forward. But one must realize that all the arguments that you have heard today in the time that that's been directed to you , no one has given you any percentages of individuals that seem to be any different than what our briefs and reported figures have indicated, which is that if you look at

the Department of Health's statistics that I gave you originally in my brief where they only listed 40 individuals that were injured, setting aside the people who are fatalities, it was 2515. You look at the other figure of 5941, you look at the other reported document that had the addresses of all the individuals that were there that evening, I believe those figures come to 267 Rhode Island, 137 outside of the State of Rhode Island. When you balance all those figures, all those figures are very comfortable with the definitions of the substantial majority and the primary defendants. So that regardless of whose burden it is, you have to have some weighing factor to assist you in making your decision. We have given that to you, regardless of whose burden it is. If there is an opposition to this memorandum or this position that has 185 individuals that are represented, not talking about relatives and heirs, we have not heard what those percentage figures represent, I would except that they are not any different than what you have already been confronted with. So that with the analogizing and the definitions of, again, primary defendant, which your Honor indicated which we had in our brief as distinguished to secondary defendants, you look at the defendants that we sued primarily in the Court, every single count

alleged certain factual scenarios, many of them giving case citations and statutes as to why we felt each one of those defendants were a so-called primary defendant. You've got the joint tort-feasor, joint and several liability, you've got joint enterprise, you've got promotion, you've got responsibilities of overseeing certain supervisors who were doing the fire inspections, whether it was the state in failing to educate. You've got odd infinitum of elements, 95 percent of which the law is somewhat settled in Rhode Island as to what law should be applied. As an inference, for whatever it's worth, on some of these other significant issues, which we have indicated were promotion, the states that are somewhat connected to these cases, Texas, Alabama, Connecticut, Massachusetts, all have references and citations on -- Rhode Island does not -- on the issue of promotional liability. So when we're looking at what is a primary defendant and what is a regular defendant, I believe your Honor correctly indicated that the only understanding and knowledge that I have from any references that I've looked at is primary and secondary, which has to do with indemnity. So that for those reasons, the primary defendant definition, certainly, does not allow this Court and your Honor to

take these cases and send them back where they came from. When the same committee, the same committee that drafted this legislature in referring to some other act, talked about what a primary defendant was, and I believe they said, without saying it verbatim, is that that individual who would be responsible for the ultimate cost to paying the obligation, which obviously is what this is all about. If you show 1 percent negligent on any of these defendants, they are 100 percent responsible. It really has nothing to do with deep pockets, and any lawyer who exercises rights on behalf of his client really addresses the questions, first, of liability, and, secondarily, with the idea of who is going to pay it. When you are talking about liability, regardless of -- and excuse me for using the defendant's name -- Bob Derderian, or the Great White, if they're the initiating causes, if they trigger it by some of their actions, which, in turn, imputes negligence to one or the other so-called primary defendants, they have to be there. It would be malpractice not to bring in these so-called primary defendants. Whatever one wants to refer to as another type of defendant, which is not a secondary defendant, that's not another issue, but to leave out -- and, by the way, talking about the State of Rhode Island, in

reality, if you asked a nonlawyer where would you get the best objectivity addressed on bringing an action against the Town of West Warwick or the State of Rhode Island, but in this very Court itself. This is a Court, of course, we are in the State of Rhode Island, but it is detached from the system. There is less of a reason to obviously be biased one way or the other. I believe that's a help, not a hindrance in this Court accepting responsibilities on this particular case.

It would be an absolute -- even, by the way, even Judge Gibney in one of the briefs indicated that this case is not about speed, this is about justice, this is about fairness, and that's what this is all about. No reflection on anything that Judge Gibney can do, but her powers are limited, she cannot do what you can do, she cannot take all those cases that have already been out there and that are in this Court today. Brian Cunha's cases, he indicated to me, expressed to this Court, that he will voluntarily remove those cases here. There is another attorney who has one plaintiff out of the State of Connecticut, they have a right to bring this case in here under the regular jurisdiction requirement, because there is complete diversity. So it doesn't even mean that this Court escapes the same type of responsibilities,

generally the same type of time and involvement that it would get by getting all the cases. It absolutely makes absolutely no sense. If there was a system that said that if you can't take it, and it all goes to Judge Gibney, then that would be a good balancing of the equity. That comports to a Doctrine of Juris Prudential Equanimity, because then you'd have two choices to make, but we don't have that choice. It's you or it's everywhere. And it makes absolutely no sense to take this very simple statute, and, really, all we're really talking about is 1369, the rest of it only serves 1369.

So for those reasons, I would suggest to this Court on reviewing all the memorandums, which, obviously, are ad nauseam covering every particular subject one can imagine, and then when you're reflecting on what happens when you're asked to construe this particular document, this writing, this 1369, this Court, more significantly than any Court, has been construing the Constitution on a daily basis. There is a document that everyone expounds as being well written and applicable at the time and has a modification to it that it grows as the years grow with it. If this Court, which it has not any problem interpreting the Constitution, and all those precedents

which interpret the Constitution, certainly, can take this case de novo with the Statute de novo, and certainly provide direction for all counsel, so that all clients, regardless of plaintiffs or defendants, are addressed, again, with fairness and justice.

Professor Adomite, I believe from Western School of Law, had written a law review article. It is my understanding after speaking to him that it was his intent to forward it to your Honor and forward it to every interested attorney that he could obtain an address from, which we sent to him from copies of the briefs that were filed with this Court.

THE COURT: I get copies from all sorts of places and I've read it, and my law clerks have read it.

MR. RESMINI: But there a scholastic approach without any particular --

THE COURT: He may have made a mistake in that article, but we won't have to get into that.

MR. RESMINI: He wrote quite a bit, he wrote it without the benefit of having the briefs that were filed by both sides, and after listening to Mr. Wistow, he modified my feelings on whether or not the shall provision should be addressed by you regardless of which way you go, and I tend to agree with him on that,

but what I'm getting at is the final analysis, as Professor Adomite said, that this is the Court where it should stay. And I leave you with one other thought, that Hubert Humphrey once was asked about a particular law and said why should it be applied, and his response without any hesitation was not only because it's the law, as 1369 is, but also because it is right. And for those reasons, I would ask your Honor to take and accept full jurisdiction on these cases. Thank you.

THE COURT: All right.

MR. CRANE: Now good afternoon, your Honor. My name is Ed Crane --

THE COURT: Good Afternoon -- not quite, my clock says 11:59.

MR. CRANE: My apologies, my watch is a little bit fast, your Honor. Then, good morning, your Honor. My name is Ed Crane. I represent Anheuser-Busch in the matters that have been filed in this Court, your Honor, along with Mr. Cavanaugh, and I realize that I'm second in the batting order here in the pro-Federal camp, and I intend to keep my remarks short, but I would like to make a couple of observations at the outset.

One is that even though I represent Anheuser-Busch in the cases, your Honor, at least for purpose of today's argument, I'm really arguing on

behalf of a number of other defendants who have been sued on promotional theories, sponsorship theories, we got together before the argument and decided that given all the lawyers involved, there might be some sense of economy if one lawyer addressed issues common to those defendants. So for purposes of today, at least, that's what I'm doing. Those defendants include Shell and Clear Channel, McLaughlin & Moran and some other defendants.

We're here, really, in the Court, your Honor, because we have an Act of Congress. That Act of Congress was passed to confer Federal subject matter jurisdiction on this Court. We think it is clear, we think it is unambiguous, and, in fact, we respectfully submit, your Honor, that the Station Fire is exactly the type of accident that Congress envisioned when it adopted the Multiparty Multiforum Trial Jurisdiction Act of 2002. You've had voluminous briefs, there is a law review article, eloquent counsel have argued here today; no one, no one opposing, no one -- excuse me -- no one asking this Court to abstain has suggested that this litigation does not qualify under 1369(a). It's clear. It's clear that the jurisdictional grant applies here for reasons that I'll talk about in just one second. All of the debates you have heard is about

1369(b).

Your Honor, we're also here because Federal Court, under the MMTJA, is the only place where the interests of judicial economy, fairness to all parties, can take place. Counsel already talked with you about how this tragedy, in fact, is national in scope. We know, your Honor, that, unfortunately, of the 100 people killed, 41 were non-Rhode Island residents. Mr. Wistow talked to you about cases that would likely be filed all over the country in eight or nine Federal Judicial Circuits. We know, as we stand here today, that cases have already been filed in Connecticut, in Massachusetts, in Rhode Island State Court, and, indeed, originally in this Court, your Honor. And we also know that that's only the vanguard. Hundreds of more cases are coming to be filed wherever, to only multiply the problems, exponentially, in terms of judicial management, in terms of discovery, in terms of conflicting rights and responsibilities of Courts and parties, and, therefore, your Honor, all of those considerations are what impelled Congress to pass the MMTJA; to create one Federal Court responsible for handling all civil litigation arising from a single tragedy at a unique location. That is exactly what we have here. We are asking the Court to exercise its

clear grant of jurisdiction under 1369(a), and, your Honor, we've heard much talk today about what the statute did not contain, or what the legislative history may have contained at some point. Your Honor, I would like to speak to you for just a few minutes about what the statute does contain, because I think you need to look no further than this statute to understand that you are fully empowered to act as the one Court to adjudicate all civil actions, whether originally filed in State Court or Federal Court arising out of this tragedy.

You have a Federal subject matter jurisdiction grant in 1369(a); applies to a single accident involving deaths of 75 or more natural persons, unfortunately, more than 75 natural persons were killed in this terrible tragedy. You have minimal diversity among adverse parties. It's undisputed. No party disputes the 1369(a) showing that's been made here by Anheuser-Busch and the other parties urging this Court to exercise its jurisdiction. And for that reason, your Honor, we respectfully submit that we have met the burden that was our burden, and the removed actions, the cases that we removed from the Rhode Island State Court to this Court, to show that this Court has Federal subject matter jurisdiction. The other

defendants have met that burden as well. The focal point, everything you have heard about today, has been about Section 1369(b). I think you understand our position, your Honor, that that is an abstention provision. Indeed, it is not jurisdictional. Because the way the statute is set up, the Court makes the initial determination under 1369(a) as to whether Federal subject matter jurisdiction applies, and it makes that determination -- again, we respectfully submit -- by looking at the accident, looking at the facts and circumstances and the totality of the parties in the accident. The Court must do that in order to come to the conclusion that it involves 75 or more deaths of natural persons. Once that jurisdictional determination is made, the Court has jurisdiction, unquestionably. And the only question, then, is whether the Court must invoke the abstention that's set forth in 1369(b). So I'm urging the Court not to confuse those issues. 1369(a) is jurisdictional, 1369(b) is abstention. We believe there is really no serious dispute about that.

THE COURT: Well, you agree that it is a mandatory abstention; I'm mandated by Congress to abstain if the provisions of (b) apply.

MR. CRANE: The statute says, "shall abstain,"

your Honor, and we agree that shall abstain is mandatory; however, it involves subsidiary determinations that the Court must make, which we believe are discretionary, and the Court's already talked about those.

The Court must, must determine whether the primary defendants are all from one state, and must determine whether the substantial majority of all plaintiffs are from the same state, and are also from the same state as the primary defendants. We respectfully submit, your Honor, that those subsidiary determinations within 1369(b) likely fall within the Court's discretion because they involve, at least to some extent, factual examinations that the Court must make about the parties in the litigation. Nonetheless, your Honor, as we've argued, we believe that the parties who have the burden of demonstrating abstention, those opposing proceedings staying in this Court, have to establish that the primary defendants are from one state, and I would like to just articulate briefly what Anheuser-Busch's position is, it has been set forth in our briefs, but very simply, it's this: We came at it from the micro and then went to the macro.

What we stated to the Court is primary

defendant, at a minimum, in this particular litigation has to include the parties who started the fire, and then we said it's more expansive than that; it includes other parties who have been sued directly by the plaintiffs, and who will be pursued by the plaintiff under theories of joint and several liability, because those primary defendants, most culpable, most responsible for causing the fire, undoubtedly, have insufficient assets to deal with the scope of this tragedy, and then, your Honor, we said it is even broader than that, it could be all direct defendants, but we respectfully submit, all direct defendants is certainly a workable definition of primary defendant, but it also should include an assessment of the defendants who are most culpable for causing this tragedy. And the allegations that you see in the complaints indicate who started the fire, Judge, there doesn't seem to be any mystery about that. In addition, your Honor, you do have to deal with the substantial majority of all plaintiffs' question, and, simply, when you look at 1369(a) and what it requires the Court to do to make the threshold jurisdictional determination, and then you look at substantial majority of all plaintiffs' language in 1369(b), we believe it's very clear that what the Court must do is

to assess where all plaintiffs are in the litigation as a whole, all litigation arising from the Station Fire. Not case by case, but all litigation. And various parties have submitted information about who those plaintiffs are to the Court.

But we submit that the two prongs of the abstention analysis, both primary defendant and substantial majority, can never be satisfied in this litigation by the parties seeking abstention, just based on the facts in the record to date. And, therefore, your Honor, we submit that this Court cannot invoke abstention under 1369(b).

I'll close now, your Honor, unless the Court has questions of me.

THE COURT: Let me ask you this. How am I going to determine what this substantial majority is when I've only got a few cases, I've got a few statistics; how am I going to know who all these plaintiffs are going to be?

MR. CRANE: I'm glad you asked that question, your Honor, because I do have some thoughts on that, which I'll respectfully submit for the Court's consideration. But at the threshold, I will submit that you need not even get to that determination if you deal with the primary defendant issue in the ways that

we have suggested, because it's a two-part test, your Honor, and if the primary defendants are not all from the same state, then, your Honor, there is no need to even proceed to the substantial majority analysis, but assuming the Court needs to proceed to the substantial majority analysis, you have, in this courtroom -- I became a lawyer because I can't count well -- I don't know, 50, 100 lawyers, whatever the number is, many of whom, many of whom are experienced counsel representing plaintiffs and families who have claims arising from the Station Fire. You could ask them to submit information to this Court about who those parties are and what states they are citizens of, your Honor. You could ask that of the parties before this Court. You could ask all parties to submit whatever information they have. But, your Honor, at a minimum we know based on the submissions that Mr. Resmini made in the past complaint, and the allegations that he makes there, and the list that he submitted to the Court of the decedents, we know that 41 of the decedents are not citizens of Rhode Island, so begin the inquiry there. That's one suggestion that I have for the Court on this question. But, again, I'll reiterate that the Court need not get there if it decides the primary defendants are not all of the same state.

THE COURT: What does substantial mean in your view?

MR. CRANE: Substantial means virtually all, your Honor. That's what it means. That's what it has to mean in order for the Court to fully effectuate Congressional intent in passing this statute, because the overarching intent of the statute -- and I don't think anybody can dispute this -- was to allow full consolidation of all civil actions arising from a single accident in one Federal Court, and Congress unambiguously, your Honor, determined that Federal Court is the only forum where that can take place, and your Honor knows that. Your Honor knows that if the cases are filed in multiple state courts, and this Act is held not to apply by your Honor, that there will be no way to consolidate all those cases in one Court. So we submit, your Honor, that substantial majority means virtually all plaintiffs who have claims arising from all cases, arising out of the Station Fire. That's our position. We believe that's consistent with what Congress intended here. Otherwise, your Honor, you would have a statute which was enacted to consolidate all civil actions with a lesser definition of substantial majority that would allow -- that theoretically could allow many cases to escape the

scope of the Act. Congress didn't intend that. And I'll offer one other reason for why Congress didn't intend that. In addition to 1369(a), which I talked about, your Honor, look at the removal provision, Section 1441(e). It is a sweeping removal provision. It provides that a defendant can remove any case to Federal Court that could have originally been brought under 1369 in Federal Court, that's 1441(e)(1)(a), if memory serves. 1441(e)(1)(b), your Honor, goes well beyond that. 1441(e)(1)(b) says that "Any defendant currently a defendant in a Federal action brought under 1369, can remove any civil action from State Court, even if that action could not originally have been brought in Federal Court under 1369." I think you need no further evidence than that of the scope of what Congress was trying to achieve. It was saying you have Federal subject matter jurisdiction under 1369(a), and removal jurisdiction which will allow you to bring all cases related to the accident that confers subject matter jurisdiction under 1369(a) into Federal Court for disposition.

I believe that's the best evidence, your Honor, at this hour of what Congress intended to do, and I respectfully submit that Congress did exactly what it set out to do in passing the statute. The Court has

all the power it needs, it has jurisdiction, the parties can bring all cases here, whether filed in State Court, or, as an example, your Honor, cases filed in other Federal courts. There was some discussion today about how somehow it is limited, and we can't get all cases here, that's not true, we can. Anheuser-Busch moved under Section 1404 to transfer the Hanault case originally filed in Connecticut to this Court, that Court granted the motion. That case is coming here. And, in addition, I don't want to get off on a sidetrack, your Honor, but, the statute as enacted allows this Court to exercise jurisdiction over all Station Fire cases wherever they're filed. We can use Section 1404 to get Federal cases here. We can use 1441(e) removal jurisdiction to get all state cases here. And if there are any Federal cases that ultimately escape the 1404 net, we can still, as a last resort, and we do not intend to do this, but we could still in a last resort, go to a Multidistrict Panel and ask that those cases be transferred here for consolidated pretrial proceedings. The MDL panel still has that power for any Federal case. This statute didn't take it away. And the whole *Lexecon* discussion we heard earlier -- your Honor is well aware of what *Lexecon* stands for -- and this statute did not, in

fact, change the *Lexecon* holding. However, the Multidistrict Panel still retains the power to transfer any Federal action here that involves a common question of law or fact. So, your Honor --

THE COURT: The statute provides that I have to give notice to the Multidistrict Panel.

MR. CRANE: Indeed it does, your Honor. Indeed it does.

THE COURT: And one question I have in my mind, when do I do this? I suppose after I find I have jurisdiction, if that's what I find.

MR. CRANE: That's a question I'll not try to answer for your Honor. I think you know what you want to do.

But in any event, just to conclude, we ask the Court to exercise its jurisdiction, proceed with adjudication of these cases, because this is the one place where all parties, all litigants, can have these disputes resolved, and we can avoid duplicative litigation, we can avoid paying lawyers unnecessarily, we can avoid burdening witnesses with all of the problems that arise from cases that aren't consolidated in one Court. Thank you very much for your attention, Judge.

MR. REARDON: Good afternoon, your Honor. My

name is Robert Reardon, and I represent sixteen plaintiffs that brought a lawsuit in the District of Connecticut, eight of which are victims of the fire, and the others are related parties. I thank the Court for this opportunity and for permission to address you. I will be very brief. I appreciate the Court's patience in listening to these arguments, all of the points that have been well made by my colleagues here on both sides of this issue.

Our situation, your Honor, is somewhat different in that all of the plaintiffs that we represent are residents and citizens of the State of Connecticut, and none of the defendants that have been named in our lawsuit are residents or citizens of the State of Connecticut, thus, we have complete diversity.

In addition, your Honor, we have always sought jurisdiction under the new Act, the MMTJ Act, but if this case remains here, as it was transferred here by Judge Squatrito, it would not be possible to transfer this case to the Rhode Island Superior Court, and, therefore, our case would be returned to the District Court of Connecticut. Judge Squatrito, if your Honor has received his decision, I'd appreciate you --

THE COURT: I've read it.

MR. REARDON: You have the decision. Very well,

your Honor. He did point out something in his decision that I think is significant to the arguments that have been made this morning, found on Page 10 and 11, where he said that in addressing the potential rights of the Connecticut Plaintiffs, that should the District of Rhode Island decide to abstain from exercising jurisdiction over the actions pending before it under Section 1369, a transfer of this action to the District of Rhode Island would still benefit the parties to this case. If this case is transferred now, venue in the District of Rhode Island would still be proper, even if that same Court decided to abstain under Section 1369(b). A transfer at this juncture would eliminate future uncertainty and litigation by providing an unassailable forum for the Plaintiffs' claims.

Judge Squatrito feels that this is, in fact, the unassailable forum for the litigation of these claims, and your Honor has well pointed out that you are in the unique situation of making a final decision if that, in fact, is the case.

We would urge your Honor that since we have complete diversity, it is not in the interest of the Connecticut Plaintiffs to delay any further in making that decision that needs to be made as to what Court will, in fact, hear the issues that need to be

addressed in this case. When we commenced our litigation, we began our discovery process, we had filed Interrogatories, noticed certain depositions. All of that has been stayed until this Court makes a determination of the issues that are now before you. We urge this Court to address those issues promptly, and I know your Honor appreciates the magnitude of this tragedy and how it has affected these victims. We all recognize as members of the judicial system, that justice delayed is justice denied, and the victims here want nothing more than to move forward and get closure of this process. While your Honor certainly will, I'm sure, do the right thing in deciding whether to keep these cases or send them back to respective jurisdictions where they may come from, please keep in mind that the longer we delay in getting to the forum that needs to address issues of discovery and depositions, the more witnesses' minds fade, the more difficult it is to obtain evidence, and while I compliment counsel who have secured the evidence -- the physical evidence from the scene, there is a great deal more that needs to be done, and we would all like to get on with doing it, your Honor.

So, respectfully, your Honor, my point is that at least according to the District of Connecticut, this

is the unassailable forum for the Plaintiffs' claim, and since diversity exists in the Connecticut cases, it is not the State Superior Court here in Rhode Island, and, finally, your Honor, if your Honor recognizes the arguments that have been made objecting to jurisdiction in this Court venue, we respectfully request that you remove these cases or reject these cases and send them back, transfer them back to the District of Connecticut.

If you have any questions of me, your Honor -- I will simply mention, your Honor, that as one point in determining, in looking at my defendants, it appears to me that 11 of the defendants are based in Rhode Island, and 16 are out-of-state defendants, so we have all of the Plaintiffs in our case, are Connecticut citizens, none of the defendants are Connecticut citizens, and of the defendants, more than half of those defendants are not citizens of the State of Rhode Island.

Do you have any questions of me, your Honor?

THE COURT: I have nothing. Thank you.

MR. REARDON: Thank you, your Honor.

THE COURT: Hearing no response, then I presume those are all the oral arguments.

I have read all this material that's been submitted to me already, I will read it again and so

will my law clerks. I'll take this matter under advisement, and I will issue a written decision. I'm writing on a clean slate, and I'll do the best I can. Thank you.

(ADJOURNED 12:21 P.M.)

C E R T I F I C A T I O N

I, Angela M. Gallogly, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Angela M. Gallogly, RPR

1-6-04
Date

FILED
2004 JAN -8 P 12:40
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND