UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

TAMMY PASSA; WALTER CASTLE, JR.; )
CHERYL ROSSI, as next of kin of )
decedent, JOSEPH E. ROSSI, )
)
Plaintiffs, )
)
v. ) C.A. No. 03-148L
)
JEFFREY DERDERIAN; MICHAEL DERDERIAN; )
DERCO, d/b/a "The Station"; MANIC )
MUSIC MANAGEMENT, INC.; JACK RUSSELL; )
MARK KENDALL; DAVID FILICE; ERIC )
POWERS; DANIEL BICHELE; PAUL WOOLNOUGH; )
KNIGHT RECORDS, INC.; ANHEUSER-BUSCH )
COMPANIES, INC.; MCLAUGHIN & MORAN, )
INC.; AMERICAN FOAM CORPORATION; )
WHJY-FM; CLEAR CHANNEL COMMUNICATIONS, )
INC.; TOWN OF WEST WARWICK; DENNIS )
LAROCQUE, individually, and as Fire )
Inspector for the Town of West Warwick; )
STATE OF RHODE ISLAND; IRVING OWENS, )
individually, and in his capacity as )
Fire Marshal for the State of Rhode )
Island; TRITON REALTY LIMITED )
PARTNERSHIP; TRITON REALTY, INC.; )
FOAMEX INTERNATIONAL, INC.; GENERAL )
FOAM CORPORATION; ANHEUSER-BUSCH, INC.; )
SHELL OIL COMPANY; MOTIVA ENTERPRIZES )
LLC; LUNA TECH; LUNA TECH, INC. )
)
Defendants. )

RONALD KINGSLEY, as Parent and Next )
Friend of ZOE JEAN KINGSLEY, a minor, )
and on behalf of all beneficiaries of )
LISA KELLY, )
)
Plaintiffs, )
)
v. ) C.A. No. 03-208L
)
JEFFREY DERDERIAN; MICHAEL DERDERIAN; )
DERCO, d/b/a "The Station"; MANIC MUSIC )

MANAGEMENT, INC.; JACK RUSSELL; MARK )
KENDALL; DAVID FILICE; ERIC POWERS; )
DANIEL BIECHELE; PAUL WOOLNOUGH; KNIGHT )
RECORDS, INC.; ANHEUSER-BUSCH, INC.; )
MCLAUGHLIN & MORAN, INC.; LUNA TECH, )
INC.; LUNA TECH PYROTECHNIK GMBH; )
AMERICAN FOAM CORPORATION; WHJY-FM; )
CLEAR CHANNEL COMMUNICATIONS, INC. )
)
Defendants. )

BARBARA GUINDON, individually and as )
Mother and Next Friend to ERICA GUINDON, )
a minor; CHRISTOPHER SCOT; )
JULIANNA GIAVEN; ERIC MALARDO; MICHELLE )
MALARDO; RICHARD SANETTI; PATRICIA )
SANETTI; CATHERINE CARIGNAN; DANIEL )
DAVIDSON; STEPHEN BRUNO; TAMMY AYER, )
as Guardian and Next Friend to KAYLA )
MARIE DOROTHY ABBENANTE AYER, a minor; )
LOUIS ROSSI, as Administrator of the )
Estate of JOSEPH ROSSI; EDWARD CORBETT, )
JR., as Administrator of the Estate of )
EDWARD CORBETT, III; PAUL ROE, )
individually, and as Co-Administrator )
of the Estate of LORI K. DURANTE; )
GEORGE GUINDON; MICHELLE SPENCE, )
individually, and as Mother and Next )
Friend of HAILEY SPENCE, a minor, )
)
Plaintiffs, )
)
v. ) C.A. No. 03-335L
)
AMERICAN FOAM CORPORATION; FOAMEX )
INTERNATIONAL, INC.; BARRY H. WARNER; )
TRITON REALTY LIMITED PARTNERSHIP; )
JEFFREY DERDERIAN; MICHAEL DERDERIAN; )
DERCO; MANIC MUSIC MANAGEMENT, INC.; )
JACK RUSSELL; MARK KENDALL; DAVID )
FILICE; ERIC POWERS; DANIEL BICHELE; )
PAUL WOOLNOUGH; KNIGHT RECORDS, INC.; )
ANHEUSER-BUSCH, INC.; MCLAUGHIN & )
MORAN, INC.; LUNA TECH, INC.; LUNA TECH )
PYROTECHNIK GMBH; CLEAR CHANNEL )

COMMUNICATIONS, INC., d/b/a WHJY-FM; )
MOTIVA ENTERPRISES, LLC; SHELL OIL )
COMPANY; TOWN OF WEST WARWICK; DENNIS )
LAROCQUE; STATE OF RHODE ISLAND; IRVING )
J. OWENS, )
)
Defendants. )

LOUIS F. ALVES and MARY A. ALVES, )
as parents of LOUIS S. ALVES, deceased; )
ROBERT W. RAGER, )

Petitioners, )
)
v. ) M.P. No. 03-70L
)
MCLAUGHIN & MORAN, INC.; ANHEUSER-BUSCH, )
INC.; CLEAR CHANNEL BROADCASTING, INC.; )
)
Respondents, )
)
v. )
)
JEFFREY DERDERIAN; MICHAEL DERDERIAN; )
and DERCO, )
)
Interested Parties. )

JUDITH O'BRIEN, Mother of ROBERT )
RESINER, decedent; LAWRENCE FICK, )
Father and Guardian of SAMANTHA and )
WILLIAM FICK, minor children of )
CHARLENE FICK, decedent; DEBORAH LEMAY; )
CLAIRE BRUYERE, Mother of BONNIE HAMLIN, )
decedent; MICHAEL PERREAULT, )
)
Petitioners, )
)
v. ) M.P. No. 03-71L
)
MCLAUGHIN & MORAN, INC.; )

| | |
|---|---|
| ANHEUSER-BUSCH, INC.;<br>CLEAR CHANNEL BROADCASTING, INC.,<br><br>Respondents,<br><br>v.<br><br>JEFFREY DERDERIAN; MICHAEL DERDERIAN;<br>and DERCO, d/b/a "THE STATION,"<br><br>Interested Parties. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>DECISION AND ORDER</u>

Ronald R. Lagueux, Senior United States District Judge

On February 20, 2003, a deadly fire destroyed a nightclub located in West Warwick, Rhode Island, known to its patrons as "The Station." The fire started during the first minutes of a performance by the rock band Great White, while the club itself was crowded with spectators, staff, and performers. When defendants, Jack Russell, Mark Kendall, David Filice, and Eric Powers, members of the band "Great White" (hereafter referred to as "Band Members") took the stage that night, they and their tour manager, Daniel Bichele, ignited pyrotechnic devices as a part of their performance.[1] These "pyrotechnics," also described as stage fireworks, or sparklers, caused flaming sparks to explode behind the stage area. According to witnesses, the sparks from these fireworks ignited foam insulation material previously

---

[1] One of the members of Great White, Ty Longley, was killed in the nightclub fire, and as a result, he is not a defendant.

installed in the club's ceiling and walls for soundproofing purposes.[2] Once started, the fire quickly spread throughout The Station, creating a fiery inferno in its wake. In less than three minutes, the entire establishment was ablaze, and a reported 412 people inside the building that night were scrambling to escape the conflagration.[3] According to this Court's best estimates, this tragic fire left 100 individuals dead and more than 200 injured. Only seventy-seven people are reported to have escaped the building without physical harm, yet, even for these lucky few who escaped bodily injury, the disaster continues to haunt their memories and affect their lives. The impact of this tragedy on the victims, the survivors, their families and friends, and the entire community cannot be overstated. The Station nightclub fire, dubbed the fourth worst nightclub fire in American history, see Peter Adomeit, The Station Nightclub Fire and Federal Jurisdictional Reach: The Multidistrict, Multiparty, Multiforum Jursidiction Act of 2002, 25 W. New Eng. L. Rev. 243, 243 (2003), continues to pervade the

---

[2] For a detailed account of the tragedy at the time it occurred, including statements of witnesses, see Karen Lee Ziner, Many Feared Dead, Scores Hurt When Fire Hits W. Warwick Club--Witnesses: Fireworks From Show Set Blaze, Providence J.-Bull., Feb. 21, 2003, at A1.

[3] Newspaper reports of the fire have estimated the number of individuals inside the club that night at 412, see The Station Nightclub Disaster: In the Fire, Providence Sunday J., Sept. 21, 2003, at A16.

consciousness of those affected by the tragedy, even as we sort through the ashes in search of understanding.

In the wake of this tragedy, numerous lawsuits have been filed throughout southern New England in both state and federal courts. At present, this Court is concerned with five of these cases, two originally filed here in the United States District Court for the District of Rhode Island, Passa v. Derderian, C.A. No. 03-148L, and Guindon v. American Foam Corp., C.A. No. 03-335L, and three cases removed here from the Rhode Island Superior Court, Kingsley v. Derderian, C.A. No. 03-208L, Alves v. McLaughlin & Moran, Inc., M.P. No. 03-70L, and O'Brien v. McLaughlin & Moran, Inc., M.P. No. 03-71L.[4]

Three of these cases, Passa, Guindon, and Kingsley, are civil actions filed by fire victims, their estates, and surviving family members alleging a variety of different state law tort claims against a host of different named Defendants. These named Defendants include the surviving Band Members (including their tour manager), their management company, and their record label;

---

[4] This writer is also aware of three other "Station Fire" cases recently transferred to this Court from the District of Connecticut and the District of Massachusetts, Estate of Henault v. American Foam Corp., C.A. No. 03-483L (from Connecticut), Roderiques v. American Foam Corp., C.A. No. 04-26L (from Massacusetts), and Sweet v. American Foam Corp., C.A. No. 04-56L (from Massachusetts). As these causes of action allege a separate, independent basis for federal jurisdiction under 28 U.S.C. § 1332, the federal diversity statute, federal jurisdiction in those cases is a separate issue. Thus, the litigants in those three cases are not parties to these motions.

nightclub owners Jeffrey and Michael Derderian (the "Derderians"), a corporation owned by the Derderians, DERCO, Inc.; a real estate company, Triton Realty, Inc. ("Triton Realty"); insulation manufacturers American Foam Corporation ("American Foam") and Foamex International, Inc. (Foamex); pyrotechnic manufacturer Luna Tech, Inc. ("Luna Tech"); event sponsors such as Anheuser-Busch Companies, Inc. ("Anheuser-Busch"), McLaughlin & Moran, Inc. ("McLaughlin & Moran"), Shell Oil Company ("Shell"), Motiva Enterprises, LLC ("Motiva"), WHJY-FM radio, Clear Channel Communications, Inc. ("Clear Channel"); and representatives of government agencies establishing fire code regulations and enforcing compliance, including the West Warwick Town Fire Inspector, the Town of West Warwick, the Rhode Island State Fire Marshall, and the State itself. Passa and Guindon were originally filed in this Court, while Kingsley was initially filed in Rhode Island Superior Court and then removed to this Court by Defendant Anheuser-Busch.

The other two cases, Alves and O'Brien, are miscellaneous petitions, also originally filed in Rhode Island Superior Court and removed to this Court by Anheuser-Busch.[5] These two

---

[5] One additional miscellaneous petition, Unnamed Manufacturers v. McLaughlin & Moran, M.P. No. 03-72L, was also originally filed in Rhode Island Superior Court and removed to this Court by Anheuser-Busch. However, the Petitioners in that case entered a Notice of Withdrawal in this Court on September 19, 2003. As a result, the petition is withdrawn, and that matter is no longer pending. Nevertheless, parties to this

petitions were filed soon after the tragedy by victims and other supporting entities and potential defendants in an effort to preserve physical evidence by placing it within the supervisory custody and control of the Superior Court. Unlike the civil actions at issue, these miscellaneous petitions name only a handful of Defendants, termed therein as "Respondents" or "Interested Parties."[6]

At issue before the Court is the question of jurisdiction. In each of the five cases described above, jurisdiction in federal court is alleged under a new statute, 28 U.S.C. § 1369, popularly known as the Multiparty, Multiforum, Trial Jurisdiction Act of 2002 ("MMTJA"). This is a new jurisdictional act greatly expanding the original and removal jurisdiction of the federal courts, and to date no court has had the occasion to apply or interpret it. As a result, this writer will be the first to construe § 1369, and thus, is forced to be the first to bite the proverbial bullet.

Although the five cases at issue have not been consolidated,

---

withdrawn matter have filed amicus submissions with the Court concerning jurisdiction and participated in the motion hearing held by the Court on October 15, 2003.

[6] As the Derderians point out, there are no named "Defendants" to the miscellaneous petitions, only "Respondents" and "Interested Parties." However, as the Petitioners to these actions chose to serve Anheuser-Busch and others with complaints in those cases, Petitioners have effectively cast Anheuser-Busch, McLaughlin & Moran, Clear Channel, DERCO, and the Derderians in the role of Defendants to these claims.

each of them has a motion pending on the same jurisdictional issue. In Passa, Defendants American Foam and the Derderians have filed a motion to dismiss the case for lack of jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1). This motion is opposed by a multitude of other Defendants, including the Town of West Warwick, Anheuser-Busch, McLaughlin & Moran, and Shell Oil.[7] These parties argue that jurisdiction is appropriate, and construe the motion as one for statutory abstention pursuant to § 1369(b). In Guindon, a similar motion to dismiss for lack of jurisdiction, advocated by the same parties, was filed. Opposing this motion are the Guindon Plaintiffs, Triton Realty, and Anheuser-Busch.

In the removed cases, Kingsley, Alves, and O'Brien, Defendants American Foam and the Derderians have filed motions to remand the case to state court for lack of jurisdiction, or, in the alternative, have asked this Court to abstain from exercising jurisdiction under § 1369. Regardless of the method, the end result sought in these motions is the return of these cases to the Rhode Island Superior Court. The Plaintiffs' Steering Committee, a group of lawyers representing over 180 potential

---

[7] Other parties opposing this motion are Dennis Laroque, West Warwick Fire Inspector, Motiva, Clear Channel, General Foam Corp., Foamex, and Triton Realty. An amicus submission opposing the motion was also filed by the Plaintiffs in the Estate of Henault case, which was transferred to this Court from the District of Connecitcut.

plaintiffs who have not yet filed suit, has filed an amicus submission supporting the jurisdictional position of the Derderians and American Foam. Opposing these motions are Anheuser-Busch, Triton Realty, McLaughlin & Moran, and Clear Channel.

Because each of these motions concerns the same question, namely, whether jurisdiction is proper in this Court under § 1369, this Court will consider them together in this opinion. As the reader will notice, those parties advocating federal jurisdiction and those opposing it in each of the five cases discussed above include both Plaintiffs and Defendants on both sides of the argument. Thus, this writer cannot correctly refer to either side of the argument as Plaintiffs or Defendants, as is typical in most cases. As a result, for convenience, this writer will refer to those advocating federal jurisdiction as "Proponents," and those objecting to federal jurisdiction as "Opponents."[8] Now, it is necessary to address the motions before the Court.

For the reasons discussed in this opinion, this writer concludes that jurisdiction under § 1369 is appropriate in the

---

[8] "Proponents" of federal jurisdiction in the different cases include the Town of West Warwick, Dennis Laroque, Anheuser-Busch, Shell Oil, Motiva, McLaughlin & Moran, General Foam, Foamex, Triton Realty, the Guindons, Clear Channel Communications, and the Henault Plaintiffs (amicus). "Opponents" of federal jurisdiction include American Foam, the Derderians, and the Plaintiffs' Steering Committee (amicus).

five cases at issue. As demonstrated herein, the Court interprets § 1369(b) as a mandatory abstention provision. Based on the uncontested facts presented, the Court finds that mandatory abstention under § 1369(b) is not required, as neither a substantial majority of all plaintiffs nor the primary defendants all claim residency in a single state. As a result, the Court denies Opponents' motions to dismiss for lack of jurisdiction and the motions to remand to state court.

## Discussion

I. Standard of Review

The jurisdictional question before the Court is couched in the procedural vehicle of a motion to dismiss, or, where appropriate, to remand to state court for lack of subject matter jurisdiction, brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure. On a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, "[t]he party invoking federal court jurisdiction bears the burden of proving its existence." Pejepscot Indus. Park, Inc. v. Maine Cent. Railroad Co., 215 F.3d 195, 200 (1st Cir. 2000). In order to adjudicate a Rule 12(b)(1) motion, the Court must first look to the nature of the movant's challenge. See Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). If the challenge goes to the sufficiency of the jurisdictional allegations in a complaint

(questioning not the facts themselves, but rather whether they establish a basis for federal jurisdiction), the court must credit the pleaded factual allegations as true and draw all reasonable inferences from them in the nonmoving party's favor. Id. When the challenge goes to the accuracy of the jurisdictional facts asserted by the plaintiff, it is the Court's obligation to engage in fact-finding to "address the merits of the jurisdictional claim by resolving the factual disputes between the parties." Id. Here, the Opponents of federal jurisdiction do not question the accuracy of the facts plead by Proponents in support of jurisdiction, but, rather, challenge whether these facts are sufficient to merit original federal jurisdiction under the MMTJA, 28 U.S.C. § 1369. As a result, the Court accepts the Proponents' factual allegations as true, and focuses on whether these facts, as alleged, establish a basis for federal jurisdiction under § 1369. Now, this writer will consider the statute at issue.

II. The Multiparty, Multiforum, Trial Jurisdiction Act of 2002

Federal courts are courts of limited subject matter jurisdiction. See U.S. Const. art. III, § 2. In order for a party to properly maintain a lawsuit in federal court, the court must have and retain subject matter jurisdiction over the case at all times during the litigation. Fed. R. Civ. P. 12(h)(3)

("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.") Prior to 2002, federal subject matter jurisdiction was limited to certain specific areas of law outlined in Article III, section 2, of the United States Constitution,[9] to cases where a question of federal law was presented, see 28 U.S.C. § 1331, or where the parties had complete diversity of state citizenship and an amount in controversy greater than $75,000.00, see 28 U.S.C. § 1332. In September of 2002, only months before the Station nightclub tragedy, Congress enacted a new jurisdictional statute, the MMTJA. This statute reads, in pertinent part:

> § 1369. Multiparty, multiforum jurisdiction
> (a) In general.-The district courts shall

---

[9] Article III, section 2 of the United States Constitution provides:

> The judicial Power shall extend to all Cases, in law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;-to all Cases affecting Ambassadors, other public Ministers and Consuls;-to all Cases of admiralty and maritime Jurisdiction;-to Controversies to which the United States shall be a Party;-to Controversies between two or more States;-between a State and Citizens of another State;-between citizens of different States;-between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. Const., art. III, § 2.

> have original jurisdiction of any civil action involving minimal diversity between adverse parties that arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location, if-
>
> (1) a defendant resides in a State and a substantial part of the accident took place in another State or other location, regardless of whether that defendant is also a resident of the State where a substantial part of the accident took place;
>
> (2) any two defendants reside in different States, regardless of whether such defendants are also residents of the same State or States; or
>
> (3) substantial parts of the accident took place in different States.
>
> (b) Limitation of jurisdiction of district courts.-The district court shall abstain from hearing any civil action described in subsection (a) in which-
>
> (1) the substantial majority of all plaintiffs are citizens of a single State of which the primary defendants are also citizens; and
>
> (2) the claims asserted will be governed primarily by the laws of that State.

28 U.S.C. § 1369 (2002).

This new jurisdictional statute, by its terms, expands the original jurisdiction of federal courts to include lawsuits arising from accidents where more than 75 natural persons die at a discrete location, provided that the other requirements of the statute are satisfied. The first part of the statute, § 1369(a), grants the federal district court original jurisdiction over any civil action stemming from such a tragedy with minimal diversity between the parties, provided that one of the following factors

is also present: (1) a defendant resides in a different state from where a substantial part of the accident took place, regardless of whether a substantial portion of the accident also took place in his or her own state; (2) any two defendants reside in different states, regardless of whether these defendants happen to reside in the same state as another defendant; or (3) substantial parts of the accident took place in different states. Neither side of this jurisdictional controversy disputes the application of § 1369(a) to the facts of the Station nightclub tragedy, as the fire caused over 75 deaths at a discrete location in West Warwick, Rhode Island, and the named defendants in these five cases are not all residents of Rhode Island, or of the same state. The MMTJA defines "minimal diversity" as existing when "any party is a citizen of a State and any adverse party is a citizen of another State...." 28 U.S.C. § 1369(c) (Emphasis added). Here, the Plaintiffs to these five causes of action are all residents of Rhode Island, while the various Defendants are residents of multiple different locales, including Rhode Island, California, Missouri, Pennsylvania, Texas, Alabama, Delaware, Massachusetts, Nevada, and Germany. This writer agrees with the parties that the first part of the MMTJA granting federal jurisdiction, § 1369(a), is satisfied in this case.

It is the second part of the MMTJA, § 1369(b), that has the different parties to these motions in disagreement over whether

cases arising from the Station nightclub fire should be brought in federal or state court. Section 1369(b), entitled, "Limitation of jurisdiction of district courts," mandates that a district court judge abstain from hearing any civil action meeting the requirements of § 1369(a) where two conditions are both satisfied: abstention is required when (1) "the substantial majority of plaintiffs are citizens of a single State of which the primary defendants are also citizens" and (2) "the claims asserted will be governed primarily by the laws of that State." 28 U.S.C. § 1369(b). Opponents of federal jurisdiction argue that § 1369(b)'s exception operates as a limitation on the statute's grant of original federal jurisdiction, defining the text of the statute in light of its subsection heading, "Limitation on jurisdiction of district courts." These parties then suggest that the facts of the Station fire and the nature of the claims presented satisfy both § 1369(b)(1) and (2),[10] and that therefore this Court has no subject matter jurisdiction, and is statutorily required to dismiss and/or remand these cases. Proponents of federal jurisdiction disagree, arguing that the statutory text of § 1369(b), which begins with the phrase "[t]he district court shall abstain," is a mandatory abstention doctrine

[10] Opponents argue that both the "substantial majority of all plaintiffs" and the "primary defendants" are all residents of Rhode Island, and that the claims asserted will be primarily governed by the laws of Rhode Island.

rather than a jurisdictional limitation provision, that the facts of the disaster fail to satisfy the tenets of § 1369(b)(1),[11] and that, as a result, mandatory abstention by this Court is not required. These contrary interpretations of § 1369(b) require this writer to interpret the meaning of the statutory subsection and then apply it to the facts of the Station nightclub tragedy in order to discern whether federal jurisdiction exists in these cases.

III. Statutory Construction

In order to determine the meaning of § 1369(b), this Court must engage in statutory construction. As the First Circuit has observed, statutory construction must always begin with the language of the statute as written by the legislature. U.S. v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987). When the statutory language is clear on its face, and its words "neither create ambiguity nor lead to an entirely unreasonable interpretation," an inquiring court must apply the statute as written, and "need not consult other aids to statutory construction." Atlantic Fish Spotters Ass'n v. Evans, 321 F.3d 220, 224 (1st Cir. 2003); Charles George Trucking Co., 823 F.3d

---

[11] Proponents concede that the claims at issue will be governed primarily by the tort laws of Rhode Island. Thus, the requirements § 1369(b)(2) are satisfied in the context argued herein.

at 688 ("So long as the statutory language is reasonably definite, that language must ordinarily be regarded as conclusive (at least in the absence of an unmistakable legislative intent to the contrary)."). However, when the statutory language chosen by Congress is unclear, or capable of more than one reasonable interpretation, it is proper for a court to consult extrinsic sources, such as legislative history, for guidance. U.S. v. Gibbens, 25 F.3d 28, 34 (1st Cir. 1994).

Here, as the parties make clear in their submissions, the terminology used in § 1369(b) does not "point unerringly in a single direction," Charles George Trucking, 823 F.3d at 688. Specifically, § 1369(b) and (b)(1) present this writer with three different textual nuances whose meaning cannot be resolved without additional study: (1) the potentially dichotomous title and text "Limitation on jurisdiction of district courts.--The district court shall abstain from hearing any civil action described in subsection (a) in which--"; (2) the clause "substantial majority of all plaintiffs," and (3) the term "primary defendants," all three of which the statute itself fails to explain or define. The statutory language of this subsection is thus capable of more than one reasonable interpretation. As a result, this Court is obliged to look beyond the words of the statute and consider other sources to determine Congressional intent and purpose in creating this new statutory provision.

IV. Legislative History of the MMTJA

The MMTJA has its genesis during the Carter administration. During oversight hearings conducted in the 95th Congress by the House Subcommittee on Courts, Civil Liberties and the Administration of Justice (now Courts, the Internet and Intellectual Property), the House of Representatives considered different possible changes to be made in the federal judiciary in an effort to streamline the process and promote judicial efficiency. One concept considered by the House Subcommittee was the abolition of federal diversity of citizenship jurisdiction. H.R. Conf. Rep. No. 107-685 at 199 (2002), reprinted in 2002 U.S.C.C.A.N. 1120, 1151. Because the Senate opposed such an expansive change in the federal courts, the House Subcommittee narrowed its focus, and eventually concentrated "on the problem of dispersed complex litigation arising out of a single accident resulting in multiple deaths or injuries." Id.

Over the years that followed, legislation on this narrowed issue was introduced in both the 98th and 99th Congresses, but never enacted. The House of Representatives approved legislation similar to the MMTJA in the 101st and 102nd Congresses, and the full House Committee on the Judiciary favorably reported similar language in the 103th Congress, however, the provisions failed to proceed into law. Id. Language similar to the MMTJA next

appeared in the "Judicial Reform Act," as amended, which the House of Representatives passed during the 105th Congress, but which also failed in the Senate. Id. During the 106th Congress, the House of Representatives passed the precursor to the MMTJA, H.R. 2112, by voice vote under suspension of the rules. Id.

This early version of the MMTJA, however, stalled in the Senate. During the "waning days of the 106th Congress," the bill's author, Representative F. James Sensenbrenner, proffered the Senate three possible changes to H.R. 2112 in an effort to increase support for the bill. Id. at 201, reprinted in 2002 U.S.C.C.A.N. at 1153. One of these proffered changes to H.R. 2112 was what now appears as § 1369(b) of the codified MMTJA. Id. Although H.R. 2112 failed to pass the Senate, it was resurrected by the House of Representatives in the 107th Congress as H.R. 860. Id. at 200, reprinted in 2002 U.S.C.C.A.N. at 1152. As an effort of good faith, Representative Sensenbrenner included in H.R. 860 the language of the three compromise clauses he had originally proffered to the Senate at the end of the 106th Congress to generate support for H.R. 2112, including the language that would later constitute § 1369(b). 147 Cong. Rec. H893-01, available at 2001 WL 252448 at *7. After only two days in Committee, H.R. 860 was put to a vote in the House of Representatives, and passed under suspension of the rules. Id., available at 2002 WL 252448 at *11 and *19. H.R. 860 then went

to the Senate, where, after some modifications, the bill passed the Senate and was enacted into law. According to the House Conference Report on the MMTJA, "No hearings on H.R. 860 were held in the 107th Congress given the ample legislative history that preceded it from the 95th Congress to the 106th." H.R. Conf. Rep. No. 107-685 at 200, reprinted in 2002 U.S.C.C.A.N. at 1152.

In reviewing the existing legislative history, this writer finds that the MMTJA was intended to "streamline the process by which multidistrict litigation governing disasters are adjudicated," creating a device whereby multiple causes of action all stemming from one major disaster can be consolidated for adjudication in one federal court. Id. at 199, reprinted in 2002 U.S.C.C.A.N. at 1151. As was articulated in the MMTJA House Conference Report, regarding the purpose for the new legislation:

> It is common after a serious accident to have many lawsuits filed in several states, in both state and federal courts, with many different sets of plaintiffs' lawyers and several different defendants. Despite this multiplicity of suits, the principal issue that must be resolved first in each lawsuit is virtually identical: Is one or more of the defendants liable?....The waste of judicial resources--and the costs to both plaintiffs and defendants--of litigating the same liability question several times over in separate lawsuits can be extreme.
>
> Different expert consultants and witnesses may be retained by the different plaintiffs' lawyers handling each case. The court in each lawsuit can issue its own subpoenas for records and depositions of witnesses, potentially conflicting with the discovery scheduled in other lawsuits.

> Critical witnesses may be deposed for one suit and then redeposed by a different set of lawyers in a separate lawsuit. Identical questions of evidence and other points of law can arise in each of the separate suits, meaning that the parties in each case may have to brief and argue--and each court may have to resolve--the same issues that are being briefed, argued, and resolved in other cases, sometimes with results that conflict.
>
> Current efforts to consolidate all state and federal cases related to a common disaster are incomplete because current federal statutes restrict the ways in which consolidation can occur--apparently without any intention to limit consolidation....For those cases that cannot be brought into the federal system, no legal mechanism exists by which they can be consolidated, as state courts cannot transfer cases across state lines. In sum, full consolidation cannot occur in the absence of federal legislative redress.
>
> The changes set forth in [the MMTJA] speak directly to these problems.

Id. at 200, reprinted in 2002 U.S.C.C.A.N. at 1152.

Here, after reviewing this legislative history, it is clear that in enacting § 1369, Congress intended to create a mechanism whereby litigation stemming from one major disaster could easily be consolidated in one federal court for discovery and trial. It is also clear that Congress' motivation in passing this legislation was to promote judicial efficiency while avoiding multiple lawsuits concerning the same subject matter strewn throughout the country in various state and federal courts. Thus, § 1369 was intended to address these concerns by creating a new statutory grant of original federal jurisdiction aimed

exclusively at large accidents resulting in 75 or more deaths.

Opponents have argued that the MMTJA was intended only to apply to cases arising from airline disasters, citing as evidence repeated references to airline disasters in the legislative history and testimony before Congress from representatives of the airline industry concerning the effects of multidistrict airline litigation. It is true that Congress' enactment of the MMTJA occurred only months after the tragic events of September 11, 2001, a disaster involving terrorist attacks on American cities utilizing hi-jacked commercial airplanes. However, while it is certainly correct that major airline disasters were contemplated when this act was formulated by Congress, neither the language of the bill itself nor the legislative history limit the application of § 1369 to airline tragedies. In arguing for the passage of H.R. 860 in the House of Representatives, Representative Sensenbrenner explained that he believed "the purpose of this bill is to make the process of adjudicating a common disaster lawsuit, such as one arising from a plane crash or a train wreck, more convenient to all of the litigants concerned." 147 Cong. Rec. H893-01, available at 2001 WL 252448 at *13. Earlier Congressional discussions from the prior introduction of the bill's predecessor in the 102nd Congress describe the intended scope of the proposed legislation as extending to even more kinds of complex tragedies, including hotel fires. See 137 Cong. Rec.

E1923-02 (1991), available at 1991 WL 86705 at *1. As a result, this writer concludes that the MMTJA was not intended to apply only to airline disasters, but to all qualifying tragedies resulting in the death of 75 or more natural persons.

Another critical part of the statute is the clause added by Representative Sensenbrenner at the last minute to garner additional support for the bill in the Senate, § 1369(b). As this section appeared near the end of this bill's consideration in the House, and as there were no additional debates on this clause in the Senate, the legislative history on § 1369(b) is somewhat limited. Representative Sensenbrenner described the clause on the House floor as creating an "exception to the minimal diversity rule." 147 Cong. Rec. H893-01, available at 2001 WL 252448 at *7. The clause was also referred to as "an additional safeguard to the limited expansion of Federal court jurisdiction." Id. Finally, the largest piece of legislative history concerning § 1369(b) in particular can be found in the MMTJA House Conference Report:

> Subsection (b) of new § 1369 creates an exception to the minimal diversity rule. In brief, a U.S. district court may not hear any case in which a "substantial majority" of the plaintiffs and the "primary" defendants are all citizens of the same state; and in which the claims asserted are governed primarily by the laws of that same state. In other words, only state courts may hear such cases.

H.R. Conf. Rep. No. 107-685 at 201, reprinted in 2002 U.S.C.C.A.N. at 1153.

Although less description is provided, these passages nevertheless shed light on the legislative intent behind Representative Sensenbrenner's compromise clause. From the descriptive language utilized, it is clear that Congress was concerned about a small subset of disaster cases finding their way into federal court--cases where the substantial majority of the plaintiffs and the "primary" defendants are all from the same state, and where the claims asserted will be governed primarily by the laws of that same state. By creating § 1369(b), Congress attempted to create a statutory exception, or "safeguard" whereby these local disaster cases could continue to be heard in state court, even though more than 75 people died therein and minimal diversity existed between the parties. Thus, in an effort to achieve this balance, the statute directs the federal court to "abstain from accepting jurisdiction in primarily local actions," in favor of state courts. Adomeit, <u>supra</u> at 252-56.

Now, in light of this history, the Court turns to the three statutory clauses from § 1369(b) at issue.

V. Is 28 U.S.C. § 1369(b) a Mandatory Abstention Clause or a Jurisdictional Condition?

As discussed above, the statute at issue, § 1369(b), begins with the following section heading and statutory text:

"Limitation of jurisdiction of the district courts.--The district court shall abstain from hearing any civil action described in subsection (a) in which-...." 28 U.S.C. § 1369(b). While neither the subsection heading nor the statutory text appear ambiguous in isolation from one another, it is their juxtaposition that fosters variant interpretations. Proponents of federal jurisdiction look to the text of the statute as controlling over the section title, and read this provision as a mandatory abstention clause acting as a limitation on the <u>exercise</u> of the original federal jurisdiction given to United States District courts by Congress in § 1369(a). Thus, Proponents view § 1369(a) as jurisdictional, and § 1369(b) as a mandatory abstention clause imposed by Congress, similar to that found in the Bankruptcy Act, 28 U.S.C. § 1334(c)(2). Opponents of federal jurisdiction read the section title as dominating the text of the statute, and argue that § 1369(b) operates as a limitation on the statute's jurisdictional grant itself. Thus, Opponents read § 1369(b) as an exception, or a condition to the statute's jurisdictional grant, arguing that the federal court has no jurisdiction if § 1369(b)(1) and (2) are satisfied.

While the outcome of this debate may seem purely academic, the parties in these cases argue intensively that its resolution has an impact on the instant motions to dismiss/remand. First, the parties argue that whether § 1369(b) is viewed by this Court

as an abstention clause or a jurisdictional clause may have an impact on the burden of proof in this analysis. As stated before, the burden of proof in a Rule 12(b)(1) motion is always on the party asserting federal jurisdiction. See Pejepscot Indus. Park, Inc., 215 F.3d at 200. However, in some instances, such as the mandatory abstention clause contained in the Bankruptcy Act, 28 U.S.C. 1334(c)(2), requiring mandatory abstention in bankruptcy cases upon motion, the burden of proof is instead placed on the party advocating abstention. See Renaissance Cosmetics, Inc. v. Development Specialists Inc., 277 B.R. 5, 12 (S.D.N.Y. 2002) (party seeking mandatory abstention under bankruptcy statute must show that all statutory requirements have been satisfied). Proponents of federal jurisdiction argue that § 1369(b) is analogous to § 1334(c)(2). Therefore, Proponents argue that Opponents' motion to dismiss under Rule 12(b)(1) should be viewed as a motion to abstain, and that, as a result, the burden of proof in this analysis should be shifted to Opponents. However, as the underlying facts in this case are uncontested, and as the outcome of these motions will not be affected by the burden of proof, this writer feels that assigning the burden of proof in this case is unnecessary.

Although the burden of proof is not a material factor in determining this motion, this writer feels that more long term issues affecting the case bear on the construction of § 1369(b)

as an abstention clause or a jurisdictional condition. As this writer has observed, in order to hear a particular case or controversy, federal courts must have and retain subject matter jurisdiction at all times during the litigation. Thus, a motion under Rule 12(b)(1) to dismiss the case for lack of subject matter jurisdiction is proper at any time during the course of the litigation. Further, if subject matter jurisdiction evaporates before the case is fully litigated, it is the Court's duty to dismiss the case for lack of federal subject matter jurisdiction, regardless of whether the parties desire or have moved for dismissal under Rule 12(b)(1). See Fed. R. Civ. P. 12(h)(3).

Abstention, however, is a different doctrine. Abstention is not jurisdictional in nature. S.G. Phillips Constructors, Inc. v. City of Burlington, 45 F.3d 702, 708 (2d Cir. 1995) ("The act of abstaining presumes that proper jurisdiction otherwise exists."); see also Quackenbush v. Allstate Insurance Co., 517 U.S. 706, 712 (1996) (stating that an abstention-based remand order was not premised on lack of subject matter jurisdiction). Rather, as this court has recently observed, abstention doctrines "are judicially created rules whereby a federal court may decide not to hear a matter before it even when all other jurisdictional and justicibility requirements are present." Office of the Child Advocate v. Lindgren, 296 F.Supp.2d 178, 189 (D.R.I. 2004).

Abstention doctrines "uniformly reflect a desire to allow state courts to decide certain matters instead of federal courts" even though the necessary prerequisites for federal subject matter jurisdiction are present. Erwin Chemerinsky, Federal Jurisdiction, § 12.1, at 736-37 (3d ed. 1999). Although some abstention doctrines are discretionary, others are mandatory. U.S. v. Lewis, 936 F. Supp. 1093, 1106-08 (D.R.I. 1996) (describing four of the mandatory and discretionary abstention doctrines recognized by the United States Supreme Court). In those cases where abstention is required, a federal district court may not hear the cause of action before it, and must defer instead to the jurisdiction of the state court.

When faced with a situation where abstention may be mandated, the district court must address the issue at the outset and determine whether it is required to abstain from hearing the matter presented. However, once a court has determined that abstention is not required, this question is not typically revisited during later stages of the litigation. Indeed, it has been held reversible error for a trial judge to determine that abstention is not required, hear a case, and then attempt to abstain once the matter has proceeded through trial. Guiney v. Roache, 833 F.2d 1079, 1080 (1st Cir. 1987). Therefore, because federal courts do not routinely abstain from hearing cases in the later stages of litigation, while they do dismiss cases at all

stages for lack of subject matter jurisdiction, this Court's interpretation of § 1369(b) as a statutory abstention provision or a jurisdictional condition could affect future proceedings in this litigation.

A. Mandatory Abstention as a Limitation on the Exercise of Jurisdiction

With this in mind, this writer turns to the provision at hand. After reviewing the statutory language and the legislative history, this writer is persuaded that § 1369(b) should be read as a mandatory abstention clause limiting the exercise of federal jurisdiction. In developing § 1369(b), it was Congress' intention to provide an "exception" or "safeguard" limiting the exercise of federal jurisdiction under § 1369 in those cases arising from purely local disasters. Reading § 1369(b) as an abstention provision is most consistent with this intended result. Because the United States Supreme Court has mandated that federal courts must "proceed to judgment and give redress to parties before them in every case to which their jurisdiction extends," Office of the Child Advocate, 296 F.Supp.2d at 189 (citing New Orleans Pub. Serv. v. Council of New Orleans, 491 U.S. 348, 358 (1989)), a district court's decision to abstain from exercising federal jurisdiction is the exception rather than the rule, justified only under exceptional circumstances where

the state court's interest in hearing the case serves an important countervailing interest. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976). Here, as the text of § 1369(b) demonstrates, Congress identified certain exceptional circumstances in disaster litigation cases where the state court's interest in hearing the matter outweighs the federal interest in multidistrict, multiforum consolidation--namely, where the tragedy is sufficiently local in character as to satisfy the tenets of § 1369(b)(1) and (2). In these cases, although jurisdiction is otherwise proper under § 1369(a), the text of § 1369(b) instructs district courts to abstain from hearing them. Thus, viewing § 1369(b) as a mandatory abstention provision is consistent with the legislative history characterizing the subsection as an exception to the minimal diversity rule contained in § 1369(a).

In addition, interpreting § 1369(b) as a mandatory abstention provision is consistent with the language of the statute itself, which reads, "The district court shall abstain[.]" 28 U.S.C. § 1369(b). The meaning of the terms "abstain" and "abstention" in the federal jurisdictional context are well established as referring to those rules, originally created by the judiciary, whereby federal courts can decline to hear some matters otherwise properly before them on grounds that they are more suitably situated in state court. See Chemerinsky,

§ 12.1, at 735. Thus, the concept of abstention both utilizes the actual language of the statute and furthers Congress' stated intent to restrict federal district courts' ability to hear purely local disaster cases unless jurisdiction is established on different grounds. See H.R. Conf. Rep. No. 107-685 at 201, reprinted in 2002 U.S.C.C.A.N. at 1153 ("[A] U.S. district court may not hear any case in which a "substantial majority" of plaintiffs and the "primary" defendants are all citizens of the same state....").

Thus, this writer agrees with Proponents that § 1369(b) is a mandatory abstention provision, directing district courts to abstain from hearing those cases stemming from local tragedies, as defined in the statute.[12]

B. Section Headings vs. Statutory Text

The crux of the Opponents argument in favor of § 1369(b) as a condition to jurisdiction rests in the subsection heading, "Limitation of jurisdiction of district courts," which Opponents

---

[12] Although this writer does not address Proponents' argument that § 1369(b) is analogous to the mandatory abstention provision found the Bankruptcy Act, 28 U.S.C. § 1334(c)(2), the Court notes additional support for its analysis on abstention in the fact that similar language in § 1334(c)(2), reading "the district court shall abstain from hearing such proceeding," has been interpreted by the First Circuit and other courts as a mandatory abstention clause rather than a condition to jurisdiction. See In re Middlesex Power Equipment & Marine Inc., 292 F.3d 61, 67 (1st Cir. 2002).

argue functions as a jurisdictional condition and controls this Court's interpretation of the following statutory text. However, contrary to Opponents' argument, this heading text does not trump the language of the statute itself unless that language is itself ambiguous. As the United States Supreme Court has observed:

> [H]eadings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner; to attempt to refer to each specific provision would be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain.

Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co., 331 U.S. 519, 528-29 (1947) (internal citations omitted).

If the statutory text in question is separated from the subsection heading, it reads as follows:

> The district court shall abstain from hearing any civil action described in subsection (a) in which--
>
> (1) the substantial majority of all plaintiffs are citizens of a single State of which the primary defendants are also citizens; and

(2) the claims asserted will be governed primarily by the laws of that State.

28 U.S.C. § 1369(b).

A plain reading of the statutory text alone draws this writer to only one conclusion--the statute requires the district court to abstain from hearing any case satisfying the jurisdictional requirements of subsection (a) when the stated criteria are satisfied. Thus, this writer disagrees with Opponents, and does not find § 1369(b) to operate as a jurisdictional condition. Rather, the Court considers it a mandatory abstention provision.

VI. Is Abstention under 28 U.S.C. § 1369(b) Required?

Having determined that § 1369(b) is a mandatory abstention clause, the Court now considers whether or not this statutory subsection requires abstention in the five cases at issue. As stated above, there are three elements that must be satisfied before abstention under § 1369(b) is required. First, the Court must find that the "substantial majority of all plaintiffs" are all from the same state, here, Rhode Island. Second, the Court must find that the "primary defendants" are also from Rhode Island. Third, the Court must determine that the claims asserted will be governed primarily by the laws of Rhode Island. The last of these elements is not in contention, as it is clear that Rhode

Island law will govern the tort claims asserted in the five cases at bar. Thus, this court must turn its attention to ascertaining whether the first two elements are satisfied.

A. The Substantial Majority of All Plaintiffs

The first prerequisite to abstention in § 1369(b) centers on this Court's interpretation of the phrase, "the substantial majority of all plaintiffs are citizens of a single State[.]" Opponents of federal jurisdiction argue that abstention is warranted in the five cases at issue because "the substantial majority of all plaintiffs" in litigation stemming from the Station nightclub fire are all citizens of Rhode Island. Proponents contest this characterization, arguing that the substantial majority of all plaintiffs in these cases are not all from one single state. In order to evaluate this issue, this writer must focus on two interpretative questions. First, to whom does the phrase "all plaintiffs" refer? Second, what amount constitutes a "substantial majority" under the statute?

Several possible interpretations of the term "all plaintiffs" have been suggested to the Court. One suggestion is that as the statute uses the term "plaintiffs" rather than victims, this Court should consider only those parties who have filed suit to date in each case, and thus, are plaintiffs in litigation arising from the Station fire, in determining whether

abstention is necessary under § 1369(b). However, in light of the legislative history documenting Congress' interest in broad consolidation of multiple lawsuits arising from a single accident in one judicial forum, this Court feels that reading the term "plaintiffs" in such a limited fashion is not warranted.

Although only a limited number of plaintiffs have filed suit to date, it is certain, based on the large number of fire victims, that many more suits will follow in the days to come. According to reports of the fire, 412 individuals were present in the Station nightclub on the night of the fire. Out of these persons present, 100 individuals died as a result of the fire. In addition to this number, more than 200 persons are reported to have suffered some form of injury as a result of the tragedy. See Tracy Breton, The Station Nightclub Disaster-Panel Wants State Court to Hear Fire Suits, Providence J.-Bull., Sept. 9. 2003, at B1.[13] According to the Derderians, only 77 individuals are believed to have escaped the fire without injury. Splitting the difference, this Court estimates that there are at least a total of 335 potential plaintiffs who have or may litigate claims

---

[13] According to data in the Providence Journal, 412 individuals were present at the Station the night of the fire. Out of this total, the Journal listed approximately 255 persons as from Rhode Island, making Rhode Islanders represent 61.89% of the people inside the club before the fire. This figure is less than two-thirds of the total, and it takes into account all those present, not merely those killed or injured. See The Station Nightclub Disaster: In the Fire, Providence Sunday J., Sept. 21, 2003, at A16.

arising from the Station nightclub fire. This figure does not include potential derivative claimants (spouses, children, and other dependants of fire victims), as that number of potential plaintiffs is much larger, and indeed, at this point, incalculable.

A case-by-case reading of the term "all plaintiffs," considering only those plaintiffs who have filed, would frustrate Congress' desire for consolidation. Currently, this Court has been transferred three additional cases arising from the Station nightclub fire from Connecticut and Massachusetts. The plaintiffs in these cases are not all from Rhode Island-indeed, in Estate of Henault v. American Foam, C.A. No. 03-483L, the filing plaintiffs are all from Connecticut, and have jurisdiction in this court based on the federal diversity statute, 28 U.S.C. § 1332. This Court has no power to transfer the Henault case to Rhode Island state court. As a result, even if this Court were to abstain from hearing the five cases at issue, it would still be required to hear cases arising from the Station fire. Since the defendants in these cases and the issues are likely to be identical, such an interpretation would foster the possibility for inconsistent discovery rulings and even verdicts on liability. Thus, this writer feels that limiting the term "all plaintiffs" to those individuals who have filed suit in each case runs contrary to Congress' intent in enacting § 1369. A broader

construction is necessary.

This writer feels that, in light of the legislative history on § 1369, any interpretation of "all plaintiffs" under the statute must include all potential plaintiffs, meaning all those who have died or suffered injury as a result of the tragedy at issue. Such an interpretation is consistent with Congress' desire to consolidate all cases arising from one major disaster in one federal court, as it conditions abstention on the citizenship of all potential claimants rather than considering only those who are the first to file suit. At present, however, and indeed, for years into the future, as the statute of limitation on tort claims under Rhode Island law tolls for minors, see R.I. Gen. Laws § 9-1-19, an exact count of the number of derivative claimants is incalculable. Therefore, this writer will consider the statistics available on the tragedy in terms of percentages, and will assume that potential derivative claims will fall in line with these percentages.

As this writer stated previously, an estimated 335 individuals died or suffered injury in the Station nightclub fire. Out of these 335 people, the Derderians have submitted documentation to the court placing 148 as residents of Rhode Island, 57 from Massachusetts, 9 from Connecticut, 2 from California, 1 from Florida, 1 from Maine, 1 from Nevada, and 1 from Ohio. The residence of the remaining fire victims is

currently unestablished before the Court. Placing this in terms of percentages, according to this writer's calculations, 44.18% of those killed or injured in the Station nightclub fire are believed to be from Rhode Island, 17.01% from Massachusetts, 2.69% from Connecticut, 0.60% from California, and 0.30% from Florida, Maine, Nevada, and Ohio, respectively. According to this Court's estimates, the residency of a remaining 34.33% of those believed killed or injured in the nightclub fire is currently unestablished in the documentation provided to this writer. These figures represent the percentage of potential plaintiffs believed to reside in each of the eight different states affected by this tragedy to date as calculable by the data available to the Court at this point in time.

Having articulated these figures, this writer must now determine whether a "substantial majority" of these potential plaintiffs can be described as citizens of a single state for purposes of § 1369(b). Proponents have argued that the statutory term "substantial majority" should be read by this Court as requiring virtually all plaintiffs to be citizens of a single state. In contrast, Opponents have suggested that this Court focus on the fact that more potential plaintiffs reside in Rhode Island than any other one state. Thus, they argue, as the number of Rhode Island fire victims more than doubles the number of victims from any other single state, this Court should find that

a substantial majority of the potential plaintiffs are Rhode Islanders.

As Congress enacted § 1369 to promote consolidation, this writer believes that a "substantial majority of all plaintiffs" must be determined not by comparing the statistics of two particular states affected by a tragedy, but rather by determining whether the number of potential plaintiffs from a single state makes up a substantial majority of all potential plaintiffs with claims arising from the same disaster. Here, Rhode Island residents make up approximately 44.18% of the group this writer has identified as representing potential plaintiffs. While it is true that Rhode Islanders make up the largest group of potential plaintiffs, it cannot be said that they constitute a "substantial majority of all plaintiffs." According to this writer's calculations, Rhode Island residents make up less than 50% of the total number of potential plaintiffs identified at this time, and thus, at this point they fail to constitute a simple majority, let alone a substantial majority. While this writer rejects Proponents' argument that the term "substantial majority" should be read to mean "virtually all," the Court does agree that a "majority" must make up more than 50% of the whole, and that a "substantial majority" must constitute a number somewhat in excess of that figure, such as two-thirds or three-fourths. Therefore, as Rhode Island residents fail to measure a

"substantial majority of all plaintiffs," this writer finds abstention unwarranted under § 1369(b)(1).

B. The Primary Defendants

Although the Court could end its discussion with this conclusion, this writer feels compelled to complete his analysis of § 1369(b) by interpreting the last undefined term in the statute, namely, the term "primary defendants." For abstention to be required under the statute, both the substantial majority of all plaintiffs and the primary defendants must all reside in a single state. Thus, to satisfy the tenets of § 1369(b)(1), this writer must determine that all of the primary defendants in litigation arising from the Station nightclub tragedy are residents of Rhode Island. To state this another way, § 1369 does not require this court to abstain if any one of the so-called "primary defendants" is from a state other than Rhode Island. As with the other terms at issue, "primary defendants" is not defined within the text of § 1369. Legislative history also fails to shed much light on which defendants Congress considered "primary."

Opponents of federal jurisdiction argue that the "primary defendants" in this case include only Rhode Island defendants, such as the Derderians, American Foam, Triton Realty, and McLaughlin & Moran. As the Opponents do not want federal

jurisdiction to attach, they argue that the Band members and their tour manager, Daniel Bichele, are not primary defendants. The Band members and Bichele, who allegedly started the nightclub fire, are all residents of California. Proponents would expand the list of primary defendants to include, at a minimum, the Band Members and their tour manager, and, at a maximum, other parties sued on theories of joint and several liability, including Anheuser-Busch, Clear Channel, Shell Oil, and others, all of whom claim residence in other states. Proponents argue that no definition of "primary defendants" should be acceptable that does not include the Band Members and their tour manager. Opponents argue that the Band Members, although sued, are not necessarily "primary defendants" in these civil actions seeking financial compensation for fire victims.

Several different definitions of "primary defendants" have been offered to the Court by the parties. First, some of the litigants have suggested to this Court that the "primary defendants" should be defined as those defendants with the "deepest pockets." This writer rejects that contention outright, as the measure of a particular defendant's ability to pay a judgment should have no bearing on this Court's evaluation of a Rule 12(b)(1) motion.

Second, it has been argued that this Court should consider those defendants that are most culpable for the nightclub fire as

"primary defendants." However, at such an early stage in the court proceedings, before either discovery or a trial on the merits, it becomes difficult, if not impossible, for this writer to assign either culpability or liability for the tragic events of February 20, 2003. To utilize this standard as a baseline, the Court would be forced to reserve ruling on abstention until the issues of liability were resolved. As a result, it is an unworkable standard, and this writer declines to adopt it.[14]

The last possible definition of the term "primary defendants," suggested by the Court at oral argument, interprets the term "primary defendants" as including all defendants facing direct liability, and excluding all defendants joined as secondary or third-party defendants for purposes of vicarious liability, indemnification or contribution. For the reasons described in this section, the Court concludes that this is not only the most workable definition of the term "primary defendants" as used in § 1369(b)(1), but also the interpretation most consistent with its use in existing tort case law.

The term "primary defendant" appears throughout modern case law, and has different meanings in different contexts. In the context of RICO claims, for example, courts sometimes divide

[14] The Court notes, however, that if it were to assign culpability at this point, it can envision no list of culpable primary defendants that omitted the names of the Band Members who are responsible for starting the fire.

defendants into two groups: primary defendants, defined as alleged participants in racketeering activity, and secondary defendants, defined as alleged aiders and abettors. See, e.g., Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 650 (3d Cir. 1998). In securities fraud actions, the Fifth Circuit has used the terms "primary" and "secondary" defendants to separate those primary parties alleged to have improperly purchased and sold securities from secondary defendants having only a "legally cognizable relationship" to the plaintiff. See Marrero v. Banco di Roma, 487 F. Supp. 568, 572 (E.D. La. 1980) (citing Woodward v. Metro Bank of Dallas, 522 F.2d 84, 94 (5th Cir. 1975)). In tort actions, however, "primary" defendants are most often defined as those parties that are allegedly directly liable to the plaintiffs, while "secondary" defendants are usually those parties sued under theories of vicarious liability or joined for purposes of contribution or indemnification. See, e.g., Haberstam v. Welch, 705 F.2d 472, 476 (D.C. Cir. 1983) (describing secondary defendants as those vicariously liable); Sims v. Chesapeake & Ohio Railway Co., 520 F.2d 556, 559 (6th Cir. 1975) (using the terms "primary defendant" and "secondary defendant" in the context of indemnification); Restatement (Second)of Torts § 886B, cmt. c (1979) (describing the terms "primary" and "secondary" responsibility in the context of indemnification); 4 Am. Jur. 2d Appellate Review § 112 (stating

that under a contribution order, a joint tortfeasor is liable to the "primary defendant" for any amount paid over a stated sum). Thus, it follows that the United States Supreme Court has historically defined "primary defendants" as those parties having a "dominant relation to the subject matter of the controversy." United States v. American Tobacco Co., 221 U.S. 106, 143 (1911).

This writer feels that all defendants sued directly in a cause of action maintain a dominant relationship to the subject matter of the controversy, while those parties sued under theories of vicarious liability, or joined for purposes of indemnification or contribution, maintain an indirect or "secondary" relationship to the litigation. Thus, this writer feels that the most appropriate definition of "primary defendants" in the context of § 1369(b)(1) must include those parties facing direct liability in the instant litigation.

As the Court commented earlier, this definition of primary defendants is also the most workable under the statute, as it does not require the Court to make a pre-trial determination of liability or culpability, but rather requires only a review of the complaint to determine which defendants are sued directly. If all defendants facing direct liability are from a single state, then that portion of § 1369(b)(1) relating to primary defendants is satisfied. If all defendants facing direct liability are from more than one state, however, the requirement

is not met, and abstention is not mandated.

Here, the Court need not engage in an in-depth analysis of how each of the defendants is sued, because it is clear that the Band members and their tour manager, alleged to have started the fire resulting in 100 deaths and over 200 injured persons, are sued directly in three of the five causes of action at issue, Passa, Kingsley, and Guindon. In these three causes of action, the primary defendants are not all from a single state, and therefore, abstention under § 1369(b) is not required.

Although the Band members and Bichele are not sued in the remaining miscellaneous petitions, Anheuser-Busch is a Respondent in both of these causes of action, Alves and O'Brien. As there are no named defendants to these two causes of action, Anheuser-Busch has the same potential for liability as the other served Respondents, which include Clear Channel, the Derderians, DERCO, and McLaughlin & Moran. Anheuser-Busch is a corporation organized under the laws of the state of Delaware, with a principal place of business in St. Louis, Missouri. Therefore, the primary defendants in the miscellaneous petitions are also not all from a single state, and, as a result, abstention under § 1369(b) is not required.

C. Removal under 28 U.S.C. § 1441(e)(1)(B)

In addition, this writer concludes that Defendant Anheuser-

Busch's removal of the two miscellaneous petitions and the Kingsley matter is proper under the new removal statute, 28 U.S.C. § 1441(e)(1)(B), also created by Congress as a part of the MMTJA:

> (e)(1) Notwithstanding the provisions of subsection (b) of this section, a defendant in a civil action in a State court may remove the action to the district court of the United States for the district and division embracing the place where the action is pending if--
>
> (A) the action could have been brought in a United States district court under section 1369 of this title; or
>
> (B) the defendant is a party to an action which is or could have been brought, in whole or in part, under section 1369 in a United States district court and arises from the same accident as the action in State court, even if the action to be removed could not have been brought in a district court as an original matter.

28 U.S.C.A. § 1441(e)(1).

Here, Anheuser-Busch is a named defendant in each of the two cases originally filed in this Court alleging jurisdiction under § 1369, Passa and Guindon. As a result, § 1441(e)(1)(B) allows Anheuser-Busch to remove to federal court any civil action arising from the same accident in which it is named as a defendant, including the Kingsley case and the two miscellaneous petitions, Alves and O'Brien. Once these actions are removed,

jurisdiction in federal court falls under § 1369 pursuant to another portion of the new removal provisions, 28 U.S.C. § 1441(e)(5). This provision reads:

> (5) An action removed under this subsection shall be deemed to be an action under section 1369 and an action in which jurisdiction is based on section 1369 of this title for purposes of this section and sections 1407, 1697, and 1785 of this title.

28 U.S.C. § 1441(e)(5).

Thus, since abstention is not warranted in these cases, and since removal was properly executed under § 1441(e)(1)(B), the Court determines that original federal jurisdiction is appropriate in these five causes of action under § 1369.

Additionally, as regards the miscellaneous petitions, the Court notes that these petitions are ancillary proceedings filed on behalf of potential plaintiffs and defendants before any civil action itself was brought, either in this Court or in state court. The motivation behind these miscellaneous petitions was the preservation of evidence from the fire. The petitions sought to preserve physical evidence from the tragedy by bringing it under the protective custody and control of the Rhode Island Superior Court. Since these petitions were filed, this evidence has been collected in one warehouse facility here in Rhode Island, and placed under the custody and control of the Rhode Island Superior Court by virtue of the miscellaneous petitions. The Court notes that it would be incongruous to remand only the

miscellaneous petitions to state court, thus allowing the state court to retain jurisdiction over the physical evidence necessary for litigation of the civil actions pending in this Court. Jurisdiction over both the evidence and the civil actions should be in the same court. Thus, this writer feels that exercising jurisdiction over the miscellaneous petitions, and thus, over the warehouse of collected evidence, is not only proper under § 1369(b), but also incidental to exercising jurisdiction over the civil actions at issue. Therefore, removal of the miscellaneous petitions was proper, and jurisdiction will be retained in this Court.

VII. Other Arguments for Remand

In addition to the arguments addressed heretofore, Opponents of federal jurisdiction suggest that this Court should remand the two removed cases, Alves and O'Brien, based on allegations that Anheuser-Busch's removal was procedurally improper. The crux of this argument is that in the miscellaneous petitions there are no named "defendants" only named "respondents." Opponents argue removal is therefore procedurally inappropriate under § 1441(e)(1)(B), as the statute requires removal to be instigated by "a defendant." However, by serving Anheuser-Busch and the other respondents with complaints in these cases, the Opponent-petitioners effectively cast these parties in the role of

defendants to these claims. Because the words respondent and defendant are almost synonymous, this writer refuses to invalidate an otherwise proper removal based merely on the niceties of legal rhetoric. Thus, the Court rejects this argument.

Another additional argument raised by Opponents is that this Court should abstain from exercising its jurisdiction in this case under another abstention doctrine, citing issues of federalism and comity. The gist of Opponents' argument here is that the state court, led by Justice Alice Gibney, has already invested considerable time and effort towards the proper management of cases arising from the Station nightclub fire. Opponents argue that in light of this commitment of resources and the large impact that the case has had on the state of Rhode Island, this Court should recognize a substantial state interest in these proceedings and abstain from exercising its jurisdiction. However, such an argument runs afoul of the First Circuit's observation that a state court's special sensitivity to particular issues is not a just cause for federal abstention. Guiney, 833 F.2d at 1085 ("We are unaware of any case in which a state court's assertedly greater sensitivity to state or local conditions has been held to justify federal abstention.") Because this Court finds that no other judicially-created abstention doctrine applies to this case, and because it refuses

to abstain based on Opponents' generalized concerns, this argument is rejected. Jurisdiction is proper in this Court under § 1369, and this Court will exercise it.

## Conclusion

For the aforementioned reasons, Opponents' motions to dismiss and/or remand for lack of subject matter jurisdiction are denied. Based on the facts presented and the analysis conducted, the Court concludes that abstention is not required in the five cases discussed herein. This Court will exercise original federal jurisdiction in these cases based on the MMTJA, 28 U.S.C. § 1369.

It is the intention of the Court to consolidate all the Station fire cases filed in, removed, or transferred to this Court for discovery purposes so that discovery can proceed in an orderly and coordinated fashion. To that end, discovery will remain stayed until September 1, 2004, in order to allow all potential plaintiffs an opportunity to bring suit and participate in discovery from the outset.

It is so ordered.

Ronald R. Lagueux

Ronald R. Lagueux
Senior U.S. District Judge
March 29, 2004