UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| TAMMY PASSA *et al.*, Plaintiffs | : | |
| VS. | : | C.A. NO.: 03-148-L |
| JEFFREY DERDERIAN *et al.*, Defendants | : | |

**DEFENDANTS FOAMEX INTERNATIONAL INC. AND GENERAL FOAM CORPORATION'S RULE 12(b)(6) MOTION TO DISMISS**

Defendants Foamex International Inc. ("Foamex") and General Foam Corporation ("General Foam") hereby respectfully move the Court, pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims asserted against them on the grounds that the plaintiffs fail to state a cause of action against them as a matter of law. For the reasons set forth in the Memorandum filed herewith, Foamex and General Foam request that all claims asserted against them in the plaintiffs' Second Amended Complaint be dismissed with prejudice.

Defendants hereby request oral argument on this motion.

Defendants
FOAMEX INTERNATIONAL INC. and
GENERAL FOAM CORPORATION
By Their Attorneys,

FROST BROWN TODD LLC

Carl A. Henlein (JRC)

Carl A. Henlein, Esq.
John R. Crockett, III, Esq.
Susan S. Wettle, Esq.
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202-3363
(502) 589-5400 telephone
(502) 581-1087 facsimile

134

and

HIGGINS, CAVANAGH & COONEY

Gerald C. DeMaria #0637
James A. Ruggieri #2828
123 Dyer Street
Providence, Rhode Island 02903
(401) 272-3500 telephone
(401) 273-8780 facsimile

**CERTIFICATION**

I hereby certify that on the 30th day of April, 2004, a true copy of the within was mailed to all known counsel.

**PASSA CERTIFICATION**

I hereby certify that on the 30 th day of April, 2004, a true copy of the within was mailed to:

Ronald J. Resmini, Esq.
Ronald J. Creamer, Esq.
RONALD J. RESMINI LAW OFFICES
155 South Main Street
Providence, RI 02903

Edward T. Hinchey, Esq.
Curtis Diedrich, Esq.
SLOANE & WALSH, LLP
Three Center Plaza
Boston, MA 02108

Thomas C. Angelone, Esq.
HODOSH, SPINELLA & ANGELONE
One Turks Head Place, Suite 1050
Providence, RI 02903

James R. Lee, Esq.
RI DEPT OF THE ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

Mark Reynolds, Esq.
Anthony F. DeMarco, Esq.
BOYER, REYNOLDS & DeMARCO, LTD
170 Westminster Street, Suite 200
Providence, RI 02903

Fred A. Kelly, Esq.
Randall L. Souza, Esq.
NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903

Howard A. Merton, Esq.
Eric M. Sommers, Esq.
VETTER & WHITE
20 Washington Place
Providence, RI 02903

Scott J. Tucker, Esq.
TUCKER HEIFETZ & SALTZMAN LLP
Three School Street
Boston, MA 02108

William P. Robinson, III, Esq.
Stephen M. Prignano, Esq.
Stephen J. MacGillivray, Esq.
EDWARDS & ANGELL LLP
2800 Financial Plaza
Providence, RI 02903

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Thomas Bender, Esq.
HANSON CURRAN LLP
146 Westminster Street
Providence, RI 02903

Faith A. LaSalle, Esq.
ZIZIK, LaSALLE & POWERS, P.C.
40 Westminster Street, Suite 201
Providence, RI 02903

Christopher C. Fallon, Jr., Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103-3508

Joseph V. Cavanagh, Jr., Esq.
Kristin E. Rodgers, Esq.
BLISH & CAVANAGH, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

James H. Reilly, III, Esq.
Donald J. Maroney, Esq.
KELLY, KELLEHER, REILLY & SIMPSON
146 Westminster Street, Suite 500
Providence, RI 02903

Marc DeSisto, Esq.
DeSISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906

Andrew J. Trevelise, Esq.
REED SMITH LLP
2500 One Liberty Place
Philadelphia, PA 19103-7301

W. Thomas McGough, Jr., Esq.
James J. Restivo, Jr., Esq.
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219

Deborah G. Solmor, Esq.
Edward M. Crane, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
333 West Wacker Drive, Suite 2100
Chicago, IL 60606

Carl A. Henlein, Esq.
John R. Crockett, III, Esq.
Susan S. Wettle, Esq.
FROST BROWN TODD
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363

Robert I. Reardon, Jr., Esq.
Robert I. Rimmer, Esq.
THE REARDON LAW FIRM, PC
160 Hempstead Street
New London, CT 06320

Susan H. Acheson
______________________________

UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| TAMMY PASSA *et al.*, | : | |
| Plaintiffs | : | |
| VS. | : | C.A. NO.: 03-148-L |
| JEFFREY DERDERIAN *et al.*, | : | |
| Defendants | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS FOAMEX INTERNATIONAL INC. AND GENERAL FOAM CORPORATION'S RULE 12(b)(6) MOTION TO DISMISS**

On February 20, 2003, a tragic fire occurred at The Station nightclub which "left 100 individuals dead and more than 200 injured"[1] (hereinafter referred to as "The Station Fire"). In an effort to lay blame for this terrible tragedy at the feet of as many parties as possible, injured persons are suing anyone remotely connected to the fire. In the lawsuits filed to date, plaintiffs have named as defendants the nightclub and its owners; the owners of the nightclub property; the rock band whose pyrotechnic display ignited the fire (and the band's managers and recording company); the company that manufactured the pyrotechnics; radio stations, gas stations and beer companies that sponsored or promoted the concert; the fire inspectors; the town of West Warwick; the State of Rhode Island; the company that sold the foam that the nightclub owners applied for soundproofing; and a company that allegedly manufactured that foam – along with persons or companies related to this long list of entities.

[1] *Passa v. Derderian*, 2004 U.S. Dist. LEXIS 5039 at *7 (D.R.I. March 29, 2004).

Plaintiffs allege defendant General Foam Corporation ("GFC") produced the polyurethane foam that The Station's owners purchased – from yet another defendant, American Foam Corporation ("American Foam") – and applied to the walls of the nightclub for soundproofing. They allege defendant Foamex International Inc. ("Foamex") purchased GFC sometime after these transactions involving the foam, and that Foamex is the successor to GFC. Because any liability of a successor would be merely derivative of any liability of GFC, for purposes of this Motion to Dismiss, Foamex and GFC appear collectively as "GFC."

In this lawsuit, the Second Amended Complaint alleges, at best, a tenuous and remote relationship between the injured Plaintiffs and GFC. Thus, GFC moves the Court to dismiss Plaintiffs' Second Amended Complaint because it fails to state a claim upon which relief can be granted. In the alternative, GFC moves the Court for summary judgment on the basis that there are no issues of material fact and it is entitled to judgment as a matter of law.

## I. BACKGROUND

GFC denies the allegations asserted against it in Plaintiffs' Second Amended Complaint, and denies that anything it has done would subject it to liability for the injuries sustained by persons in The Station Fire. Nonetheless, for purposes of this motion, GFC acknowledges that well-pleaded factual allegations of the Second Amended Complaint are taken as true.

Assuming their truth for the purpose of argument, the allegations establish that GFC owed no legal duty to the plaintiffs under Rhode Island law. Further, The Station Fire was caused by the negligence of parties other than GFC, so that any alleged

negligence by GFC is too far removed from the fire – legally and factually – to be part of the proximate causation chain. The negligent and illegal acts that occurred after GFC's alleged distant production of the foam, taken individually or altogether, are legally sufficient to sever GFC's causal connection to the fire. Whether these intervening, superceding acts are the proximate cause of The Station Fire and whether GFC owed a legal duty to the Plaintiffs present questions of law for the Court.

Plaintiffs' Second Amended Complaint fully sets forth the following intervening acts by other defendants in this case.

- American Foam (not GFC) knowingly sold its non-fire retardant packing foam to Jeffrey Derderian and Michael Derderian, The Station's owners, who used it as illegal soundproofing material for walls and ceilings.
- The Derderians purchased non-fire retardant foam and applied it to the walls and ceilings of The Station, in violation of applicable Rhode Island fire codes and Occupational Safety and Health Administration ("OSHA") regulations.
- The Town of West Warwick and the State of Rhode Island failed to properly inspect The Station premises to identify the inappropriate and illegal use of the foam on the walls and ceilings and order that it be removed.
- The Derderians permitted the illegal use of pyrotechnics on The Station premises without the license required of a business having pyrotechnics.
- Great White used pyrotechnics in their act without the license required of those who use pyrotechnics and in a facility that was not licensed for that use, and in violation of OSHA regulations; the pyrotechnics set off by the band ignited the fire.
- The Derderians violated other OSHA regulations, fire codes and recognized safe practices by overcrowding The Station on the night of February 20, 2003, failing to have exits cleared and marked, and failing to properly respond to the fire ignition to facilitate the escape of The Station patrons.

The magnitude of these superceding causes are pleaded – and therefore conceded – by Plaintiffs, inviting the Court to grant the dismissal GFC requests.

Further, even if these intervening acts of other parties did not sever the causal chain between GFC and Plaintiffs' injuries and deaths, GFC cannot be liable to Plaintiffs.

GFC was a bulk supplier of non-defective foam to others, like American Foam, who fabricated and altered the foam for countless end uses unknown to GFC. GFC's bulk foam had innumerable uses, including among others, safe packaging. Under the bulk supplier doctrine as recognized in Rhode Island, GFC had no duty to warn the distant users of end products that contain its remanufactured bulk foam.

Because GFC owed no legal duty to the plaintiffs, ***and*** because any legal causal connection of GFC to The Station fire was severed by the intervening acts of those responsible for this tragic fire, ***and*** because GFC was only a bulk supplier of foam subsequently altered and modified by others, GFC is entitled as a matter of law to have the claims against it dismissed with prejudice at this time.

## II. PLAINTIFFS' ALLEGATIONS COMPEL GFC'S DISMISSAL

In their Second Amended Complaint, Plaintiffs allege the following facts.[2] Plaintiffs Tammy Passa and Walter Castle, and Plaintiff Cheryl Rossi's husband, Joseph Rossi, attended The Station nightclub in West Warwick, Rhode Island, on February 20, 2003. (2d Am. Compl. ¶ 44.) At approximately, 10:40 p.m., defendant Daniel Biechele, the manager of the headlining act, "Great White" (*Id.* ¶ 16), began preparing the stage for the band. (*Id.* ¶ 55.) As part of the preparations, Biechele set up a pyrotechnic device in front of the drumriser on the stage. (*Id.* ¶ 55.) At approximately 11:10 p.m., Great White took the stage and Biechele activated the pyrotechnic device. (*Id.* ¶¶ 56-57.) Sparks from the device ignited foam that had been adhered to the ceiling and back wall of the stage; the fire then spread "producing toxic fumes and smoke." (*Id.* ¶ 58.) The Station

---

[2] Citations to the paragraphs of the Second Amended Complaint are to "2d Am. Compl. ¶ ____."

premises had no sprinkler system and the exit signs were not operable. (*Id.* ¶¶ 48 & 72.) In addition, the nightclub was overcrowded with guests in excess of its licensed capacity. (*Id.* ¶ 48.) Joseph Rossi died in the ensuing fire (*Id.* ¶ 60) and Tammy Passa and Walter Castle were injured. (*Id.* ¶¶61-62.)

Plaintiffs correctly blame a number of different individuals and entities for this tragic fire. They claim that defendants Jeffrey Derderian, Michael Derderian and DERCO LLC (collectively, the "Derderians"), the owners of The Station nightclub (*Id.* ¶¶ 7-9), were responsible in many ways for the fire. First, they "failed to manage, maintain, control, supervise and/or inspect the former Station nightclub" prior to or during the music concert as required by Rhode Island law. (*Id.* ¶¶ 67, 77, 87.) Second, they installed packing foam around the stage as soundproofing without ensuring that the material was fire resistant as required by Rhode Island law. (*Id.* ¶¶ 68, 78, 89.) Third, they failed to obtain permits prior to using pyrotechnics at The Station as required by Rhode Island law. (*Id.* ¶¶ 70, 79, 90.) Fourth, they allowed the use of pyrotechnics at The Station by persons not licensed to use them. (*Id.* ¶¶ 71, 80, 91.) Finally, in violation of Rhode Island law, they failed to maintain The Station premises "so that emergency lighting and exit signs were operable in the event of fire and/or power outage." (*Id.* ¶¶ 72, 82, 92.)

Plaintiffs also have named Triton Realty Limited Partnership and Triton Realty Inc., the owners and lessors of The Station property, as defendants. These owners/lessors, Plaintiffs claim, were aware that there were no sprinklers, that the fire exits were inadequate, that the wood framing and materials used within the construction

frame were combustible and that polyurethane foam had been installed as sound-proofing. (*Id.* ¶¶ 181-182, 185-186.)

Plaintiffs assert that Biechele and the members and management of the band Great White were "negligent in the use, operation, supervision, management and installation of the pyrotechnics" on February 20, 2003, and failed to obtain the required permits to use such pyrotechnics. (*Id.* ¶¶ 97-98, 103-104, 109-111, 116-117, 121-123.)

The Second Amended Complaint further claims that several defendants, including Anheuser-Busch, McLaughlin and Moran, Inc., WHJY-FM radio station and its parent companies, and Shell Oil Company were responsible for the overcrowding of The Station on the night of February 20, 2003. (*Id.* ¶¶ 127, 135, 139 & 141.) Plaintiffs assert that Anheuser-Busch's sale of beer to The Station's patrons on the evening in question "interfered with the ability of said patrons to react in such a manner as to exit the premises safely." (*Id.* ¶ 131.)

The Second Amended Complaint alleges that Luna Tech, Inc., a manufacturer and seller of the pyrotechnics used on February 20, was negligent in selling the pyrotechnic device to Great White without proper warnings. (*Id.* ¶ 146.) Plaintiffs assert that Luna Tech "knew or should have known that its pyrotechnics would be used during Great White's indoor performance and failed to warn Great White . . . in the proper use of same." (*Id.* ¶ 147.) In addition, Plaintiffs claim that Luna Tech is strictly and negligently liable for placing an inherently dangerous product into the stream of commerce without "adequate requirements for inspection of the premises where said product is being used." (*Id.* ¶ 149.)

The Second Amended Complaint alleges that the Town of West Warwick and the State of Rhode Island were negligent for failing to adequately inspect The Station premises and to enforce their various fire and safety codes. (*Id.* ¶¶ 174, 177.)

Plaintiffs also assess blame against parties not connected directly to The Station premises. According to the Second Amended Complaint, defendant American Foam sold non-fire retardant foam to the Derderians and the Derderians installed that foam as sound insulation at The Station. (*Id.* ¶ 152.) Plaintiffs assert that American Foam "knew or should have known" that the foam "would be installed in an environment intended for public assembly sensitive to heat sources" and that the foam was not flame retardant. (*Id.* ¶ 153.) American Foam, the Second Amended Complaint goes on, "knew or should have known" that the foam was defective in its design, in its warnings and for its intended use or foreseeable misuse. (*Id.* ¶ 154.) In spite of their allegations, Plaintiffs admit they do not know whether American Foam warned the Derderians that the foam was not flame retardant or whether American Foam inquired as to the Derderians' planned use of the foam. (*Id.* ¶ 37.)

Plaintiffs further allege that GFC[3] was negligent in selling non-fire retardant foam to American Foam that GFC knew or should have known was defective in its design, in its warnings and for its intended use or foreseeable misuse. (*Id.* ¶ 26.)

## III. CHOICE OF LAW

It is well-settled that "[a] federal court sitting in diversity 'must apply the conflict of law rules of the state in which it sits.'" *La Plante v. American Honda Motor Co., Inc.*,

---

[3] As noted earlier, Plaintiffs also allege that Foamex is the successor to GFC. (2d Am. Compl. ¶ 27.)

27 F.3d 731, 741 (1st Cir. 1994). A district court sitting in "minimal diversity" under 28 U.S.C. § 1369 functions in the same way as a district court sitting in diversity – both are federal courts applying state law. In the instant case, therefore, Rhode Island law should govern.

"In resolving conflict of law disputes arising out of tort actions, Rhode Island employs an interest-weighing approach." *La Plante,* 27 F.3d at 741. Under this approach, the courts consider "the rights and liabilities of the parties 'in accordance with the law of the state that bears the most significant relationship to the event and the parties.'" *Najarian v. National Amusements, Inc.*, 768 A.2d 1253, 1255 (R.I. 2001) (citations omitted). Courts will consider the following factors in reaching their conclusion:

> "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." In applying these principles in tort cases, contacts to be considered are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."

*Id.* at 1255 (internal citations omitted). The Rhode Island Supreme Court has also noted that "'in an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship.'" *Id.* at 1255 (citations omitted).

Applying the set of factors enumerated by the *Najarian* court, it is apparent that Rhode Island has more contacts than any other state with the events underlying the case at bar. Based on all of these considerations, Rhode Island law should govern this lawsuit.

*See Passa v. Derderian*, 2004 U.S. Dist. LEXIS 5039 at *45 (D.R.I. March 29, 2004) (finding "it is clear that Rhode Island law will govern the tort claims asserted" in the cases arising from The Station fire).

## IV. STANDARD OF REVIEW

Although now in its early stages, there is no question that this lawsuit and its companion cases will be immense, with a multitude of plaintiffs and defendants embroiled in litigation that will go on for years before any trial takes place. *See Passa*, 2004 U.S. Dist. LEXIS 5039 at *47 ("Although only a limited number of plaintiffs have filed suit to date, it is certain, based on the large number of fire victims, that many more suits will follow in the days to come.") Discovery alone will require an enormous expenditure of financial and human resources from both the Court and the parties.

When, as here, the Court is presented with the ability to dispose of certain claims as a matter of law, it is appropriate to do so at the first opportunity. For instance, in *Gaines-Tabb v. ICI Explosives USA, Inc.*, 995 F. Supp. 1304, 1313 (W.D. Okla. 1996), *aff'd* 160 F.3d 613 (10th Cir. 1998), the Western District of Oklahoma court was presented the question of whether Timothy McVeigh's acts in constructing and detonating a bomb beside the A.P. Murrah Federal Building in Oklahoma City were the supervening cause of the plaintiffs' injuries and deaths, and thus *the sole proximate cause* of those injuries and deaths. The question was posed to the court in a Rule 12(b)(6) motion to dismiss by the defendant manufacturer of fertilizer in the purported class action; the court addressed the dispositive causation issue before considering any discovery or class certification issues. District Court Judge David L. Russell's decision to follow this course was affirmed by the Tenth Circuit Court of Appeals and provides

authority for this Court, sitting in Rhode Island, to apply the same standard. *See Gaines-Tabb v. ICI Explosives USA, Inc.*, 160 F.3d 613 (10th Cir. 1998).

For purposes of GFC's motion for dismissal under Rule 12(b)(6), the Court examines only the well-pleaded allegations of Plaintiffs' Second Amended Complaint. *Pascoag Reservoir & Dam, LLC v. The State of Rhode Island*, 217 F. Supp.2d 206, 210 (D.R.I. 2002) (citations omitted). Here, the well-pleaded allegations of the Second Amended Complaint, taken as true, do not establish essential elements of the claims against GFC, namely, the allegations are insufficient as a matter of law to prove that a remote producer of bulk foam allegedly used as soundproofing at The Station was the proximate cause of the fire that occurred there. Moreover, the allegations cannot support a conclusion that GFC had a legal duty to prevent that fire.

The failure of the Second Amended Complaint to state a claim against GFC cannot be cured with additional or more "artful" pleading by Plaintiffs. The allegations, unproven at this stage, state all that can be logically asserted against GFC. More allegations will not alter the fact that the acts of GFC are unrelated, and not causally connected, in any sense, to the fire that occurred on February 20.

Although GFC includes materials beyond the pleadings in support of this motion, the supplemental items are not essential to establish GFC's right to dismissal of the claims against it. Nonetheless, if the Court considers the supplemental materials in reaching its decision, the irrefutable evidence will demonstrate that GFC is entitled to summary judgment at this time as well.

The Federal Rules of Civil Procedure provide that a 12(b)(6) motion to dismiss for failure to state a claim will be converted to a summary judgment motion where the motion relies on material outside of the pleadings. F.R.C.P. 12(b).[4]

GFC, as the party moving for summary judgment, satisfies its initial burden by demonstrating that there are no genuine issues of material fact for trial. This burden "may be discharged by showing that there is an absence of evidence to support the nonmoving party's case." *Rochester Ford Sales, Inc. v. Ford Motor Company*, 287 F.3d 32, 38 (1st Cir. 2002). "After such a showing, the 'burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Id.* (internal citations omitted).

"In the end, after examining the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, [the court] is required to determine if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Id.* (internal citations omitted). Here, there is neither the quality nor quantity of evidence available to the plaintiffs that will forestall judgment for GFC.

## V. AS A MATTER OF LAW, GFC'S REMOTE PRODUCTION AND SALE OF BULK FOAM WAS NEITHER NEGLIGENT NOR THE PROXIMATE CAUSE OF THE FIRE.

The essence of the allegations that compose GFC's supposed negligence is that GFC manufactured and sold foam which was not fire retardant. Plaintiffs allege that

---

[4] "The proper office of summary judgment 'is to pierce the boilerplate of pleadings and assay the parties' proof in order to determine whether trial is actually required.' Consequently, upon conversion of a motion to one for summary judgment, 'the party to whom the motion is directed can shut down the machinery only by showing that a

GFC knew or should have known that this made its foam defective in its design, in its warnings and for its intended use or foreseeable misuse.

"In order to prevail on a claim of negligence in Rhode Island, a plaintiff must prove that: (1) the defendant owed the plaintiff a legal duty to refrain from negligent activities; (2) the defendant breached that duty; (3) the breach proximately caused harm to the plaintiff; *and* (4) there was actual loss or damage resulting." *The Travelers Insurance Co. v. Priority Business Forms, Inc.*, 11 F. Supp.2d 194, 197 (D.R.I. 1998) (citing *Splendorio v. Bilray Demolition Co., Inc.*, 682 A.2d 461, 466 (R.I. 1996)) (Emphasis added.) Thus, Plaintiffs must establish that, at the time GFC allegedly produced its bulk polyurethane foam in Pennsylvania and sold it to American Foam in Rhode Island, GFC owed Plaintiffs a legal duty ***and*** that GFC's alleged production and sale of its foam was the proximate cause of Plaintiffs' harm. As a matter of law, Plaintiffs cannot establish either one of these two legal requirements.

### A. GFC did not have a duty to prevent the fire at The Station.

To sustain their negligence claims against GFC, Plaintiffs must first establish that GFC owed them a legal duty which it breached. *See Travelers*, 11 F. Supp.2d at 197. It is well-established that whether a duty exists in a particular factual situation is a question of law, and thus one that the court determines. *Santucci v. Citizens Bank of R.I.*, 799 A.2d 254, 256 (R.I. 2002); *Olivier v. State of Rhode Island*, 1984 R.I. Super. Lexis 128 (R.I. Super. Feb. 16, 1984); *Travelers*, 11 F. Supp.2d at 198. The Supreme Court of Rhode Island has, "articulated several factors that may be considered in determining

---

trialworthy issue exists.'" *Collier v. City of Chicopee*, 158 F.3d 601, 604 (1st Cir. 1998) (internal citations omitted).

whether a duty exists, including the foreseeability and likelihood of the injury to the plaintiff, the connection between the defendant's conduct and the injury suffered, the policy of preventing future harm, and the consequences to the defendant and the community of imposing a duty of care on the defendant with resulting liability for breach." *Santucci v. Citizens Bank of R.I.*, 799 A.2d 254, 256-257 (R.I. 2002).

The Rhode Island legal duty analysis – employing "foreseeability" and "likelihood" with a necessary "connection" between "conduct and the injury," and culminating in a balancing of interests test – clarifies GFC's right to dismissal of this case. It was neither likely nor foreseeable to GFC that pyrotechnics would be illegally used and ignite a fire in an overcrowded, unsafe building in which packing foam sheets (manufactured by American Foam not GFC) had been illegally applied for soundproofing and allowed to remain there for two years by oversight of the fire safety inspectors. To conclude otherwise would impose upon GFC a duty to have somehow anticipated the incredible events that lead up to the horrendous fire that occurred at The Station. Rhode Island law imposes no such duty on distant producers of nondefective bulk products such as GFC.

Moreover, consideration of the factors enumerated in *Travelers, Santucci* and *Olivier* support the conclusion that GFC did not have a duty to prevent the fire. Holding a manufacturer of a bulk material with hundreds of safe end uses responsible for every use to which its product is placed would make the manufacturer an absolute insurer of its bulk product. This outcome has been soundly rejected in the context of strict products liability. In *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775 (R.I. 1988), the Rhode Island Supreme Court recognized that for purposes of imposing strict liability for

failure to warn, a product is defective only if the seller does not warn of dangers reasonably foreseeable at the time of marketing. *Id.* at 782. The court stated that to require manufacturers to warn of unknowable dangers would be "absurd" and "make them virtual insurers of their products." *Id.*

The factors considered in determining whether a legal duty exists weigh heavily against imposing a duty on GFC to prevent the fire that caused Plaintiffs' injuries and deaths. It would be too onerous a burden to require bulk producers like GFC to anticipate, assess the hazards of, and protect unknown ultimate users from the risks of every end product containing its bulk foam. This is particularly compelling where blatantly illegal applications, uses and exposures of the bulk product occur. Because GFC did not owe a legal duty to Plaintiffs, GFC is entitled to have Plaintiffs' claims against it dismissed at this time.

### B. Plaintiffs' injuries were caused by illegal and negligent acts of others for which GFC is not responsible.

The Second Amended Complaint fails to assert facts which, if proven, would establish that GFC's production of non-fire retardant foam was the proximate cause of the Plaintiffs' injuries.[5] Plaintiffs cannot establish proximate cause because the

---

[5] GFC is also entitled to dismissal because Plaintiffs will be unable to prove that GFC manufactured the bulk foam selected by American Foam for its packaging foam sold to the Derderians. Foam manufacturers other than GFC supplied identical bulk foam to American Foam within the relevant time frame. Rhode Island requires proof of product identification to sustain a products liability case. *See Gorman v. Abbott Laboratories*, 599 A.2d 1364 (R.I. 1991) (establishment of liability requires identification of specific defendant responsible for injury). Further, Rhode Island has rejected market share as an alternative basis for liability when a plaintiff cannot identify the manufacturer of the product that caused the alleged harm. *Gorman*, 599 A.2d 1364 (R.I. 1991). However, for purposes of this Motion to Dismiss only, GFC accepts Plaintiffs' unproven allegations as true.

intervening acts that occurred between GFC's alleged negligence and The Station Fire superceded any negligence by GFC, thereby breaking the fragile causal chain connecting it to Plaintiffs' injuries. In the absence of factual allegations supporting proximate cause – an essential element of each of their claims – the claims fail as a matter of law.

### 1. Under Rhode Island law, an unanticipated intervening act renders an original act of negligence too remote to constitute a proximate cause.

Assuming *arguendo* that GFC was negligent in producing non-fire retardant polyurethane foam, GFC's negligence was not the proximate cause of Plaintiffs' injuries. Under Rhode Island law,

> A defendant's original act of negligence will be considered as a remote and not a proximate cause of a plaintiff's injury when there is an intervening act on the part of a responsible third person unless it be made to appear that the defendant should have anticipated that such an intervening act would be a natural and probable consequence of his own act.

*The Travelers Insurance Co. v. Priority Business Forms, Inc.*, 11 F. Supp.2d 194, 199 (D.R.I. 1998) (citing *Nolan v. Bacon*, 216 A.2d 126 (R.I. 1966)).

In *Travelers*, the court explained that although proximate cause is normally a question of fact, the Rhode Island Supreme Court "has not hesitated, in certain circumstances, to declare the absence of proximate cause as a matter of law." *Travelers*, 11 F. Supp.2d at 199 (citing *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461 (R.I. 1996); *Walsh v. Israel Couture Post, No. 2274 V.F.W. of the United States*, 542 A.2d 1094 (R.I. 1988); *Clements v. Tashjoin*, 168 A.2d 472 (R.I. 1961)).

The *Travelers* court ultimately concluded that the intervening act of arson which resulted in damage to certain premises was not only an illegal act which the defendant, who leased the property, was not bound to anticipate, it was also not the natural and

probable consequence of the lessee's allegedly negligent behavior of discontinuing a burglar alarm system and not informing the landlord. Further, the court found that the presence of flammable chemicals on the premises was a *condition*, rather than a *proximate cause*, of the destruction. According to the court, no danger existed in the unsecured storage of these materials alone; absent the illegal intervening act of arson, the premises would not have been destroyed.

Under Rhode Island law, intervening illegal acts of third persons have been held, as a matter of law, to have broken the chain of proximate causation flowing from a defendant's original negligent acts. *See Travelers*, 11 F. Supp.2d at 199-200 (discussing *Clements* and *Splendorio*).

In *Clements*, the defendant allegedly left the key in the ignition of his automobile, unattended, and on the grounds of a mental institution. 168 A.2d at 472. A patient at the institution subsequently entered and operated the auto, and negligently collided with the plaintiff's auto, injuring the plaintiff. *Id.* at 472-73. The Rhode Island Supreme Court held that the defendant was not bound to anticipate that his neglect in leaving the key in the ignition would "naturally and probably" result in a patient stealing the vehicle, operating it negligently and injuring the plaintiff. *Id.* at 474.

The *Clements* court also cited with approval to 65 C.J.S. Negligence § 111 d:

> Liability cannot be predicated on a prior or remote cause which merely furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, even though the injury would not have resulted but for such condition or occasion.
>
> . . . .
>
> If no danger existed in the condition except because of the independent cause, such condition was not the proximate cause.

Further, the court recognized that the question is generally one of fact, "[b]ut if there is no evidence connecting the alleged negligence with the injury, or if it is obvious that the act or omission was not the natural and proximate cause thereof, the question is for the court." *Clements,* 168 A.2d at 475.

In *Splendorio,* an asbestos inspector was hired prior to the demolition of a building to determine whether the building contained any asbestos. 682 A.2d. at 463. The inspector certified, incorrectly, that the building did not contain asbestos. *Id.* The building was demolished, and subsequently the demolition company, in violation of the law, removed the debris to its own wrecking yard rather than to a licensed solid waste facility. *Id.* It was then discovered that the building had, in fact, still contained asbestos when demolished. *Id.* The wrecking yard's neighbors, upon learning of the contaminated debris in their midst, sued various parties, including the negligent inspector, alleging diminished property values. *Id.* at 464. The Rhode Island Supreme Court held that the inspector was not bound to anticipate the demolition company's "unforeseeable and illegal superceding act." *Id.* at 467.

The Rhode Island Supreme Court has also determined, on several occasions, that certain intervening negligent acts of third persons are unforeseeable as a matter of law, and therefore, break the chain of proximate causation flowing from a defendant's original negligent acts.[6]

---

[6] For example, in *Walsh v. Israel Couture Post, No. 2274 V.F.W. of the United States*, 542 A.2d 1094 (R.I. 1988), a member of the VFW Post fell and sustained injuries when he leaned against a railing that had become dislodged when struck by a truck owned by L.W. Fontaine Trucking Co. *Id.* at 1095. The Rhode Island Supreme Court held, as a matter of law, that the failure of the VFW either to repair the damage or to post a warning for a period of nine days was not foreseeable to the trucking company and, therefore,

In these Rhode Island cases holding that an intervening act superceded the defendants' prior, remote acts of negligence – and thus, were the proximate cause of the injuries – the defendants' alleged negligent acts were much closer to the plaintiffs' injuries than the alleged negligent acts of GFC. In *Travelers*, the initial negligence was the property lessee's disabling of a burglar alarm and storing flammable chemicals on the property – and the damage was that caused by an arsonist who broke into the building and set fire to it. In *Clements*, the initial negligence was leaving keys in an unlocked car on the grounds of a mental institution – and damage was that caused by a person who stole the car and then wrecked into the plaintiff. In *Splendorio*, the initial negligence was the inspector's failure to identify asbestos-containing materials at a demolition site – and the damage was that caused by the illegal dumping of asbestos-containing materials.

GFC's alleged negligence, on the other hand, is much farther removed from the Plaintiffs' injuries – in time, space and sequence – than any of the cases above. GFC's alleged negligence is the production of non-fire retardant foam in Pennsylvania – which was then sold to a fabricator in Rhode Island who then cut, shaped and modified the foam before selling it to the Derderians, who then installed it in The Station for soundproofing, where it remained for two years through three fire inspections that should have cited its illegal use and ordered it to be removed, and where it remained until the night of February 20, 2003 when it was ignited by illegal pyrotechnics at The Station, a venue exceeding its capacity limits and lacking in basic fire protection measures. It is inconceivable that GFC should have anticipated that these intervening acts that occurred

---

constituted an intervening efficient cause that absolved Fontaine from its original negligence. *Id.* at 1096.

between its alleged remote manufacture of bulk foam years before the fire, would be a natural and probable consequence of its alleged negligence in producing bulk foam which was safe for its intended use.

### 2. Each of the numerous acts that intervened between GFC's manufacture of bulk foam and Plaintiffs' injuries was sufficient to break the legal causal chain.

Between GFC's alleged negligence and the plaintiffs' injuries from the fire, *both* illegal and negligent acts intervened. Each of these intervening acts *by itself* was sufficient to break the chain of legal causation between GFC and Plaintiffs' injuries.

#### *a. The foam was misused in violation of safety laws.*

The allegations of the Second Amended Complaint demonstrate that the non-fire retardant foam allegedly produced by GFC was misused. American Foam sold the remanufactured foam to the Derderians knowing that the foam was not fire retardant, when it had in inventory an alternative fire retardant foam.[7] Though there is some dispute as to whether American Foam knew the end use of its foam (*i.e.* that it would be installed illegally as soundproofing in an environment intended for public assembly), and though the outcome of that dispute may be critical to American Foam, it is not material to GFC's defense. Furthermore, the Derderians purchased non-fire retardant foam and installed the foam around the stage as soundproofing without ensuring that the material

---

[7] *See* "Lawyer Seeks Immunity for Singer in Nightclub Fire," ASSOCIATED PRESS (as reported on www.nytimes.com) February 28, 2003, in which Aram DerManouelian, president of American Foam, is quoted as saying that "[the Derderians] asked for egg-crate material and that's what we sold them .... It's good packaging material. You just can't light it on fire." DerManouelian also stated that American Foam sells fire-retardant packing foam, but "it costs about twice as much."

was fire resistant as required by Rhode Island law.[8] Moreover, OSHA found the Derderians' installation of flammable foam over an interior exit door and surrounding walls to be a "serious" violation.[9] On December 9, 2003, the Derderians were each indicted on 200 felony counts of involuntary manslaughter for violating the state fire code regulation that required them to use flame-resistant acoustical material in their nightclub, and for knowingly putting people in jeopardy of serious harm but choosing to ignore the risks and/or acting with a callous disregard for the safety of others.[10]

Buying non-fire retardant packing foam and applying it as soundproofing to walls and ceilings is not a natural and probable consequence of GFC's remote production of non-fire retardant foam in bulk for legal packing applications. It is not reasonably foreseeable that non-fire retardant packing foam would be sold by American Foam to be grossly misused in this manner.

#### b. *The City of West Warwick and the State of Rhode Island failed to identify, cite and order removal of the misused foam during any one of the inspections of The Station.*

---

[8] Affidavit of John M. Hoffmann ("Hoffmann Aff.") ¶ ¶ 5 and 8. Video footage taken at The Station prior to the fire shows that the Derderians may have used flammable paint to change the color of the foam after it was installed on the walls and ceilings, thereby materially altering the flammability characteristics of the foam itself. [DATELINE NBC show, August 14, 2003; Hoffmann Aff. ¶¶ 7-10.] The use of such paint on the foam would constitute even further misuse of the foam by the Derderians.

[9] *See* "U.S. fines Derderians, band on safety issues," Providence Journal, August 21, 2003. OSHA rates a violation as "serious" when "there is substantial possibility that death or serious physical harm could result, and the employer knew, or should have known, of the hazard." OSHA also fined the Derderians for a serious violation because an exit door near the stage was not distinguishable from the walls due to its being covered by the foam.

[10] *See* "Grand jury indicts club's owners, ex-tour manager in 100 deaths," Providence Journal, December 10, 2003.

Assuming *arguendo* it *was* foreseeable to GFC that the Derderians would purchase the non-fire retardant bulk foam it produced and sold to American Foam for packaging applications, and misuse it by applying it to the walls and ceilings of the nightclub, it was *not* foreseeable that the City and State fire inspectors would fail in their legal duties to protect the citizens of Rhode Island when they repeatedly failed to identify the readily apparent foam as violating City and State codes and failed to require that it be removed.

The Second Amended Complaint alleges that the City of West Warwick and the State of Rhode Island failed to inspect adequately The Station premises and to enforce their various fire and safety codes. Specifically, the City and State conducted inspections after the Derderians had installed the foam on the walls and ceiling of the nightclub. Those inspections failed to identify the foam applied to the interior of the building did not conform to R.I. Gen. Laws § 23-28.6-15.[11] Had the foam been identified at the time of the inspections, the inspectors would have cited the Derderians for the noncompliant foam and ordered that it be removed from the building.

Thus the City and State had not only the *opportunity* to ensure the removal of the non-fire retardant foam from The Station premises, but also *the legal duty* to order removal of the noncompliant foam. It was neither foreseeable to GFC nor a natural and probable consequence of the remote production of non-fire retardant bulk foam that fire inspectors would fail to identify such remanufactured foam, whose obvious misuse on the walls and ceilings of The Station constituted a violation of City and State fire safety codes.

### c. *Pyrotechnics were improperly used at The Station, igniting the fire.*

Again, assuming *arguendo* that it *was* foreseeable to GFC that American Foam would sell non-fire retardant packing foam to be used as soundproofing in a place of public occupancy, that the Derderians would misuse the non-fire retardant foam by applying it as soundproofing, *and* that City and State fire inspectors would fail to identify the noncompliant foam during inspections and order that it be removed, it was *not* foreseeable to GFC that illegal pyrotechnics would be used at those premises.

According to Plaintiffs' allegations, the Derderians failed to obtain permits, required by R.I. Gen. Laws § 23-28.11-3 and § 23-28.11-4, for premises at which pyrotechnics would be used.[12] Further, Plaintiffs allege that Defendants Biechele and the members and management of the band Great White were "negligent in the use, operation, supervision, management and installation of the pyrotechnics" on February 20, 2003, and failed to obtain the required permits to use such pyrotechnics. Failing to obtain these permits violated R.I. Gen. Laws § 23-28.11-3 and § 23-28.11-4.[13] OSHA cited the band with a "serious" violation related to its use of pyrotechnics on the night of the fire.[14] On December 9, 2000, the band's manager, Daniel Biechele, was indicted on 200 felony counts of involuntary manslaughter for setting off pyrotechnics at The Station without the

---

[11] Hoffmann Aff. ¶ 7.
[12] Hoffmann Aff. ¶¶ 10 and 11.
[13] Hoffmann Aff. ¶ 11.
[14] *See* "U.S. fines Derderians, band on safety issues," Providence Journal, August 21, 2003. Specifically, OSHA found that the pyrotechnic materials were not properly stored; there was no "walk through" demonstration; the pyrotechnic operators were not properly licensed and approved; fire extinguishers "were not readily accessible" during the preparation; each pyrotechnic device was not separated from the audience by at least 15 feet; and smoking was not prohibited within 25 feet of the pyrotechnics.

required permit to do so, and for knowingly putting people in jeopardy of serious harm and ignoring the risks and/or acting with a callous disregard for the safety of others.[15]

The distant producer of bulk polyurethane foam could not foresee that pyrotechnics, the legal use of which are limited to persons possessing appropriate licenses and on appropriately licensed premises, would be illegally set off in a nightclub. Similarly, it is not a natural and probable consequence that pyrotechnics would be illegally set off on premises having non-fire retardant foam illegally applied to the walls and ceiling.

#### *d. The Station nightclub was unsafe as a place of public assembly.*

Once again, assuming that it *was* foreseeable to GFC that its non-fire retardant polyurethane foam would be misused as soundproofing material in The Station nightclub, *and* that it was foreseeable that state and local inspectors would not identify the illegally used foam during their inspections for fire safety and code violations and thus not order that it be removed, *and* that it was foreseeable that pyrotechnics would be illegally used in The Station – it was *not* foreseeable to GFC that its remote production of non-fire retardant bulk foam would naturally and probably result in the Derderians – and others who promoted the concert the evening of February 20 – encouraging and allowing the overcrowding of the facility in violation of its business and occupancy licenses, particularly in a structure that lacked fire safeguards for a place of public occupancy

---

[15] *See* "Grand jury indicts club's owners, ex-tour manager in 100 deaths," Providence Journal, December 10, 2003.

under those conditions, as required by Rhode Island Gen. Laws § 23-28.6-2 and §23-28-6.13.[16, 17]

### 3. Proximate cause is an essential element of each of Plaintiffs' claims against GFC.

All of the Plaintiffs' claims against GFC are grounded in negligence and products liability. Each of their claims requires the Plaintiffs to establish that GFC's alleged wrongful conduct was the proximate cause of their injuries. *See, e.g., Geloso v. Kenny*, 812 A.2d 814, 817-18 (R.I. 2002) ("It is well settled that in order to gain recovery in a negligence action, a plaintiff must establish proximate causation between the conduct and the resulting injury, and the actual loss or damage."); *Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd.*, 772 A.2d 1056, 1063 (R.I. 2001) ("Without putting forth any evidence about the condition of the [product] at the time of its manufacture (that is, at the time it left defendant's hands) or about proximate cause (that is, that failure to warn had caused [plaintiff's] injuries), plaintiffs may not maintain their products liability action.")

In most cases, proximate cause is established by showing that "but for the negligence of the tortfeasor, injury to the plaintiff would not have occurred." *Geloso v. Kenny*, 812 A.2d 814, 818 (R.I. 2002); *English v. Green*, 787 A.2d 1146, 1151 (R.I.

---

[16] Hoffmann Aff. ¶ 13.

[17] *See* "U.S. fines Derderians, band on safety issues," Providence Journal, August 21, 2003. OSHA also cited and fined the Derderians with "serious" violations for having no written emergency action plan; having no written fire prevention plan; not training employees to assist in a safe and orderly evacuation of other employees; and not informing employees of the fire hazards to which they would be exposed. *Id.* Moreover, OSHA fined the Derderians $85,200.00 for a "willful" violation because The Station's exit door near the stage swung inward instead of outward in the direction of travel. *Id.* A "willful" violation is one that is "committed with an intentional disregard of, or plain indifference to, the requirements of the Occupational Safety and Health Administration regulations."

2001).[18] Even where a "but for" causal relationship can be shown, however, Rhode Island law requires that the causal connection be something more than a mere remote one. For example, in *Jamison v. Labrosse*, 627 A.2d 852 (R.I. 1993), the plaintiff's minor son fell while climbing on a dumpster rented by the plaintiff to clear up debris left on the plaintiff's property by defendant. The Rhode Island Supreme Court concluded that the causal relationship between the debris left about by the defendant and the minor's falling from the dumpster was too remote to be the proximate cause of the child's injuries. Rather, "[t]he plaintiff's own actions in obtaining the dumpster and his son's climbing into it broke any chain of causation." *Id.* at 853.

This critical distinction between "any" causal connection and one that is sufficiently close to a plaintiff's injury, is what necessarily defeats these Plaintiffs' claims against GFC.

## VI. GFC IS NOT LIABLE FOR AN END PRODUCT THAT INCORPORATES ITS BULK POLYURETHANE FOAM.

GFC produces and distributes polyurethane foam in bulk, and sells its bulk foam to fabricators such as American Foam. Polyurethane foam is produced by an exothermic reaction of two liquid chemicals: a polyol and an isocyanate. Those two chemicals, along with water, catalysts and surfactants, are mixed and poured onto a moving conveyor where a chemical reaction similar in appearance to the rising of bread creates polyurethane foam. By varying the chemical formulation used in the manufacturing

---

[18] For example, in *Geloso v. Kenny*, 812 A.2d 814 (R.I. 2002), the plaintiff fell at defendant's house on stairs which did not have a handrail. The court concluded that the absence of the handrail could be a proximate cause of plaintiff's injuries because evidence showed that when plaintiff had fallen in the past she had used a handrail to break her fall. The court held, nevertheless, that defendants were not liable because they had *no duty* to provide a handrail under the circumstances.

process, foams of varying physical characteristics, such as density, tensile strength, elongation and firmness, can be produced. GFC produced bulk polyurethane foam for sale in large buns or blocks having dimensions of approximately 74" by 84" by 36" to 40." *See* Affidavit of Margaret Hebner ("Hebner Aff.") ¶¶ 3 and 7.

American Foam further processes the bulk foam for various end uses for its customers. Under the bulk supplier doctrine, set forth in § 5 of the Restatement (Third) of Torts and adopted by the Rhode Island Supreme Court, GFC is not liable for the injuries arising from the use of the sheets of packing foam that American Foam manufactured from bulk foam and sold to the Derderians.

### A. Rhode Island has adopted the bulk supplier doctrine as set forth in the Restatement.

The Restatement (Third) of Torts § 5 (1998), entitled "Liability of a Commercial Seller or Distributor of Product Components for Harm Caused by Products Into Which Those Components are Integrated," provides:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated *if*:
>
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; *or*
>
> (b) (1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; *and*
>
> (2) the integration of the component causes the product to be defective, as defined in this Chapter; *and*
>
> (3) the defect in the product causes the harm.

(Emphasis added.)

Comment (a) to Section 5 provides that the term "product components" as used above includes "*raw materials, bulk products, and other constituent products* sold for

integration into other products." (Emphasis added).[19] That comment further provides that "product components" include both components, such as raw materials, that have no functional capabilities unless integrated into other products, as well as components that, while able to function on their own, may also be assimilated into a variety of end products. The illustrative bulk foam example used in Section 5 is directly on point here.

The Reporters' Notes accompanying this Section show that this provision mirrors the existing product liability law of most jurisdictions, and specifically notes that "[t]he rationale for the general rule of nonliability for sellers of nondefective components has been set forth in numerous cases." *Id.*

Rhode Island adopts and follows the Restatement. In *Buonanno v. Colmar Belting Co., Inc.*, 733 A.2d 712 (R.I. 1999), the Supreme Court of Rhode Island

---

[19] The illustration to Section 5 specifically mentions "bulk foam" as an example of a product component governed by this section:

> ABC Foam Co. manufactures bulk foam with many different uses. XYZ Co. purchases bulk foam from ABC, then processes the foam and incorporates the processed foam in the manufacture of disposable dishware. ABC becomes aware that XYZ is using processed foam in the dishware. ABC and XYZ are both aware that there is a potential danger that processed foam may cause allergic skin reactions for some users. ABC is aware that XYZ is not warning consumers of this potential problem. ABC has no duty to warn XYZ or ultimate consumers of the dangers attendant to use of the processed foam for disposable dishware. The foam sold by ABC is not defective in itself as defined in this Chapter. A supplier of a component has no duty to warn a knowledgeable buyer of risks attendant to special application of its products when integrated into another's product. ABC did not participate in the design of the disposable dishware manufactured by XYZ, and is thus not subject to liability under Subsection (b).

*Id.*, comment b, illustration 4.

unanimously adopted the provisions of § 5 of the Restatement (Third).[20] That decision is instructive on Rhode Island's interpretation of § 5 of the Restatement and the bulk supplier defense applicable here. In *Buonanno*, both the manufacturer and the distributor of component parts of a conveyor-belt system which injured the plaintiff were defendants. The distributor-defendant sold all the individual component parts of the conveyor system to the plaintiff's employer who had the system assembled on site. The manufacturer-defendant manufactured the wing pulley that was sold to the distributor-defendant and re-sold to the plaintiff's employer who incorporated it into the conveyor system. The plaintiff appealed from the trial court's grant of summary judgment to both defendants. The majority of the Supreme Court, deciding the case in the light of § 5 of the "recently published" Restatement (Third), affirmed the summary judgment granted to the manufacturer-defendant but reversed the summary judgment granted to the distributor-defendant because fact issues were present concerning its participation in the ultimate design of the conveyor. *Buonanno*, 733 A.2d at 715.

Pursuant to the provisions of § 5, the Court noted that "[a]s a general rule, component manufacturers or sellers should not be liable under this section unless the component part itself was defective when it left the manufacturer. Furthermore, a component part supplier should not be required to act as an insurer for any and all accidents that may arise after that component part leaves the supplier's hands." *Id.* at 716

---

[20] *See also Ruzzo v. LaRose Enterprises*, 748 A.2d 261, 266 (R.I. 2000) (noting that the Court "adopted § 5 of the Restatement (Third) Torts" in *Buonanno*); *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F. Supp.2d 263, 277 (D.R.I. 2000) (noting that "the Rhode Island Supreme Court unanimously 'adopted' § 5 of the Restatement (Third) of Torts" in *Buonanno*).

(citations omitted). Having found no evidence of a defect in the component parts themselves, the Court determined the pivotal issue to be the duty owed by these defendants relative to their involvement in the integration of the components into the conveyor system. *Id.* at 715-16. Thus, a dismissal of the component manufacturer was proper.

### B. Exceptions to the bulk supplier doctrine do not apply to GFC's production and sale of bulk foam.

Section 5 of the Restatement provides broad protection to producers of bulk products like GFC, but it also recognizes two exceptions to that protection, neither of which apply to GFC's distant production of bulk foam.

#### 1. There is no defect in GFC's bulk polyurethane foam.

Liability cannot be incurred unless a defect in the component itself causes the damage complained of. *See* § 5, comment b ("A commercial seller or other distributor of a product component is subject to liability for harm caused by a defect in the component."). Plaintiffs cannot prove that GFC's bulk polyurethane foam was defectively made or designed – it was a bulk material used by American Foam in the production of boxes and containers with foam liners. Further, the fact that it is flammable and may produce irritating vapors and smoke does not render bulk foam, with hundreds of safe applications, an inherently dangerous product. *See e.g., In re Silicone Gel Breast Implants Prods. Liability Litig.*, 887 F. Supp. 1463 (N.D. Ala. 1995) (despite evidence that degraded foam may release a chemical associated with cancer in animals, bulk foam with a broad array of safe uses should not be viewed as an inherently dangerous product).

A component part manufacturer "is required to provide instructions and warnings regarding risks associated with the use of the component product." Restatement (Third) of Torts § 5 cmt. b (1998). However, "when a sophisticated buyer integrates a component into another product, the component seller owes no duty to warn either the immediate buyer or ultimate consumers of dangers arising because the component is unsuited for the special purpose to which the buyer puts it." *Id.* Comment d to § 5 of the Restatement, entitled "Incomplete Products" (defined as "products that can be put to different uses depending on how they are integrated into other products"), provides:

> A seller ordinarily is not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another utilizes the incomplete product. A safety feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation. The same considerations also militate against imposing a duty on the seller of the incomplete product to warn purchasers of the incomplete product, or end-users of the integrated product, of dangers arising from special adaptations of the incomplete product by others.

GFC warned its manufacturing customers, including American Foam, of the flammable nature of its bulk polyurethane foam and the hazards from vapors and smoke.[21] It was the duty of GFC's customers and fabricators, such as American Foam, to select the appropriate bulk foam product for the end uses for which they intend to incorporate the foam, and to warn the end users – its customers – about any hazards associated with the use of their end product. *See, e.g., In re Silicone Gel Breast Implants*, 887 F. Supp. at 1468 (law recognizes that burdening sellers of bulk materials having widespread safe uses with a duty to warn end-product users would be too onerous in light of more direct responsibility of those selecting product for their specific application).

---

[21] Hebner Aff. ¶¶ 12 and 13.

American Foam admits that it was aware of the flammable nature of the foam it sold to the Derderians and had available a different foam, that was fire retardant, for sale at the time of the Derderians' purchase.[22]

**2. GFC was not involved in the fabrication of its bulk foam into sheets of dimpled packing foam or the sale of the manufactured foam sheets to customers like the Derderians.**

The Restatement incorporates the pre-existing law of a majority of jurisdictions, under which a component part manufacturer may be liable as a result of its "substantial participation in the integration of the component" into the finished product that is alleged to have caused the injury at issue. *See* Restatement (Third) of Torts § 5, comment e. GFC, however, did not participate, *in any way*, in the fabrication of its bulk foam into the sheets of dimpled packing foam sold to the Derderians for an illegal end use completely unrelated to packaging.

American Foam is recognized as a quality packaging fabricator that remanufactures bulk foam into packing foam for a wide variety of ordinary packaging and container applications. American Foam purchased bulk foam to its own specifications from GFC, and others, in truck loads of large buns measuring approximately 3' by 7' by 8'.[23] American Foam remanufactured the bulk foam buns by processing them through a large and expensive machine called a "convoluter" which compresses and cuts the 3' thick bulk foam into dimpled sheets which are usually 1" to 4" thick and 7' by 8' in size.[24] These sheets are then cut again to fit the particular box, container or other packaging application. As a general rule, packing foam of this type is

---

[22] *See* fn. 7, *supra*.
[23] Hebner Aff. ¶ 7.

not fire retardant because the packaging and container applications in which the foam is used present no fire hazard or risk.[25]

Apparently, American Foam sold 25 of the convoluted foam packing sheets intended for packaging applications to the Derderians.[26] The Derderians intended to use the packing foam as sound proofing material on the walls of The Station – a place of public assembly. The decision to use the packing foam was made by the Derderians despite the fact that longstanding fire codes prohibited this use. Moreover, there were specialty products made expressly for such soundproofing uses that were flame resistant, albeit much more expensive.[27] There were also a variety of other flame retardant foams that, while not permitted for this use, may have presented a much safer alternative.[28] In fact, American Foam had such flame retardant foam products available for sale at the time the Derderians purchased the non-fire retardant packing foam.[29]

---

[24] Hebner Aff. ¶ 8.
[25] Hoffmann Aff. ¶ 6.
[26] American Foam's remanufacture of what Plaintiffs allege was GFC's bulk buns of foam into sheets of packing foam also absolves GFC from liability under Rhode Island's "subsequent alteration" statute, R.I. Gen. Laws § 9-1-32. The statute provides that "no manufacturer or seller of a product shall be liable for product liability damages where a substantial cause of the injury, death, or damage was a subsequent alteration or modification." R.I. Gen. Laws § 9-1-32(b). The statute defines "subsequent alteration or modification" as "an alteration or modification of a product made subsequent to the manufacture or sale by the manufacturer or seller which altered, modified, or changed the purpose, use, function, design, or manner of use of the product from that originally designed, tested or intended by the manufacturer, or the purpose, use, function, design, or manner of use or intended use for which such product was originally designed, tested or manufactured." R.I. Gen. Laws § 9-1-32(a)(2).
[27] Hebner Aff. ¶ 17.
[28] Hebner Aff. ¶ 16.
[29] *See* fn. 7, *supra*.

All of the transactions between American Foam and the Derderians occurred without either the knowledge or participation, in any way, of GFC. GFC had no part in the sale by American Foam or the intended illegal use of the packing foam.

GFC's bulk foam has hundreds of safe packaging and other uses. It is not inherently dangerous because it is flammable or because it produces irritating vapors and smoke when it burns. GFC cannot feasibly, and is not required by law to, anticipate and evaluate all possible end uses of its bulk foam. Certainly, it has no duty to warn about the possible hazards of misusing manufactured packing foam as soundproofing for places of public assembly, where fire and safety codes will not be enforced, where illegal pyrotechnics will be used, where overcrowding will be allowed (or even encouraged) and where basic fire safety and prevention practices will not be followed.[30] Because it had no duty to warn Plaintiffs, and because its bulk foam was neither defective nor inherently dangerous, GFC is entitled to judgment on all Plaintiffs' claims against it.

## VII. CONCLUSION

Taking as true Plaintiffs' well-pleaded allegations in the Second Amended Complaint, these "facts" establish no more than that GFC's production of bulk polyurethane foam was a remote and tenuously-related cause of the fire that occurred at The Station on February 20, 2003. Rather, the allegations establish that the illegal misuse

---

[30] *See generally In re Silicone Gel Breast Implants Prods. Liability Litig.*, 887 F. Supp. 1463 (N.D. Ala. 1995). There, Scotfoam, a bulk foam supplier (and a predecessor to Foamex), whose bulk foam was used by others in a variety of applications, was held to have no duty to warn the ultimate recipients of one of those end products – foam-coated silicone breast implants. The court recognized that "a manufacturer of a non-defective component part has no duty to evaluate all possible end uses of its product" and that "no state would impose liability in a raw material supplier situation like this, not involving an inherently dangerous or a defectively manufactured product." *Id.* at 1468.

of packing foam as soundproofing, the failure of inspectors to identify the illegal use of the foam and require its removal, and the illegal use of pyrotechnics at the overcrowded and unsafe nightclub caused Plaintiffs' injuries. Each of these cascading illegal and negligent acts severed any causal connection, as a matter of law, between GFC's remote production of bulk foam and the injuries sustained by Plaintiffs to this suit. Moreover, because of GFC's distance from The Station and the events on that fateful night, GFC was under no legal duty to the plaintiffs to prevent the fire that caused their injuries.

Aside from Plaintiffs' allegations, the indisputable facts establish that GFC produces non-defective bulk polyurethane foam. As such, GFC is not liable to those injured by the end application product, packing foam, manufactured and sold by American Foam to the Derderians for an illegal use in The Station nightclub. GFC requests that the Court recognize the bulk supplier doctrine, as adopted by the Rhode Island Supreme Court. The doctrine bars liability for Plaintiffs' injuries and deaths from attaching to GFC's remote production of bulk polyurethane foam.

For the reasons set forth above, GFC requests the Court to dismiss with prejudice all of Plaintiffs' claims asserted in the Second Amended Complaint against both GFC and Foamex, and enter judgment in favor of GFC and Foamex.

Respectfully submitted,

Carl A. Henlein
Susan S. Wettle
John R. Crockett III
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202-3363
(502) 589-5400 telephone
(502) 581-1087 facsimile

Gerald C. DeMaria #0637
James A. Ruggieri #2828
HIGGINS, CAVANAGH & COONEY
123 Dyer Street
Providence, Rhode Island 02903
(401) 272-3500 telephone
(401) 273-8780 facsimile

*Counsel for General Foam Corporation and Foamex International Inc.*

**PASSA CERTIFICATION**

I hereby certify that on the 30 th day of April, 2004, a true copy of the within was mailed to:

Ronald J. Resmini, Esq.
Ronald J. Creamer, Esq.
RONALD J. RESMINI LAW OFFICES
155 South Main Street
Providence, RI 02903

Thomas C. Angelone, Esq.
HODOSH, SPINELLA & ANGELONE
One Turks Head Place, Suite 1050
Providence, RI 02903

Mark Reynolds, Esq.
Anthony F. DeMarco, Esq.
BOYER, REYNOLDS & DeMARCO, LTD
170 Westminster Street, Suite 200
Providence, RI 02903

Howard A. Merton, Esq.
Eric M. Sommers, Esq.
VETTER & WHITE
20 Washington Place
Providence, RI 02903

William P. Robinson, III, Esq.
Stephen M. Prignano, Esq.
Stephen J. MacGillivray, Esq.
EDWARDS & ANGELL LLP
2800 Financial Plaza
Providence, RI 02903

Faith A. LaSalle, Esq.
ZIZIK, LaSALLE & POWERS, P.C.
40 Westminster Street, Suite 201
Providence, RI 02903

Joseph V. Cavanagh, Jr., Esq.
Kristin E. Rodgers, Esq.
BLISH & CAVANAGH, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

Edward T. Hinchey, Esq.
Curtis Diedrich, Esq.
SLOANE & WALSH, LLP
Three Center Plaza
Boston, MA 02108

James R. Lee, Esq.
RI DEPT OF THE ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

Fred A. Kelly, Esq.
Randall L. Souza, Esq.
NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903

Scott J. Tucker, Esq.
TUCKER HEIFETZ & SALTZMAN LLP
Three School Street
Boston, MA 02108

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Thomas Bender, Esq.
HANSON CURRAN LLP
146 Westminster Street
Providence, RI 02903

Christopher C. Fallon, Jr., Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103-3508

James H. Reilly, III, Esq.
Donald J. Maroney, Esq.
KELLY, KELLEHER, REILLY & SIMPSON
146 Westminster Street, Suite 500
Providence, RI 02903

Marc DeSisto, Esq.
DeSISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906

Andrew J. Trevelise, Esq.
REED SMITH LLP
2500 One Liberty Place
Philadelphia, PA 19103-7301

W. Thomas McGough, Jr., Esq.
James J. Restivo, Jr., Esq.
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219

Deborah G. Solmor, Esq.
Edward M. Crane, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
333 West Wacker Drive, Suite 2100
Chicago, IL 60606

Carl A. Henlein, Esq.
John R. Crockett, III, Esq.
Susan S. Wettle, Esq.
FROST BROWN TODD
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363

Robert I. Reardon, Jr., Esq.
Robert I. Rimmer, Esq.
THE REARDON LAW FIRM, PC
160 Hempstead Street
New London, CT 06320

Susan L. DeTusso (signature)