UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

TAMMY PASSA, ET AL :
Plaintiffs

-VS- :C.A.NO.03-148-L

JEFFREY DERDERIAN, ET AL :
Defendants

PLAINTIFFS' OBJECTION TO DEFENDANTS, FOAMEX INTERNATIONAL INC. and GENERAL FOAM CORPORATION'S RULE 12(b)(6) MOTION TO DISMISS

Now come the Plaintiffs in the above entitled cause and herein object to Defendants, Foamex International, Inc. and General Foam Corporation's Rule 12(b)(6) Motion to Dismiss. See Attached Memorandum.

By their Attorneys,
RESMINI LAW OFFICES, LTD.
BY:

RONALD J. RESMINI, ESQ.#0484
155 South Main St.
Suite 400
Providence, RI 02903
DATED: June 18, 2004
(401)751-8855

CERTIFICATION

I hereby certify that on this 18th day of June, 2004 I mailed a copy of the within Memorandum and Objection to Motion to Dismiss by regular mail, postage prepaid to the following:

148

Joseph V. Cavanagh, Jr., Esq.
Kristin E. Rodgers, Esq.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, R.I. 02903

Gerald C. DeMaria, Esq.
James A. Ruggieri, Esq.
Higgins, Cavanagh & Cooney
123 Dyer Street
Providence, R. I. 02903

Marc DeSisto, Esq.
DeSisto Law Offices
211 Angell St.
P O BOX 2563
Providence, R.I. 02906

Christopher C. Fallon, Jr., Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Carl A. Henlein, Esq.
John R. Crocket, III, Esq.
Susan A. Wettle, Esq.
Frost Brown Todd
400 West Market Street, 32nd Floor
Louisville, KY 40202

Howard A. Merten, Esq.
Eric M. Sommers, Esq.
Vetter & White
20 Washington Place
Providence, R.I. 02903

James T. Murphy, Esq.
Thomas R. Bender, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, R.I. 02903

Mark T. Reynolds, Esq.

BOYER, REYNOLDS & DeMARCO, LTD.
170 Westminster St.
Suite 200
Prov., RI 02903

James H. Reilly, III, Esq.
Donald J. Maroney, Esq.
KELLY, KELLEHER, REILLY & SIMPSON
146 Westminster St.
Suite 500
Prov., RI 02903

Deborah G. Solmor, Esq.
Edward M. Crane, Esq.
Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive, Suite 2100
Chicago, Il. 60606

Faith A. LaSalle, Esq.
40 Westminster Street, Suite 201
Providence, R.I. 02903

James R. Lee, Esq.
Civil Division
Department of Attorney General
150 South Main Street
Providence, R.I. 02903

Randall L. Souza, Esq.
Fred A. Kelly Jr., Esq.
Nixon Peabody, LLP
One Citizens Plaza, Suite 700
Providence, R.I. 02903

Andrew J. Trevelise, Esq.
Reed Smith LLP
2500 One Liberty Plaza
Philadelphia, Pa. 19103

Robert I. Reardon, Jr., Esq.
160 Hempstead St.
New London, CT 06320

W. Thomas McGough, Jr., Esq.
James J. Restivo, Jr., Esq.
REED SMITH LLP
435 Sixth Ave.
Pittsburgh, PA 15219

Brian Cunha, Esq.
Karen A. Alegria, Esq.
904 Broadway
East Prov., RI 02914

Thomas C. Angelone, Esq.
HODOSH, SPINELLA & ANGELONE
One Turks Head Place
Suite 1050

Scott J. Tucker, Esq.
TUCKER HEIFETZ & SALTZMAN LLP
Three School St.
Boston, MA 02108

Elaine M. Orsini

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Tammy Passa, et al.<br>Plaintiffs | : | |
| vs. | : | C.A. No. 03-148 L |
| Jeffrey Derderian, et al<br>Defendants | : | |

PLAINTIFF TAMMY PASSA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS FOAMEX INTERNATIONAL INC. AND GENERAL FOAM CORPORATION'S RULE 12(b)(6) MOTION TO DISMISS

## I. Introduction

Defendants FOAMEX INTERNATIONAL INC. AND GENERAL FOAM CORPORATION ("hereinafter "Defendants," or "GFC," or "Foamex" and "General Foam") have filed a motion positing that the lawsuits filed against them arising out of the Station fire of February 20, 2003 should be dismissed under Rule 12(b)(6). For the reasons set forth in this memorandum, Plaintiff Tammy Passa (hereinafter "Plaintiff") asks this Court to deny said motion on the grounds stated herein.

## II. Facts

On February 20, 2003, the Station nightclub in West Warwick, Rhode Island, burned down during a performance by "Great White," a rock and roll band, resulting in the death of 100 people and injuries to at least forty-two more. Plaintiff filed a Second Amended Complaint against a variety

of defendants, including General Foam and Foamex, and a foam retailer, American Foam Corporation, alleging, in short, that: General Foam should be held liable under theories of negligence, breach of warranty and strict products liability as the manufacturer of the highly-flammable, non-fire retardant polyurethane foam that was used as soundproofing at the Station night club; that Foamex, which purchased General Foam after the sale of the foam in question, is liable as the successor corporation; that American Foam, which bought the foam from General Foam and sold the foam to the owners of the Station nightclub, is also liable in negligence, breach of warranty, and strict products liability. Second Amended Complaint, paragraphs 25-27; counts 14-16. The owners of the nightclub installed said foam as sound insulation at the Station. On the night of the tragedy, the foam caught flame, causing the fire to spread almost instantaneously through the nightclub, spreading death and injury by fire and by the inhalation of toxic fumes and smoke. Plaintiff alleges that the defendants knew or should have known that the non-fire retardant foam would be installed in an environment intended for public assembly, that the foam was unreasonably dangerous because of its non-fire-retardant, highly flammable nature, and that the foam was defective in design and marketed without proper warnings to potential users of the foam's highly-flammable, non-fire-retardant nature. Id.

**III. Choice of Law**

This Court has already ruled that Rhode Island law shall govern the tort claims asserted in the cases arising from the Station fire. Passa v. Derderian, 2004 U.S. Dist. Lexis 5039 at 45 (D.R.I. March 29, 2004).

**IV. Standard of Review**

To successfully oppose the defendants' motion to dismiss, the plaintiff is not required to show that she will ultimately prevail in this action but rather that she is entitled to offer evidence to support her claims. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). "It may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Id. Instead, a complaint should not be dismissed pursuant to Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitled her to recovery. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Build of Buffalo, Inc. v. Sedita, 441 F.2d 284, 287 (2d Cir. 1971). In accord with such principle, the allegations of the plaintiff's Second Amended Complaint must be construed in the light most favorable to the plaintiff, Scheuer v. Rhodes, supra, at 236, and in fact, as the defendants note, must be taken as true. Also, the Court must examine only the allegations of the Second Amended Complaint, and no supplemental materials. Pascoag Reservoir

and Dam, LLC v. Rhode Island, 217 F. Supp. 2d 206, 210 (D.R.I. 2002). For that reason, the supporting materials that the Defendants cite and attach to their memorandum as Appendix, must be disregarded.

## V. **Argument**

A. Defendants May Be Held Liable In Negligence, Breach of Warranty and/or Strict Products Liability Under Rhode Island Law as Manufacturers of the Highly Flammable, Non-Fire Retardant Foam Which Proximately Caused the Deaths and Injuries on the Night In Question.

1. **The Defendants Owed a Duty of Care to Plaintiffs.**

In order to establish a prima facie case of negligence, a plaintiff must show that: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty of care; (3) the defendant's negligent acts constituted both the actual and proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered actual damages. Volpe Fleet National Bank, 710 A.2d 661, 663 (R.I. 1998). It is a question of law for the court to determine whether the defendant owed a duty of care to the plaintiff. Id.

The Rhode Island Supreme Court has acknowledged that "no clear-cut rule" exists to determine whether a duty is in fact present in a particular case. Ferreira v. Strack, 652 A.2d 965, 967 (R.I. 1995). The Court, has, however, cited approvingly Justice Cardozo's language in Palsgraf v. Long Island Railroad Company, 248 N.Y. 339, 162 N.E. 99 (1928), that "[t]he risk reasonably to be perceived defines the duty

to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension."_ Banks v. Bowen's Landing Corp., 522 A.2d 1222, 1227 (R.I. 1987).

In determining whether a duty of care exists in a particular case, the Court will consider the following factors:

> (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach.

Morrissey v. Capstone Financial Services, Inc., 706 A.2d 1338 (R.I. 1998).

The Court has recognized that the first element--the foreseeability of a particular kind of harm--"plays a very significant role in this calculus." Banks v. Bowen's Landing Corp., supra at 1226.

> [A] court's task--in determining "duty"--is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.

Id. at 1226-27 (quoting Ballard v. Uribe, 41 Cal.3d 564, 573 n.6, 715 P.2d 624, 628 n.6, 224 Cal. Rptr. 664, 669 n.6 (1986)). In the foreseeability determination, "[t]he particular kind of injury need not have been foreseen."

Hueston v. Narragansett Tennis Club, Inc., 502 A.2d 827, 830 (R.I. 1986).

In the instant case, Defendants argue, essentially, that their manufacture of non-fire retardant foam without proper warnings could not foreseeably lead to the death and injury of the patrons of the Station nightclub on the evening of the tragedy. Defendant points to the "illegal" use of pyrotechnics within the nightclub, the "illegal" use of the foam as soundproofing material, and the oversight of fire inspectors in failing to notice code violations as factors that would make the injuries in this case unforeseeable.

However, the kind of injury that occurred in this case -- death and injury caused and exacerbated by fire and toxic smoke produced by rapidly burning foam -- is *precisely* the type of injury that one would expect to occur from the negligent and defective manufacture and sale of highly flammable, non-fire retardant foam, and, in fact, as discussed in cases infra, the *precise* type of injury which has been the subject of many identical lawsuits against these very same Defendants and other manufacturers and sellers of polyurethane foam in the past. Put simply, fire and smoke inhalation is the danger associated with the Defendants' product, and that is exactly what occurred in this case. (It is not as though, say, the harm resulted from a child's swallowing of foam products, which may indeed

be an unforeseeable harm.)

Rather, Defendants in their Memorandum merely point to concurrent causes -- the use of pyrotechnics at the nightclub, the overcrowding of the nightclub, the negligent fire inspections by state officials -- which contributed to the injuries in this instance. While it is true that nearly all products can be ignited, "ordinary burning" must be distinguished from the kind of hot, rapid, smoky, toxic burning which occurred at the Station nightclub when the foam was ignited. This type of burning is a more serious and more unexpected danger than that posed by ordinary flammable items.

Although the Rhode Island Supreme Court has never considered a case precisely on point, courts in other jurisdiction have found a duty of care to exist in this precise situation. The case of Independent School District No. 14 v. AMPRO Corporation, 361 N.W.2d 138 (Minn. App. 1985), warrants close examination because the exact arguments issues now raised by GFC were considered and rejected by the court in that case. Specifically, in AMPRO, two young students used a Butane lighter to light a "Portapit" landing mat on fire in their school gymnasium. Testimony conflicted as to whether gasoline was used to ignite the mats, but substantial testimony showed that the Portapit mats burned very rapidly, with intense heat, and that they emitted black, dense smoke. The Portapits were

nylon vinyl-covered, polyurethane foam-filled landing mats used for high-jumping and pole-vaulting.

The plaintiff-school district filed an action against AMPRO Corporation (hereinafter "AMPRO"), the manufacturer of the mats, and United Foam, which supplied the polyurethane foam incorporated into the mats, alleging negligence on their part in failing to use flame-retardant polyurethane foam and failing to warn of the foam's dangerous propensities. At the close of the school district's evidence the defendant-manufacturers filed a motion for a directed verdict, which was granted by the trial court. On appeal, however, the court reversed, finding that sufficient evidence was offered to create a factual question for the jury to consider. Id.

Specifically, the AMPRO court rejected the foam manufacturers' argument that the harm in this instance resulted from an unanticipated use of the mats (i.e., that the foam's normal anticipated use was providing cushioning to landings after high jumps and pole vaults). The court reasoned that "[s]torage in a school building, in an area close to students and to valuable equipment, however, is also a normal, anticipated use." Id. The court noted how quickly and easily the foam ignited, the intense heat with which it burned, and the large amount of thick black smoke produced by the burning foam. The court ruled that AMPRO could be held negligent in failing to incorporate flame-

retardant foam into Portapits and that United Foam was negligent in producing non-flame-retardant foam when it knew of the problems associated with the burning of polyurethane foam. The court observed that flame-retardant foam could be used in the Portapits without unreasonable cost and that United Foam was manufacturing some flame-retardant polyurethane foam at the same time. As a result, AMPRO ruled that the jury could have determined that a reasonable manufacturer would have tested the foam for extraordinary burning propensities and taken precautions to guard against those propensities. Id.

Further, AMPRO stated that the defendants gave no warning regarding flammability on the Portapit itself or in catalogues or sales literature. While noting that any product may be ignited, the Court stressed that "ordinary burning" must be distinguished "from the hot, rapid, smoky burning" which occurred when the foam was ignited. "This is a different, more serious, and more unexpected danger than that posed by ordinary flammable items. Such a danger is not obvious, and while [plaintiff] admitted knowing that Portapits might burn, it indicated no knowledge of the speed or intensity with which they burned." Id.

The facts of the AMPRO case are directly relevant to the case at bar. The court in AMPRO found the existence of a duty of care and foreseeability of injury, even though students in that case *intentionally* ignited the foam and

even though the mats were not being used for their intended purpose. Likewise, GFC owed a duty of care to the nightclub patrons because it was reasonably foreseeable that their polyurethane foam product would ultimately be installed in a place of public assembly and that concurrent causes would lead to the harm, just like in AMPRO

Finally, regarding Defendants' argument as to lack of duty of care, Plaintiff points out that the concept of reasonable care is not relevant to her breach of warranty and strict products liability claims, but only her negligence claims. Under strict products liability theories, it is immaterial whether the manufacturer was negligent in creating the design or exercised all reasonable care in the creation of the design. Ritter v. Narragansett Electric Co., 109 R.I. 176, 190, 283 A.2d 255, 262 (1971). For that reason, even if this Court were to accept Defendants' lack of duty assertions, only Plaintiff's negligence claims against Defendants would be affected.

**2. The "Bulk Supplier" Doctrine Does Not Bar the Instant Claims.**

Defendants argue that the "bulk supplier" doctrine absolves them of liability in the instant case and that they cannot be held to be "absolute insurers" of their product. Under this doctrine, as adopted by the Rhode Island Supreme Court in Buonanno v. Colmar Belting Co., 733 A.2d 712 (R.I.

1999), a manufacturer of a component part is subject to liability for harm to persons or property only if the component is defective in itself. There are exceptions to this rule regarding integration of the product, but such exceptions need not be explicated for the purpose of this memorandum, as Plaintiff has alleged that the foam product manufactured by GFC was defective in design and defectively marketed without proper warnings. Such claims give rise to actions in negligence, breach of warranty and strict products liability. See DiPalma v. Westinghouse Electric Corp., 938 F.2d 1463, 1466 (1st Cir. 1991) (applying Rhode Island law) (duty to warn cause of action may be brought in strict liability or negligence); Castrignano v. E. R. Squibb & Sons, Inc., 546 A.2d 775 (R.I. 1988) (duty to warn in strict liability case is measured by same standard as duty to warn in negligence cause of action). Plaintiffs have alleged in their Second Amended Complaint, and such allegations must be taken as true for the purpose of this Rule 12(b)(6) motion, that GFC's foam product had inherent defects in its design and marketing. Second Amended Complaint, paras. 154-157, 165-67. As noted above, under Buonanno, supra, a component part manufacturer may be held liable for inherent defects in the component's design and marketing.

While the Rhode Island Supreme Court has never applied the bulk supplier doctrine to the manufacture of foam

products, courts in other jurisdictions addressing this exact issue have rejected the doctrine in regards to bulk suppliers of foam. In Gifaldi v. Jefferson Chemical Co., 1995 U.S. Dist. LEXIS 206 (W.D.N.Y. 1995), for instance, the plaintiffs, a building owner and a lessee, filed suit on theories of negligence and strict liability against the defendant-chemical suppliers to recover damages for the loss of a building by fire, claiming that the fire which destroyed their building was exacerbated by the building's polyurethane foam insulation, which was created by the mixture of chemicals sold by the defendant-chemical suppliers and which the defendant-chemical suppliers knew were highly flammable. Also, the plaintiffs alleged that the defendant-chemical suppliers failed to adequately warn of the flammable nature of the combined chemicals and that the chemicals were unreasonably dangerous. In response to the defendant's argument that the "bulk supplier doctrine" barred the suit, the court noted that a rationale for such doctrine is that "imposing liability on such a party would oblige it to research all possible uses and risks of finished products its goods might be used in." Id. Gifaldi stressed, however, that this public policy concern does not exist in relation to an action against a chemical supplier to a foam manufacturer "because polyol and isocyanate are claimed to be used almost exclusively in polyurethane foam and the defendants allegedly knew the dangers of

polyurethane insulation." Id. The court further reasoned that, even assuming the applicability of the bulk supplier doctrine, the defendant-chemical supplier still had a duty to warn intermediaries of the flammability characteristics of polyurethane foam. In denying the defendant-chemical supplier's motion for summary judgment, therefore, the court reasoned that a factual issue existed as to the adequacy of the defendant's warnings. Furthermore, because the plaintiffs showed proof that the defendant-chemical supplier knew that its chemical would be used in the insulation foam, said defendant could be held liable to the building owners and lessee even though its chemical alone was not defective. Id.

This same rationale applies even more so to manufacturers (as opposed to chemical suppliers) of foam products. The bulk supplier doctrine explicitly states that component part manufacturers may be held liable for their defective products. <u>Buonanno</u>, <u>supra</u>. Although polyurethane foam may be transformed into many different products after its bulk manufacture -- such as packing material, sound insulation, heat insulation, gymnasium mats, etc. -- all such products share the same dangerous propensity: a highly flammable and non-fire-retardant nature. Furthermore, even assuming <u>arguendo</u> that the bulk supplier doctrine acted as a bar to the claims against Defendants, General Foam and Foamex still had the duty to warn its intermediaries of the

flammability characteristics of polyurethane foam. Furthermore, this Rule 12(b)(6) motion must be denied because there exists a factual issue in the instant matter as to the adequacy of Defendants' warnings.

**3. The Chain of Causation from GFC to the Plaintiff Is Not Broken by Any Illegal or Negligent Acts by Other Defendants in This Case.**

Defendants argue that proximate cause is lacking in this case, to wit, that the negligent and/or illegal acts of other various other defendants constitute intervening/superseding causes, thus absolving GFC from liability. As intervening causes GFC puts forth the following: the "illegal" use of the foam as soundproofing material by the defendant-nightclub owners; the sale of the non-fire retardant foam to the night club owners by American Foam even though American Foam could have sold them an alternative fire retardant foam; the failure of city and state fire inspectors to enforce and remedy fire code violations at the nightclub; the "illegal" use of pyrotechnics at the nightclub on the night of the disaster; and the overcrowding of the nightclub on the night of the disaster.

Proximate cause is an essential element of Plaintiff's claims. To establish proximate cause, a plaintiff must show that the general type of harm suffered was reasonably

foreseeable from the defendant's acts. See Hueston v. Narragansett Tennis Club, Inc., supra 502 A.2d at 830 ("One need only reasonably foresee that an injury may result ... The particular kind of injury need not have been foreseen."). It is a question of fact for the jury to decide whether proximate cause exists -- not the judge on a Rule 12(b)(6) motion. See, e.g, Splendorio v. Bilray Demolition Co., 682 A.2d 461, 467 (R.I. 1996); D'Ambra v. Peak Building Corp., 680 A.2d 939, 940-41 (R.I. 1996). Proximate cause is a question of law for court only where the plaintiff fails to present evidence identifying the defendant's negligence as the proximate cause of his or her injury or from which a reasonable inference of proximate cause may be drawn. Russain v. Life-Cap Tire Services, Inc., 608 A.2d 1145, 1147 (R.I. 1992).

This is not that rare case where the court may usurp the jury's function of deciding the existence of proximate cause. In its memorandum, GFC has merely identified several concurrent causes which led to the disaster. The Station nightclub disaster was proximately caused by not *one* event, but by a tragic concurrence of negligence by various defendants, all of whom are responsible to some degree for their conduct or omissions. (The defendants' proportionate share of responsibility should be decided by the jury under comparative negligence principles according to Rhode Island statute.) In other words, "but for" each defendant's acts

or omissions, the harm would not have occurred or would not have resulted in such aggravation of injury. For instance, but for the negligence of the owners and operators of the Station, the premises would not have been in dangerous condition. Likewise, but for the negligent omissions of various town and state officials, certain fire hazards would not have existed. And clearly, but for the defective product manufactured and distributed by General Foam, Foamex and American Foam, the fire would not have accelerated so rapidly; an "ordinary fire" would never have spread so swiftly or resulted in such catastrophic harm. As the court in AMPRO, supra, noted, "ordinary burning" must be distinguished "from the hot, rapid, smoky burning" which occurs when polyurethane foam is ignited. "This is a different, more serious, and more unexpected danger than that posed by ordinary flammable items." AMPRO, supra.

Furthermore, GFC's argument regarding intervening acts could be (and no doubt will be) similarly offered by each of the various defendants in this matter. Should the court accept such reasoning, then it is feasible that each of the defendants in turn will be released from their negligence merely because other actors were negligent as well. Such a result is illogical and inequitable and not the law of Rhode Island. There was a concurrence of negligent acts and omissions which led to the catastrophe at the Station nightclub. Each defendant -- each link in the chain --

caused and/or exacerbated the harm that befell the victims of the nightclub fire. Had certain actions been different, the harm may have been avoided, or less grievous. But that did not happen, unfortunately. The chain of negligence, which links the defendants as joint tortfeasors, remained in place. In short, this is a case of multiple concurrent causes, rather than intervening causation.

Rhode Island is clear on the law of intervening causes. For an independent intervening cause to replace a defendant's original negligence as the proximate cause of an accident, the original negligent conduct must have become "totally inoperative" as a cause of the injury. Hueston v. Narragansett Tennis Club, Inc., supra, 502 A.2d at 830.

It is fundamental tenet of tort law that there may be concurring proximate causes which contribute to a plaintiff's injury and that a defendant's negligence is not rendered remote in the causal sense merely because a second cause intervenes. Hueston v. Narragansett Tennis Club, Inc., supra at 830. See North Atlantic Fishing, Inc. v. Geremia, 153 B.R. 607, 612 (D.R.I. 1993) (because negligent repair work was reasonably foreseeable consequence of appellants' misrepresentations, appellants were also liable for second engine failure; "if the original wrong concurs with the intervening cause and both act proximately in producing the injury, both as a rule are proximate causes").

An intervening act will not insulate a defendant from

liability if his or her negligence was a concurring proximate cause. Roberts v. Kettelle, 116 R.I. 283, 295, 356 A.2d 207, 215 (1976). The court will ask "whether the intervening act could reasonably have been foreseen as a natural and probable result of the original act of negligence of the defendant. If it could have been so foreseen, the intervening negligence is not so remote as to prevent the original act from being considered at law as merely a concurring cause of the injury." Id. In Roberts, the defendant-police officer failed to indicate with the cruiser's flashing red lights before stopping to turn left off a highway onto an "official use only" path, causing plaintiff's rear-end collision. On these facts, the Court stated that "it seems clear that [the police officer] could reasonably have anticipated that another vehicle being negligently driven at a rate of speed in excess of the maximum speed limit would approach him from the rear in the high-speed lane of an interstate highway." Id.

Likewise, in Martinelli v. Hopkins, 787 A.2d 1158 (R.I. 2001), the supreme court held that the city's conduct in negligently issuing a license for an outdoor festival could be found the proximate cause of injuries suffered by an intoxicated plaintiff, who was hurt when a tree fell on him while he was crossing a snow fence to seek a place to urinate at the festival. The license issued by the city provided that the property owner had to provide adequate

portable toilets and private security forces, but the property owner underestimated the number of toilets needed and failed to hire adequate security. The tree fell on the plaintiff when he and several other people attempted to cross a fence which was attached to the tree. On these facts, the supreme court ruled that the trial justice properly denied the city's motions based on public duty doctrine and proximate cause. The court reasoned that, given the vast quantity of beer that was made available for consumption, coupled with the woeful lack of toilet facilities, "it was reasonably foreseeable that festival attendees would seek alternative toilet arrangements in the nearby woods, and that a mere snow fence would not prevent them from achieving their objectives." Consequently, the court concluded that a reasonable inference could be drawn that the town's negligent issuance of the license, coupled with the later failure of its police chief and police officers to control the event once they became aware that it was out of hand, proximately caused the plaintiff's injuries. Id.

Although negligent intervening acts are generally more foreseeable than intentional or criminal intervening acts, even criminal acts can be a foreseeable result of the defendant's original negligence. For example, in Welsh Manufacturing, Inc. v. Pinkerton's Inc., 474 A.2d 436 (R.I. 1984), the Court held that a security service-corporation

could be held liable for thefts of approximately $200,000 perpetrated by one of its employees, because such thefts were a foreseeable result of the defendant's original negligence in failing to use reasonable care to select a competent employee. Id.

Although the Supreme Court of Rhode Island has not had the opportunity to consider this exact factual situation, courts in other jurisdictions have ruled that criminal acts resulting in injury by fire do not function as an intervening cause to cut off liability from a bulk manufacturer of non-fire retardant foam products. Specifically, in AMPRO, supra, in which students intentionally and criminally set ablaze a gymnasium mat with a Butane lighter, the court ruled that the students' arson was not an intervening/superseding cause as a matter of law and thus did not insulate the defendant-foam manufacturer and distributor from liability. Noting that a superseding cause is not legally sufficient if it is reasonably foreseeable, the court concluded that a jury could reasonably have determined that vandalism involving fire is foreseeable in a high school. Rationale: "This is particularly significant, considering the testimony that students smoked in the mezzanine area. A careless student or one interested in minor damage (like cigarette burns in the Portapit) could conceivably have started a fire as serious as the one that occurred. In addition, the jury

could reasonably have found that the unreasonable risk of harm was foreseeable, based on [plaintiff's] evidence that the foam ignited easily and burned rapidly and intensely." Id.

Similarly, in Kimco Development Corp. v. Michael D's Carpet Outlets, 536 Pa. 1, 637 A.2d 603 (1993), the Pennsylvania Supreme Court affirmed a judgment against General Foam Corporation -- *the very same defendant in the instant matter* -- despite negligent conduct by a co-defendant. In this case, General Foam, the manufacturer of foam carpet padding, was held liable for damages caused by a fire that began as a result of a carpet retailer's piling the carpet padding too close to ceiling light bulbs. The retailer, "Michael D's," had received a large shipment of polyurethane foam carpet padding from its manufacturer, General Foam, and stored the foam from floor to ceiling in its basement, but too close to ceiling light bulbs, which caused the foam padding to ignite. General Foam had failed to warn of the highly inflammatory nature of the foam padding and its capacity for causing rapid and uncontrolled spread of fire after ignition.

On appeal, the court concluded that the fire had concurrent causes, to wit, Michael D's negligence in storing the foam padding too close to ceiling light bulbs and General Foam's negligence and fault in failing to warn of the highly flammable nature of the padding. The court

rejected General Foam's argument -- *the very same argument put forth by the very same defendant in the instant case* -- that the "alleged" product defect (failure to warn) was not the legal cause of the fire. Rather, the court ruled that both General Foam and Michael D's were comparatively liable for the harm. Id.

Thus it is apparent that General Foam has been down this road before, and its very same arguments have been rejected, as they should be rejected in this case. GFC's manufacture of non-fire retardant foam without proper warning has caused injury and destruction in past cases, and it did so again at the Station to a catastrophic degree. Foam will continue to ignite and cause harm until manufacturers like GFC spend the extra money to incorporate flame-retardant material in all their foam products. The next case could involve, say, packaging foam ignited in a warehouse -- as it is clearly foreseeable that warehouse workers might mistakenly drop a cigarette butt into such material or pile it too close to ceiling lightbulbs -- or it could be another inferno in a nightclub, shopping center or restaurant. It is entirely foreseeable -- indeed, it is a matter of fact -- that polyurethane foam will end up in buildings of private or public assembly and, when ignited by negligence, arson, or by whatever cause, will exacerbate damages with its rapid spread and toxic smoke.

Although GFC states that the foam in question was meant

to be used "legally" as "packing foam," the exact nature and purpose of the foam is an issue of fact for the jury to decide. In fact, asserting such a specific use as "packing foam" contradicts GFC's argument that its foam can be put to "hundreds" of possible uses. GFC's Memorandum in Support of Motion to Dismiss, p.13, 33.

In sum, the result -- fast spreading fire -- was foreseeable in the instant case. It is arguable that the injury and death may have been *wholly* avoided in the instant case, had the Defendants made proper product warnings as to the non-fire retardant nature of its foam and/or incorporated fire retardant chemicals into its foam. Had the pyrotechnics that night at the Station nightclub come into contact with a flame-retardant foam, rather than the foam manufactured by the Defendants in this case, the fire would have spread at an "ordinary rate" and may have been extinguished without serious harm. There are only a few worst cases of public fire in American history. And that is because, in this case, the Defendants' foam spread flame and toxic smoke faster than hundreds of people could react. This was a foreseeable result.

## VI. Conclusion

For the reasons stated herein, this Court should deny the Defendants' Rule 12(b)(6) motion to dismiss.

By their Attorneys,
RESMINI LAW OFFICES, LTD.
BY:

RONALD J. RESMINI, ESQ.#0484
155 South Main St.
Suite 400
Providence, RI 02903
DATED: June 18, 2004
(401)751-8855

CERTIFICATION

I hereby certify that on this 18th day of June, 2004 I mailed a copy of the within Memorandum and Objection to Motion to Dismiss by regular mail, postage prepaid to the following:

Joseph V. Cavanagh, Jr., Esq.
Kristin E. Rodgers, Esq.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, R.I. 02903

Gerald C. DeMaria, Esq.
James A. Ruggieri, Esq.
Higgins, Cavanagh & Cooney
123 Dyer Street
Providence, R. I. 02903

Marc DeSisto, Esq.
DeSisto Law Offices
211 Angell St.
P O BOX 2563
Providence, R.I. 02906

Christopher C. Fallon, Jr., Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

58

Carl A. Henlein, Esq.
John R. Crocket, III, Esq.
Susan A. Wettle, Esq.
Frost Brown Todd
400 West Market Street, 32nd Floor
Louisville, KY 40202

Howard A. Merten, Esq.
Eric M. Sommers, Esq.
Vetter & White
20 Washington Place
Providence, R.I. 02903

James T. Murphy, Esq.
Thomas R. Bender, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, R.I. 02903

Mark T. Reynolds, Esq.

BOYER, REYNOLDS & DeMARCO, LTD.
170 Westminster St.
Suite 200
Prov., RI 02903

James H. Reilly, III, Esq.
Donald J. Maroney, Esq.
KELLY, KELLEHER, REILLY & SIMPSON
146 Westminster St.
Suite 500
Prov., RI 02903

Deborah G. Solmor, Esq.
Edward M. Crane, Esq.
Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive, Suite 2100
Chicago, Il. 60606

Faith A. LaSalle, Esq.
40 Westminster Street, Suite 201
Providence, R.I. 02903

James R. Lee, Esq.
Civil Division
Department of Attorney General
150 South Main Street
Providence, R.I. 02903

Randall L. Souza, Esq.
Fred A. Kelly Jr., Esq.
Nixon Peabody, LLP
One Citizens Plaza, Suite 700
Providence, R.I. 02903

Andrew J. Trevelise, Esq.
Reed Smith LLP
2500 One Liberty Plaza
Philadelphia, Pa. 19103

Robert I. Reardon, Jr., Esq.
160 Hempstead St.
New London, CT 06320

W. Thomas McGough, Jr., Esq.
James J. Restivo, Jr., Esq.
REED SMITH LLP
435 Sixth Ave.
Pittsburgh, PA 15219

Brian Cunha, Esq.
Karen A. Alegria, Esq.
904 Broadway
East Prov., RI 02914

Thomas C. Angelone, Esq.
HODOSH, SPINELLA & ANGELONE
One Turks Head Place
Suite 1050

Scott J. Tucker, Esq.
TUCKER HEIFETZ & SALTZMAN LLP
Three School St.
Boston, MA 02108

Elaine M. Orsini

**CARL GIFALDI and EVA GIFALDI, individually, and C-KITCHENS ASSOCIATES, INC., a corporation, Plaintiffs, -vs- JEFFERSON CHEMICAL COMPANY, TEXACO CHEMICAL INTERNATIONAL TRADER, INC., RUBICON CHEMICALS, INC., ICI AMERICAS, INC. and MOBAY CHEMICAL CORPORATION, Defendants.**

91-CV-0677E(M)

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

1995 U.S. Dist. LEXIS 206

January 10, 1995, Decided
January 11, 1995, FILED

**NOTICE**: NOT FOR PUBLICATION

**CASE SUMMARY:**

PROCEDURAL POSTURE: Plaintiffs, a building owner and a lessee, filed a products liability action on theories of negligence and strict liability against defendant chemical suppliers to recover damages for the loss of a building by fire. One chemical supplier filed a motion for summary judgment.

**OVERVIEW**: The building owners and lessee claimed that the fire which destroyed their building was exacerbated by the building's polyurethane foam insulation, which was created by the mixture of chemicals sold by the chemical suppliers and which mixture the chemical suppliers knew was highly flammable. The building owners and lessee argued that the chemical suppliers failed to adequately warn of the flammable nature of the combined chemicals and that the chemicals were unreasonably dangerous. The court denied one chemical supplier's motion for summary judgment. A factual issue existed as to whether the chemical supplier moving for summary judgment had supplied one of the chemicals used in the foam insulating the destroyed building. As there was proof that the chemical supplier knew that its chemical would be used in the insulation foam, it could be held liable to the building owners and lessee even though its chemical alone was not defective. Finally, the bulk supplier doctrine was inapplicable; even if it was applicable, there was a genuine issue of material fact as to the adequacy of the chemical supplier's warnings of the flammability of the foam created with its chemical.

**OUTCOME**: The chemical supplier's motion for summary judgment was denied.

**CORE TERMS**: isocyanate, polyurethane, foam, summary judgment, insulation, supplier, polyol, non-movant, moving party, supplied, bulk, genuine issue, duty to warn, chemical, sprayed, color, essential element, initial burden, material fact, flammability, warned, unreasonably dangerous, deposition testimony, evidence to prove, strict liability, standing alone, factual issue, modification, deposition, flammable

**COUNSEL: FOR PLAINTIFFS**: Keith A. Hanson, Esq., Minneapolis, MN. John J. Quackenbush, Jr., Buffalo, NY.

**FOR DEFENDANTS**: Peter D. Braun, Esq., Buffalo, NY. Philip A. Milch, Esq., Buffalo, NY. E. Lambert Farmer, Jr., Esq., Lexington, KY. Gerard E. O'Connor, Esq., Buffalo, NY. Allison Kyles, Esq., Denver, CO.

**JUDGES:** John T. Elfvin, U.S.D.J.

**OPINION BY:** John T. Elfvin

**OPINION: MEMORANDUM and ORDER**

The plaintiffs brought this products liability action on theories of negligence and strict liability alleging inter alia that an August 1987 fire which badly damaged a building located at 3253 Walden Avenue, Depew, N.Y. ("the building") was exacerbated by the building's polyurethane foam insulation, a constituent element of which -- namely, isocyanate -- was supplied by defendant Mobay Chemical Corporation ("Mobay"). The building was owned by plaintiffs Carl and Eva Gifaldi and housed the offices, showroom and warehouse of plaintiff C-Kitchens Associates, Inc. ("C-Kitchens"). Before this Court is Mobay's motion for summary judgment made pursuant to FRCvP n1 56(b). The motion will be denied.

- - - -Footnotes- - - - - - - - - - - - - - - - -

n1 Federal Rules of Civil Procedure.

- - -End Footnotes- - - - - - - - - - - - - - -

Along with isocyanate, the other primary constituent element of polyurethane foam is polyol. The plaintiffs allege that defendants Jefferson Chemical Company and Texaco Chemical International Trader, Inc. sold and supplied polyol knowing that its almost exclusive use was to fabricate polyurethane foam, and that defendants Rubicon Chemicals, Inc. ("Rubicon") and Mobay sold and supplied isocyanate knowing that it too was used almost exclusively to fabricate such foam. The plaintiffs claim that polyol and isocyanate, as designed and manufactured by the defendants for use in polyurethane foam, are unreasonably dangerous because the product they combine to create is highly flammable and that the defendants failed to warn them adequately of this.

The defendants allegedly sold their respective products to Dumont Co., Inc. ("Dumont"), which in turn sold the chemicals to one Carl McQueen, who mixed the polyol and isocyanate at the building to form polyurethane foam insulation, which then was sprayed into the building. The building and contents subsequently were severely damaged by fire; the insulation is alleged to have been a contributing factor to that loss.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. See FRCvP 56(c). In making such determination, a court must view the facts in the light most favorable to the non-movant and any doubts as to the existence of a genuine issue for trial should be resolved against the moving party. Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988). The moving party bears the initial burden of establishing that no genuine issue exists as to a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). If, as here, the non-movant bears the burden of proof at trial, the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of the non-movant's claim. Id. at 325. Once the moving party has established its initial burden, the non-movant must set forth specific facts showing that there is a genuine and material issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Such a

showing must consist of more than a "scintilla of evidence"; the non-movant must show that there is evidence on the basis of which a reasonable juror could return a verdict in his favor. Id. at 252. Thus, if the non-movant fails to make such a showing re any essential element of a claim, summary judgment on that claim is appropriate.

Mobay argues that summary judgment is warranted because the plaintiffs have proffered no evidence to prove that Mobay was the supplier of the isocyanate at issue. In the alternative, it argues that McQueen's modification of Mobay's isocyanate -- i.e., combining it with polyol to form polyurethane foam so altered the product as to insulate Mobay from liability for the resulting product, and that, because it was a "bulk supplier" as that term is used in the relevant caselaw, it had no duty to warn a remote user of its product, such as the plaintiffs. Such arguments will be addressed seriatim.

Mobay correctly notes that, under New York law, products liability claims based on theories of strict liability or negligence require proof identifying the product at issue as the defendant's. It then argues that summary judgment is appropriate because the plaintiffs have offered "no evidence to prove which, if any, of the defendant suppliers in this action supplied the chemicals comprising the polyurethane insulation sprayed into the plaintiffs' building." Memorandum of Law in Support of Defendant Mobay's Motion for Summary Judgment, at 10-11. Such assertions are belied by the following evidence re identity that the plaintiffs have proffered. First, if believed, the affidavit of Carl Gifaldi, see Plaintiffs' Memorandum in Opposition to Defendant Mobay's Motion for Summary Judgment, at Exh. B, and the deposition testimony of Dumont president Leon Ackerly and Carl McQueen (taken, respectively, March 3 and February 19, 1993), see id. at Exh. H, establish that McQueen applied polyurethane foam to various portions of the building at different times between April and September, 1972, that he acquired the chemicals for such from Dumont and that the insulation was never covered or coated after it was applied. Further, Ackerly testified that during 1971 and 1972 Dumont was being supplied with isocyanate from only two sources, namely, Rubicon and Mobay, see Ackerly Deposition Transcript, at 201-202, and that the color of the foam produced when using isocyanate from Rubicon was distinctly different from the color of the foam when the Mobay isocyanate was used, making it "very obvious, when you sprayed them, which isocyanate you were using." Id. at 208. Ackerly cannot specifically state whether the isocyanate that McQueen procured from Dumont was Mobay's but, given that the plaintiffs have offered the deposition testimony of C-Kitchens employee John Tillery (taken March 11, 1993) -- see Plaintiffs' Memorandum in Opposition, Exh. H, Tillery deposition at 116, and the affidavit of Carl Gifaldi, supra, in which each states that, after the insulation work was completed, two colors of foam existed in the building -- a reasonable jury could infer that Mobay's isocyanate (along with Rubicon's) was used in the building. In short, a factual issue exists re the identity of the isocyanate used.

Mobay next argues that, given the substantial modification that McQueen made to the isocyanate -- i.e., by mixing it with polyol and creating polyurethane --and given that the plaintiffs have offered no proof that isocyanate, standing alone, is defective and unreasonably dangerous -- such proof having been offered only re polyurethane --, it cannot be maintained

that isocyanate caused the plaintiffs' injury. This argument requires little discussion. It was previously raised by Mobay in its motion to dismiss the Complaint but was rejected and the motion denied because this Court concluded that under New York law "a manufacturer may be held liable if he knows his product will be altered for use in a dangerous manner, regardless of whether his product standing alone is 'defective'," and that the plaintiffs had sufficiently alleged such. See Memorandum and Order filed April 1, 1992 ("the April 1st Order"), at 7. Of course proof, not allegation, is needed to respond successfully to a summary judgment motion. The plaintiffs have offered proof that Mobay sold isocyanate to Dumont knowing it would be used to make polyurethane, that Mobay participated in the design and development of the polyurethane foam industry in this country and that Mobay had known since the late 1960's -- i.e., prior to the sale of the isocyanate at issue -- that polyurethane foam was dangerously flammable -- see Plaintiffs' Memorandum in Opposition, at Exh. -- and Mobay has not challenged this proof or the New York legal authority this Court explicated and relied on in the April 1st Order. Therefore, there is no sound reason to alter the above-quoted conclusion of such Order.

Finally, Mobay argues that summary judgment is appropriate because under the "bulk supplier doctrine" -- which holds that a bulk supplier is not liable to remote users injured by products incorporating the bulk supplier's product -- it had no duty to warn the plaintiffs. See Rivers v. AT&T Technologies, Inc., 147 Misc. 2d 366, 554 N.Y.S.2d 401 (S. Ct., N.Y.Co., 1990). Again, this argument was specifically rejected by the April 1st Order wherein this Court stated: "A rationale for the "bulk supplier doctrine" *** is that imposing liability on such a party would oblige it to research all possible uses and risks of finished products its goods might be used in. Such concern is not present here because polyol and isocyanate are claimed to be used almost exclusively in polyurethane foam and the defendants allegedly knew the dangers of polyurethane insulation." n2 Id. at 11, fn.10. Further, even assuming the applicability[*9] of the doctrine, Mobay would still have had a duty to warn intermediaries such as Dumont, and the plaintiffs have offered proof that, not only were they and McQueen not warned about the flammability characteristics of polyurethane foam, but that Dumont too was not adequately warned -- see affidavit of Dr. R. Brady Williamson (sworn to August 23, 1993) -- and in fact was misled re the flammability of the foam. See Ackerly deposition, at 80-81 and 92-93. Thus, a factual issue exists re the adequacy of Mobay's warnings.

- - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 The plaintiffs have offered proof of such claim and allegation for the instant motion. See, e.g., Plaintiffs' Memorandum in Opposition, at Exh. E.

- - - - -End Footnotes- - - - - - - - - - - - - - - -

Accordingly, it is hereby ORDERED that the defendant's motion for summary judgment is denied, and that the plaintiffs and Mobay shall appear before Part III of this Court at 3:00 p.m. or as soon thereafter as they may be heard on the 10th day of February, 1995 to set a date for trial.

**DATED:** Buffalo, N.Y., January 10, 1995
John T. Elfvin, U.S.D.J

that isocyanate caused the plaintiffs' injury. This argument requires little discussion. It was previously raised by Mobay in its motion to dismiss the Complaint but was rejected and the motion denied because this Court concluded that under New York law "a manufacturer may be held liable if he knows his product will be altered for use in a dangerous manner, regardless of whether his product standing alone is 'defective'," and that the plaintiffs had sufficiently alleged such. See Memorandum and Order filed April 1, 1992 ("the April 1st Order"), at 7. Of course proof, not allegation, is needed to respond successfully to a summary judgment motion. The plaintiffs have offered proof that Mobay sold isocyanate to Dumont knowing it would be used to make polyurethane, that Mobay participated in the design and development of the polyurethane foam industry in this country and that Mobay had known since the late 1960's -- i.e., prior to the sale of the isocyanate at issue -- that polyurethane foam was dangerously flammable -- see Plaintiffs' Memorandum in Opposition, at Exh. -- and Mobay has not challenged this proof or the New York legal authority this Court explicated and relied on in the April 1st Order. Therefore, there is no sound reason to alter the above-quoted conclusion of such Order.

Finally, Mobay argues that summary judgment is appropriate because under the "bulk supplier doctrine" -- which holds that a bulk supplier is not liable to remote users injured by products incorporating the bulk supplier's product -- it had no duty to warn the plaintiffs. See Rivers v. AT&T Technologies, Inc., 147 Misc. 2d 366, 554 N.Y.S.2d 401 (S. Ct., N.Y.Co., 1990). Again, this argument was specifically rejected by the April 1st Order wherein this Court stated: "A rationale for the "bulk supplier doctrine" *** is that imposing liability on such a party would oblige it to research all possible uses and risks of finished products its goods might be used in. Such concern is not present here because polyol and isocyanate are claimed to be used almost exclusively in polyurethane foam and the defendants allegedly knew the dangers of polyurethane insulation." n2 Id. at 11, fn.10. Further, even assuming the applicability[*9] of the doctrine, Mobay would still have had a duty to warn intermediaries such as Dumont, and the plaintiffs have offered proof that, not only were they and McQueen not warned about the flammability characteristics of polyurethane foam, but that Dumont too was not adequately warned -- see affidavit of Dr. R. Brady Williamson (sworn to August 23, 1993) -- and in fact was misled re the flammability of the foam. See Ackerly deposition, at 80-81 and 92-93. Thus, a factual issue exists re the adequacy of Mobay's warnings.

- - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 The plaintiffs have offered proof of such claim and allegation for the instant motion. See, e.g., Plaintiffs' Memorandum in Opposition, at Exh. E.

- - - - -End Footnotes- - - - - - - - - - - - - - - -

Accordingly, it is hereby ORDERED that the defendant's motion for summary judgment is denied, and that the plaintiffs and Mobay shall appear before Part III of this Court at 3:00 p.m. or as soon thereafter as they may be heard on the 10th day of February, 1995 to set a date for trial.

**DATED:** Buffalo, N.Y., January 10, 1995
John T. Elfvin, U.S.D.J